# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

STILLWATER OF CROWN POINT    )
HOMEOWNER'S ASSOCIATION, INC.,  )
individually and on behalf of its members; )
ROGER P. MAHONEY; KENT KOLODZIEJ; and )
KEVIN J. and MARGARET MCKENNA,  )
    Plaintiffs,        )
              )
   v.          )   CAUSE NO.: 2:09-CV-157-PRC
              )
JACK KOVICH, INNOVATIVE ENTERPRISES, )
LTD., ROBERT STIGLICH, HAWK   )
DEVELOPMENT CORP., and CITY OF  )
CROWN POINT, INDIANA,     )
     Defendants.     )

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment Against Defendant City of Crown Point, Indiana [DE 97], filed by Plaintiffs Stillwater of Crown Point Homeowner's Association, Inc., individually and on behalf of its members; Roger P. Mahoney; Kent Kolodziej; Kevin J. McKenna; and Margaret McKenna (collectively "Plaintiffs") on March 4, 2011. A response was filed by the City of Crown Point, Indiana (the "City") on April 19, 2011. Plaintiffs filed a reply on May 17, 2011, and, with leave of Court, Plaintiffs filed an amended reply on May 18, 2011.

This is the story of two subdivisions and three road crossings in Crown Point, Indiana. The Stillwater of Crown Point Subdivision ("Stillwater Subdivision") was developed by Stillwater Properties, LLC, Innovative Enterprises, Ltd., Robert Stiglich, and Jack Kovich. The Pine Hill Subdivision ("Pine Hill") was developed by Hawk Development Corp. Located near the border of the Stillwater Subdivision and Pine Hill is Smith Ditch. Three road crossings–Greenview Place, Stillwater Parkway, and Crooked Creek Trail–span Smith Ditch. The crossings at Greenview Place

and Stillwater Parkway are contained within the Stillwater Subdivision. The crossing at Crooked Creek Trail connects the Stillwater Subdivision and Pine Hill, with Hawk constructing a "stub section" of the crossing up to the property line, and Stillwater Properties, LLC constructing the remainder of the crossing, including that portion that spans the channel of Smith Ditch. Each crossing was constructed by placing fill material in Smith Ditch and the adjacent wetlands along with two thirty-six inch culverts to convey the flow of water in Smith Ditch under the crossings. In September 2008, flooding occurred in the subdivisions as water backed up behind the crossings, adversely affecting homes in the subdivisions, including those of Kent Kolodziej in Pine Hill and Roger P. Mahoney and Kevin J. and Margaret McKenna in Stillwater Subdivision.

In the instant motion, Plaintiffs seek summary judgment against the City only on their claim of negligence per se for alleged violations of the Indiana Flood Control Act and Crown Point Flood Control Ordinance, arguing that the City violated its duties under both laws by allowing the unpermitted construction of the three crossings, which led to flooding damages to homeowners' property.

## PROCEDURAL BACKGROUND

On June 4, 2009, Plaintiffs filed a Complaint against Jack Kovich, Innovative Enterprises, Ltd., Robert Stiglich, Stillwater Properties, LLC, Hawk Development Corp., and the City of Crown Point, Indiana, seeking injunctive relief and damages.

Count IV of the Complaint alleges that the City was negligent per se because it violated the Indiana Flood Control Act and Crown Point Ordinance by permitting the construction of three crossings of Smith Ditch in the Stillwater of Crown Point and Pine Hill subdivisions, despite the fact that the developers had not obtained floodway construction permit for the crossings from the Indiana Department of Natural Resources. Count V of the Complaint alleges that the City breached its duty

owed to Plaintiffs to exercise reasonable care in undertaking, approving, and upgrading the development of streets and drainage infrastructure in the two developments. Count VI alleges that the three crossings constitute public and private nuisances and that Plaintiffs have been harmed by the nuisance conditions created by the City.

Hawk Development Corporation filed an Answer on August 6, 2009. Innovative Enterprises, Ltd. and Jack Kovich filed an Answer on August 14, 2009. The City of Crown Point filed an Answer on September 1, 2009. Robert Stiglich filed an Answer on November 30, 2009.

On October 9, 2009, a Clerk's Entry of Default was entered against Stillwater Properties, LLC. On November 16, 2009, Defendant Stillwater Properties, LLC was severed as a party defendant for purposes of 28 U.S.C. § 636(c), and the case against Stillwater Properties, LLC only remains pending before Chief Judge Philip P. Simon.

As the remainder of the parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case, this case was reassigned to the undersigned Magistrate Judge. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary

judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule

56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

Stillwater of Crown Point subdivision (the "Stillwater Subdivision") and Pine Hill subdivision ("Pine Hill") are residential subdivisions developed in Crown Point, Indiana. Smith Ditch is a tributary of the Main Beaver Dam Ditch, the drainage basin for which includes the Stillwater Subdivision and Pine Hill, as well as areas upstream.

## A. The Crossings

The development of the Stillwater Subdivision included three street crossings of Smith Ditch–at Greenview Place, Stillwater Parkway, and Crooked Creek Trail (collectively the "Crossings"). The crossings at Greenview Place and Stillwater Parkway are located in Phase 1 of the Stillwater Subdivision, which was approved by the City in 1998. The crossing at Crooked Creek Trail is located in Phase 5 of the Stillwater Subdivision, which was approved by the City in 2003 with the exception of the Crooked Creek Trail Crossing. With respect to Phase 5, the City demanded that the Stillwater Subdivision developer provide hydraulic and hydrologic calculations to prove the crossing at Crooked Creek Trail was properly sized. Kovich and Innovative Enterprises understood that the City required the construction of the crossing at Crooked Creek Trail to connect the two subdivisions.

All three of the Crossings were constructed by placing two 36-inch culverts to convey the flow of water in Smith Ditch under each of the street crossings. Jonathan E. Jones, P.E., D.WRE, Plaintiffs' expert, found that the channel and banks of Smith Ditch are a "floodway" as that term is defined under Indiana law and Indiana Department of Natural Resources ("IDNR") regulations and that the construction of the Crossings was subject to IDNR's jurisdiction. Jones confirmed with the IDNR that the crossings were within the IDNR's jurisdiction. The upstream drainage areas at all three of the Crossings exceed one square mile. All three Crossings extend across the entire channel at each location.

Jones opines that "the crossings, as constructed, would cause rises during a 100-year event in excess of the 0.14-feet allowed by IDNR regulations. The three crossings of Smith Ditch are drainage structures that adversely affect the efficiency of and unduly restrict the capacity of the Smith Ditch floodway." Pl. Br., Exh. 2, p. 4. More specifically, Jones opines that the Crossings,

as constructed, will result in an increase of the 100 year frequency flood elevation just upstream of the Crossings of 2.58 - 4.10 feet. Although Defendant Hawk Development's retained expert, Martin S. Mann, P.E., did not conduct a "rigorous engineering review of the modeling data," Pl. Br., Exh. 3, p. 12, Mann "did not find anything objectionable in the Plaintiffs' expert report prepared by Wright Water Engineers, Inc.," *id.* at p. 13. The City's expert, Phillip E. Gralik, P.E. of RW Armstrong, has concluded that additional, bigger culverts are required at each of the Crossings.

## B. IDNR Permits

The IDNR did not issue floodway construction permits for any of the Crossings prior to their construction. The City permitted the construction of the Crossings without floodway construction permits from IDNR.

In 2007, the City of Crown Point first learned from the IDNR that the Crossings were constructed without floodway permits. On February 8, 2007, Daniel M. Klein, then-Mayor of the City of Crown Point, issued a letter entitled "Dear Resident," indicating that the City is "committed to holding accountable those responsible for any cost and modification" of the Crossings and that the City "is currently taking the responsibility to exhaust every avenue in order to find the quickest and most effective resolution." Pl. Br., Exh. 5, p. 1. The letter further provides that the City is "working diligently with the DNR to assess the needs and recommendations for the subdivision." *Id.*

The City contracted with Short Elliot Hendrickson, Inc. ("SEH") to assist the City of Crown Point in modeling the Crossings and obtaining the necessary permits for the Crossings. On June 29, 2007, SEH submitted, on behalf of the City, a Permit Application for Construction in a floodway to IDNR, application No. FW-24400, in which the City proposed replacing the two 36-inch culverts

at each of the Crossings with larger box culverts. Mann commented that the City actively participated in the design, construction and attempted after-the-fact permitting of the Crossings.

On September 28, 2007, the IDNR denied the application for an after-the-fact construction permit for the existing Crooked Creek Trail crossing because "[s]ubmitted computer modeling shows that the 'after-the-fact' existing project adversely affects the efficiency of, or unduly restricts the capacity of, the floodway;" "[s]ubmitted computer modeling shows that the 'after-the-fact' existing project creates an increase in the 100-year frequency flood elevation that poses an unreasonable threat to the safety of life or property," and "[f]ailure to submit a modified project plan with supporting computer modeling that demonstrates the project will not adversely affect the efficiency of, or unduly restrict the capacity of, the floodway." Pl. Br., Exh. 9, p. 3.

As of the date of the briefing on summary judgment, no after-the-fact floodway construction permit for the Crossings had been obtained. Tris Miles, the City Engineer, states that Crown Point requires that developers in Crown Point, Indiana, obtain all necessary permits prior to proceeding with any construction and that the City relies upon developers to obtain these permits without assistance from the City of Crown Point.

### C. The Residences

Plaintiff Kent Kolodziej's residence has a walkout basement at the back of the residence with a basement door elevation of 700.32 feet, which corresponds to cross section 4.51 of Table 1 of Jones' report entitled "Comparison of Pre-development and Existing Conditions HEC-RAS Water Surface Elevations along Smith Ditch." Pl. Br., Exh. 2, p. 3. The pre-developed 100 year frequency flood elevation at this location is 698.86 feet. In contrast, the 100 year frequency flood elevation for the existing conditions with the Crossings is 702.80 feet, more than two feet above the door entrance elevation.

The Plat of Survey for Kolodziej's residence, dated December 23, 2003, shows elevations of "706.65" at the front of the property and "699.0" at the back of the property. Pl. Reply, Exh. 16. The "Grading Notes" provide "1) 706.10 = Reference Elev. (Top of curb @ center of lot); 2) 708.15 = Prop. Finish Grade Elev. @ front line of house)". *Id.* The City's expert, Gralik, opined that the "platted finished floor elevation" for the Kolodziej residence is 708.15 and that the "actual finished floor elevation" is 699.80.

Similarly, Gralik, indicated that the "platted finished floor elevation" for the Jenks home is 706.00 and that the "actual finished floor elevation" is 697.91. Gralik opines that several properties along Smith Ditch "were constructed with finished floor elevations below those required on the subdivision grading plans and plat," including the Kolodziej and Jenks residences. Def. Br., Exh. 2, p. 3. Gralik further opined:

> The intent of the original design was likely to allow the overtopping of the road crossings before the homes flooded, by requiring the finished floor elevations be constructed at a high enough elevation to protect them if a flood, larger than the design event, occurred. Several structures within the subdivision have not followed this guideline.

> To protect the existing structures that were built below the minimum allowable finished floor elevation, the high water elevation must be kept below the finished floor elevation of the lowest unprotected structure with a reasonable amount of freeboard.

*Id.* at pp. 2-3. Tris Miles, the City Engineer, states in his Affidavit that the Kolodziej's home as well as other homes in the Stillwater Subdivision were built at a lower elevation than the elevation designed by the site engineer.

### D. The Flooding

In September 2008, a flooding event occurred in the Stillwater Subdivision and Pine Hill, in which water flooded the homes of Plaintiffs Kevin J. and Margaret McKenna and Roger P.

Mahoney in the Stillwater Subdivision and the home of Kent Kolodziej in Pine Hill.[1]  The McKennas state in response to Hawk Development's Interrogatory No. 19 that their "Home experienced severe flooding in September 2008 . . . .  Water first entered the Home through the sump pump, then started pouring in through the windows.  There was three to four feet of water in our lower level.  In 2009 and 2010, there were multiple events during heavy rains in which floodwater backed up at the Crossings and resulted in water entering the McKennas[sic] property.  The McKennas paid to have a soil berm constructed behind their house after the severe flooding in September 2008.  As a result, water did not enter the Home during the events in 2009 and 2010."  Pl. Br., Exh. 11, p. 10.

In response to the same interrogatory, Kolodziej answered that his home experienced severe flooding in September 2008.  He also answered that flood water from the Crossings had entered his property, but did not infiltrate his home, at least on the following dates: 1/15/2005; 6/5/2005; 4/17/2006; 7/15/2006; 9/13/2006; 12/16/2006; 4/25/2007; 8/31/2007; 1/8/2008; 3/15/2008; 8/25/2008; 12/27/2008; 2/15/2009; 2/27/2009; 3/8/2009; and 10/23/2009.  Pl. Br., Exh. 12, p. 12.

Also in response to that interrogatory, Mahoney answered that his home experienced severe flooding in September 2008 and that "[i]n 2009, there were multiple events during heavy rains in which floodwater backed up at the Crossings and resulted in water entering Mahoney's property.  Water did not enter Mahoney's Home during the events in 2009."  Pl. Br., Exh. 13, p. 9.

### E.  Ongoing Proceedings with IDNR

As part of the ongoing proceedings with IDNR that began in 2007, a meeting was held with IDNR, the City of Crown Point Mayor, and other City officials, including Miles (the City Engineer),

---

[1] On page 6 of their Brief, Plaintiffs represent as an undisputed material fact that "[a]s a result of the severely undersized culverts provided for the Crossings, the Plaintiffs' properties and homes have been subjected to flooding numerous times," citing their response to Jack Kovich and Innovative Enterprises' Interrogatory No. 2 attached as Exhibit 10.  The answer to Interrogatory No. 2 does not contain this information.

in late 2008.  However, in September 2008, just prior to the meeting, the City of Crown Point experienced the storm that led to the above-described flooding.  Miles personally believes that the flood exceeded the IDNR 100 year frequency flood design standards.  Having just experienced the flood, the City officials realized that the projected water level of the SEH model did not accurately reflect observed conditions and explained this to IDNR officials.  Miles represents that IDNR officials agreed with the City that the SEH model submitted with the Permit Application did not reflect the observed conditions and inaccurately portrayed the high water levels projected in the Stillwater Subdivision.  The City expressed concerns that the SEH model did not consider the areas downstream from the Stillwater Subdivision.  As a result, a decision was made to place the City's Permit Application in abeyance so that the City could reevaluate the conditions in the Stillwater Subdivision and prepare a new application which would more accurately reflect the conditions affecting the Crossings.

The City then hired Robinson Engineering in June 2009, with a contract amendment in January 2010, to reevaluate the SEH model in order to resubmit the Permit Application to IDNR.[2] The scope of the services provided by Robinson Engineering included identifying inaccuracies in the 2007 model, identifying the maximum high water elevation that can be allowed within the Stillwater Subdivision while still protecting the existing structures, determining what size culverts at the Crossings are required to reduce the high water elevation for the 100 year flood to the allowable level, identifying the impacts of the modifications on properties downstream of the Crossings and upstream of US 231, and identifying the impact downstream modifications will have

---

[2] The Affidavit of Tris Miles submitted in support of the City's Response in Opposition to Summary Judgment ends with Paragraph 5p, on the third page submitted to the Court.  The pages are unnumbered.  Although paragraphs 17-30 of the City's Statement of Genuine Disputes in its response brief cite paragraphs 5q-bb, 6, and 7 of Miles' Affidavit, those pages of the Affidavit are not included in the submission to the Court.  Thus, any unsupported statements of fact are disregarded.

on hydraulics within the subdivision and on the required culvert sizes. Robinson Engineering found that the April 2007 and the September 2007 HEC-RAS models prepared by SEH contained an error in the length of the stream that resulted in the SEH model yielding larger than necessary culverts.

On January 28, 2011, the IDNR issued a "Notice of Violation" to the City, issuing an enforcement action pursuant to Indiana Code § 14-25.5. The Notice provides that "[t]hree unpermitted culvert crossings over Smith Ditch have been constructed without the required Construction in a Floodway permits." Pl. Reply, Exh. 15, p. 1. The Notice acknowledges that two after-the-fact applications have been denied and that the work on the Crossings was done "without the prior written approval of the Division of Water and is in violation of Indiana Code 14-28-1." *Id*. The IDNR found that the City "has failed to prove that the three culvert crossings and associated fill will not adversely affect the efficiency of or unduly restrict the capacity of the floodway and will not constitute an unreasonable hazard to the safety of life or property." *Id*. The IDNR then identified the action appropriate to mitigate the violation, including that the City remove the fill and culverts from the Crossings and that the City remove all excavated materials from the floodway. From representations made by the parties in open court, the IDNR proceedings are ongoing.

The City owns property rights in the Crossings. The City believes it has a duty to maintain the Crossings but also believes that, to the extent the Crossings were originally built with any inadequacies or defects, it is the responsibility of the person or entity who originally designed and/or built the Crossing to repair and/or replace the Crossings.

## ANALYSIS

In the instant motion, Plaintiffs ask the Court to grant summary judgment in their favor on their claim for negligence per se against the City and to issue an injunction directing the City to timely modify the Crossings so that they comply with the Indiana Flood Control Act at Indiana Code

§ 14-28-1, et seq. and the Crown Point Flood Control Ordinance 1111("Flood Control Ordinance")[3] and to obtain all necessary approval from IDNR for the Crossings. Plaintiffs reason that the City's statute and ordinance violations resulted in crossings with culverts that do not comply with the Flood Control Act or the Flood Control Ordinance and are too small to convey the flow in Smith Ditch during a reasonably anticipated storm, resulting in the flooding that occurred in September 2008 and other flooding and exposing the Plaintiffs and all the homeowners in the subdivisions to an unreasonable risk of flooding in the future. Plaintiffs contend that because the City has exclusive property rights in the Crossings, only an injunction requiring the City to remedy the Crossings will provide a sufficient remedy.

In response, the City argues that it is immune from liability under the Indiana Tort Claims Act, Plaintiffs' claim is barred by the statute of limitations, the City's alleged negligence was not the proximate cause of Plaintiffs' alleged injuries, and that Plaintiffs are not entitled to an injunction. No cross motion for summary judgment has been filed by the City. All other claims by Plaintiffs against the City remain for trial.

### A. Indiana Tort Claims Act

The City asserts that it is immune from liability under the Indiana Tort Claim Act ("ITCA"), which grants immunity under specific circumstances to governmental entities for torts committed by their agencies or employees. The ITCA is construed narrowly and against the grant of immunity. *Hochstetler v. Elkhart Cnty. Highway Dep't*, 868 N.E.2d 425, 426 (Ind. 2007). The party seeking

---

[3] Ordinance 1111 (1980) was amended by Ordinance 1638 (1992). The Flood Control Ordinance, as amended in 1992, was incorporated into § 153 of the Crown Point Code at that time. The 1992 version of the Ordinance was in effect at the time the Greenview Place and Stillwater Parkway crossings were constructed. For ease of reference, the relevant sections of Ordinance 1111, as amended by Ordinance 1638, are described as the "Flood Control Ordinance" but will reference the applicable Crown Point Code section numbers.

In addition, Ordinance 1111 was amended again in 2004 by Ordinance 2004-05-09. The 2004 amendments were likely in effect at the time the Crooked Creek Trail crossing was constructed but they did not change the 1992 version of the Ordinance in any way pertinent to this Motion or the allegations against the City in this motion.

immunity bears the burden of establishing that its conduct comes within the ITCA. *Id*. The determination of governmental immunity under the ITCA is a question of law for the courts. *Id*. The City argues that, because Plaintiffs seek to hold the City liable for failure to "enforce" an Indiana statute and a City ordinance, the City is immune from liability under section 3(8) as a matter of law. Plaintiffs respond that the ITCA does not apply to this claim and that, if the ITCA does apply, the City is not entitled to immunity under section 3(8).

1.      *Scope of the ITCA*

Plaintiffs first respond that the ITCA is inapplicable to the instant request for injunctive relief because the ITCA applies only to claims or suits seeking damages in tort and not for claims seeking injunctive relief. Pl. Br., p. 3 (citing *Bd. of Trs. of Indianapolis Fire Dep't Pension Fund v. City of Indianapolis*, 498 N.E.2d 1002, 1003 (Ind. Ct. App. 1986); *Underwood v. City of Jasper Mun. Utility Servs. Bd.*, 678 N.E.2d 1280, 1283 (Ind. Ct. App. 1997)).

However, in *Holtz v. Board of Commissioners*, 560 N.E.2d 645, 647-48 (Ind. 1990), the Indiana Supreme Court clarified that the ITCA applies to all torts. Rejecting the appellate court's narrow construction of the statutory definition of "loss," the court held:

> We cannot interpret the Tort Claims Act as applying only to some torts.
>
> Even applying the strictest construction, we find that the only logical interpretation to place upon the term "loss" in the statutory definition is to find that the legislature clearly intended to include all torts committed against either persons or property.

*Id*. (considering a case concerning a retaliatory discharge claim brought by a former at-will employee against the county board of commissioners). Courts have continued to follow this ruling. *See, e.g.*, *Cox v. City of Indianapolis*, No. 1:09-cv-435, 2011 WL 3667693, at 4 (S.D. Ind. Aug. 22, 2011) (finding that plaintiff's claim that the city violated its statutory obligation to apportion the costs of a sewer project equally among affected property owners by forgiving the debts of some

14

owners and refusing to issue refunds for others sounded in tort subject to the ITCA under *Holtz* and its progeny); *Cantrell v. Morris*, 849 N.E.2d 488, 495 (Ind. 2006) (recognizing its prior holding in *Holtz* that the ITCA is "applicable to all torts committed against persons or property"); *Irwin Mort. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d 439, 446 (Ind. Ct. App. 2004); *Indiana Dept. of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1077 (Ind. Ct. App. 2001), *trans. denied* (citing *Bienz v. Bloom*, 674 N.E.2d 998, 1003 (Ind. Ct. App. 1996), *trans. denied*); *Burke v. Bd. of Dir. of the Monroe Cnty. Pub. Library*, 709 N.E.2d 1036, 1041-42 (Ind. Ct. App. 1999), *vacated in part on reh'g*, 711 N.E.2d 1288, *trans. denied*, 726 N.E.2d 314 (Ind. 1999).

In *Holtz*, the Indiana Supreme Court defined the term "tort" as

A legal wrong committed upon the person or property independent of contract. It may be either (1) a direct invasion of some legal right of the individual; (2) the infraction of some public duty by which special damage accrues to the individual; (3) the violation of some private obligation by which like damage accrues to the individual.

*Holtz*, 560 N.E.2d at 647 (quoting Black's Law Dictionary (5th ed. 1979)). One of the only two cases cited by Plaintiffs, *Underwood v. City of Jasper Municipal Utility Services Board*, issued in 1997, was rejected by the Indiana Court of Appeals in *Shelly & Sands* in 2001. The court in *Shelly & Sands* recognized that *Underwood*'s finding that not all torts are covered under the ITCA because of the limited statutory definition of "loss" as an "injury to or death of a person or damage to property" was based on the appellate decision in *Holz*, which had been vacated by the Indiana Supreme Court in 1990 on that very issue, as noted above. *See Shelly & Sands*, 756 N.E.2d at 1077 (citing *Underwood*, 678 N.E.2d 1283-84; *Holz v. Bd. of Comm'rs of Elkhart Cnty.*, 548 N.E.2d 1220 (Ind. Ct. App. 1990), *trans. granted and opinion vacated by* 560 N.E.2d 645 (Ind. 1990)).[4]

---

[4] In *Cantrell v. Morris*, the Indiana Supreme Court recognized that the Indiana Court of Appeals in *Underwood* in 1997 had relied on the *appellate* decision in the *Holtz* case from 1990 without acknowledging that the Indiana Supreme Court had overruled the holding in *Holtz* later in 1990. The court then noted that, "[f]or reasons we cannot

Moreover, nothing in *Underwood* indicates that the holding that the plaintiff's tort claims did not fall within the purview of the ITCA was because the plaintiff sought injunctive relief in addition to monetary damages but rather that the plaintiff had not suffered a "loss" as narrowly defined in the vacated *Holtz* decision. *Underwood*, 678 N.E.2d at 1283-84.

In the other case cited by Plaintiffs, *Board of Trustees of Indianapolis Fire Department Pension Fund v. City of Indianapolis*, the plaintiff board of trustees, relying on the Indiana Code, sought to reverse the defendant city's decision to require the board of trustees to utilize a city attorney rather than a privately contracted attorney. 498 N.E.2d 1002, 1003 (Ind. Ct. App. 1986). The city argued that the board of trustees had failed to comply with the ITCA, but the court held that the claims did not sound in tort and, thus, did not fall within the ITCA. *Id.* (citing Ind. Code § 34-4-16.5-1, which provided: "This chapter applies only to a claim or suit in tort.").[5] The Indiana Court of Appeals reasoned that "[t]he complaint filed by the Trustees seeks several forms of injunctive relief; costs and expenses; and, additional relief as may seem just and equitable. . . . There was no award of damages resulting from a tort, and we do not read the complaint as seeking that type of compensation." *Id.* Notably, the court did not find the ITCA inapplicable because injunctive relief was sought but rather because the court perceived the underlying claim as something other than a tort. Moreover, this decision was issued four years prior to the Indiana Supreme Court's decision in *Holtz*.[6]

---

explain, until very recently the Lexis report of the Court of Appeals decision in *Holtz* did not reveal the decision of this Court granting transfer, thereby vacating the Court of Appeals opinion, and reaching the opposite result. The Court of Appeals in other recent cases has recognized this anomaly and held the ITCA applicable to all torts committed against persons or property." 849 N.E.2d 488, 495 n.4 (Ind. 2006) (citing cases).

[5] The current version of § 34-4-16.5-1, which is identical in wording, is found at Indiana Code § 34-13-3-1 (2011).

[6] The only court to cite *City of Indianapolis* for this holding, *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 738 (Ind. Ct. App. 2000), does not discuss or analyze *City of Indianapolis* and declined to decide the issue raised by plaintiffs in *Smith* of whether the ITCA applied to the injunctive relief sought on their tort claim because plaintiffs had

In *Shelly & Sands*, the Indiana Court of Appeals found that the equitable relief sought through a claim of estoppel was barred by the failure of the plaintiff to file a proper notice under the ITCA. 756 N.E.2d at 1078. The court first found that the ITCA does not directly apply to a claim of estoppel because it is not a tort. *Id*. Nevertheless, because the doctrine of equitable estoppel is based on a claim of fraud, either actual or constructive, and because an underlying claim of fraud or constructive fraud (a tort) would be barred by the ITCA absent proper notice, the court concluded that a claim for equitable relief, such as estoppel, would also be barred by the failure to file proper notice. *Id*.

Notably, in this case, Plaintiffs do not suggest that their claim of negligence per se is not a tort. The claim of negligence per se sounds wholly in tort as Plaintiffs allege that the City committed a legal wrong by its violation of the duty set forth in § 14-28-3-5, which resulted in damage to homeowners' personal and real property. *See Holtz*, 560 N.E.2d at 547 (quoting the definition of "tort" in Black's Law Dictionary). Plaintiffs' claim for negligence per se sounds in tort and, thus, invokes the ITCA. The fact that Plaintiff seeks both injunctive relief in addition to monetary damages, and only seeks injunctive relief on this motion, does not nullify the ITCA's applicability. Notably, in this case, the injunctive relief of modifying the Crossings to improve drainage sought by Plaintiffs to remedy the breach of statutory duty is estimated by one expert to cost $2,700.000. Plaintiffs' negligence per se claim falls within the ITCA.

2.     *Immunity*

Seeking immunity, the City specifically invokes section 3(8) under the ITCA, which provides that "[a] governmental agency or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to

---

failed to raise the legal issue before the trial court.

adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8). Plaintiffs respond that the City's action or inaction is not immunized by this provision of the ITCA because the City was not enforcing laws but rather failed to follow laws itself.

Section 3(8) "applies to the decision of any governmental entity and its employees about whether to adopt or enforce any statute, rule, or regulation." *St. Joseph Cnty. Police Dep't v. Shumaker*, 812 N.E.2d 1143, 1147 (Ind. Ct. App. 2004), *trans. denied* (internal quotation marks omitted) (quoting *Quakenbush v. Lackey*, 622 N.E.2d 1284, 1287 n.3 (Ind. 1993), *impliedly overruled on other grounds by Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind. 1990) (rejecting private/public distinction established in *Quakenbush*). Local ordinances, including zoning ordinances, are laws included within the scope of Section 3(8). *See Quakenbush*, 622 N.E.2d at 1286 n.3 (citing cases).

However, "the scope of 'enforcement' is limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience of *another* to laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *Davis v. Animal Control–City of Evanville*, 948 N.E.2d 1161, 1164 (Ind. 2011) (quoting *Mullin v. Mun. City of South Bend*, 639 N.E.2d 278, 283 (Ind. 1994)); *Shumaker*, 812 N.E.2d at 1148, 1150 (discussing extensively the evolution of Indiana case law on the scope of section 3(8)); *see also Chenoweth v. Estate of Wilson*, 827 N.E.2d 44, 48 (Ind. Ct. App. 2005) (recognizing that section 3(8) affords immunity when the government actor is "compelling or attempting to compel the obedience of another to laws" based on the holding in *Shumaker*); *Valparaiso v. Defler*, 694 N.E.2d 1177, 1183 (Ind. Ct. App. 1998) (holding that the City of Valparaiso was not immune under section 3(8) because the city was being forced to comply with the law through a mandate from the Indiana Department of Environmental

Management and was not seeking to compel the obedience of another to the law).  Section 8(3)

"does not include compliance with or following of laws, rules, or regulations by a governmental unit

or its employees.  Nor does it include failure to comply with such laws, rules, or regulations"

*Shumaker*, 812 N.E.2d at 1150.  "[T]he critical determination is not whether a governmental entity

failed to follow procedures; it is whether a governmental entity or employee failed to enforce a law."

*Davis*, 948 N.E.2d at 1164.

More narrowly, section 3(8) "restricts immunity to the adoption and enforcement of laws

(and a failure to do so) which are within the assignment of the governmental entity and that the

legislature intended that a governmental entity be immune only for failing to adopt or enforce a law

that falls within the scope of the entity's purpose or operational power."  *Shumaker*, 812 N.E.2d at

1149, 1150 (citing *King v. Ne. Sec., Inc.*, 790 N.E.2d 474 (Ind. 2003)); *see also Belcher v. Norton*,

497 F.3d 742, 752 (7th Cir. 2007) (recognizing the scope of section 3(8) as set forth in *King* and

*Mullin*); *Harvey v. Bd. of Comm'rs of Wabash Cnty.*, 416 N.E.2d 1296, 1298 (Ind. Ct. App. 1981)

(holding municipality is not entitled to immunity under ITCA when it acted not as a sovereign "but

rather as a subject of the law issued by a higher sovereign," and could be held liable for failing to

erect sign required by state law).[7]

In this case, Plaintiffs' claim under the Flood Control Act is based on Ind. Code § 14-28-3-5,

which provides that:

> A county or municipality may *not* issue a permit for a structure, an obstruction, a
> deposit, or an excavation within a flood hazard area or part of a flood hazard area
> that lies within a floodway *without the prior written approval of the commission* as
> provided in IC 14-28-1.

---

[7] On page 7 of its reply brief, the City cites *Seymour National Bank v. State*, 422 N.E.2d 1223 (Ind. 1981),
which has been specifically overruled by *Quackenbush*.  *See St. Joseph Cnty. Police Dept. v. Shumaker*, 812 N.E.2d
1143, 1147, 1150 (Ind. Ct. App. 2004), *trans. denied*.

Ind. Code § 14-28-3-5 (1998) (emphasis added). The IDNR regulations implementing the requirements of the Flood Control Act also provide that "a county or municipality must not authorize a structure, obstruction, deposit, or excavation within a floodway without the applicant first receiving a license from the department under IC 14-28-1." 312 Ind. Admin. Code 10-1-5. The City reasons generally that Plaintiffs are simply claiming that the City failed to enforce the provisions of the Flood Control Act and the Flood Control Ordinance by allowing construction without determining that the developers had, in fact, obtained appropriate permits, thus bringing the City within the immunity of section 3(8). However, the City offers no analysis in support of immunity under the Indiana Flood Control Act.

It is undisputed on this motion for summary judgment that the Crossings are obstructions located in the floodway of Smith Ditch and that the City issued permits to construct the crossings even though no applications for a floodway construction permit from IDNR were submitted and IDNR never issued a floodway construction permit for any of the Crossings. The Indiana Flood Control Act places an affirmative duty on the City not to issue a permit if prior written approval has not been obtained from IDNR. The City itself failed to comply with the Indiana statute.

The City reasons that it has complied with the Flood Control Act by promulgating the City's Flood Control Ordinance. However, the Flood Control Act does not require the City to pass an ordinance but rather it requires the City to refrain from issuing permits until approval has been given by the IDNR. Nor is the City the governmental entity "charged" with enforcing the Indiana Flood Control Act–enforcement authority lies with the IDNR. Immunity for failing to adopt or enforce a law is limited to the unit of government charged with regulating the area of law. *King*, 790 N.E.2d at 482. Not only is the City *not* charged with enforcing the Indiana Flood Control Act, it is the

subject of an active IDNR enforcement action for violating the Act by issuing permits for the construction of the Crossings in violation of the Act.

In *Davis*, animal control failed to declare a dog dangerous. The Indiana Supreme Court found that animal control was entitled to immunity under section 3(8) because the provision allowing it to declare an animal dangerous constituted an enforcement provision of the ordinance that otherwise states that "[n]o person shall own, keep, or harbor a dangerous animal within the city; except for dangerous animals in compliance with the orders of the Commission . . . ." *Id.* at 1164, 1165 (quoting trial court's decision (citing Evansville, Ind., Animal Control Ordinance § 9.90.30(G) (2006))). The Indiana Supreme Court found that various other provisions of the ordinance, such as *allowing* for the commencement of a proceeding to declare an animal dangerous, for an animal control official to declare an animal dangerous without a proceeding, for precautionary measures that may be imposed if an animal is declared dangerous, for the possibility of the imposition of a fine for a failure to comply with precautionary measures, and for the possibility of destruction of the animal if the precautions are insufficient, all constituted an "activit[y] in which a governmental entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations." *Id*. at 1165 (citing *Mullin*, 639 N.E.2d at 283). The Indiana Supreme Court held that, at worst, the failure of City Defendants to follow these procedures constitutes a failure to enforce the law, and the defendants were entitled to immunity. *Id*. In contrast with animal control, the City of Crown Point was not simply failing to take available steps to ensure that developers obtained permits from the IDNR. The City itself failed to comply with state law prohibiting it from issuing permits for development absent the IDNR approval. Section 3(8) does not provide the City with immunity from suit under the Indiana Flood Control Act.

Similarly, the City is not immune from liability under the City of Crown Point Flood Control Ordinance. Under the Ordinance, the City has the duty to "[e]nsure that construction authorization has been granted by the Indiana Natural Resources Commission for all development projects subject to § 153.05 of this ordinance, and maintain a record of such authorization (either copy of actual permit or letter of recommendation)." Flood Control Ordinance § 153.02(c). Like the Flood Control Act, the Ordinance prohibits the City from issuing a permit for construction in a floodway until a floodway construction permit has been issued by IDNR:

> b. Upon receipt of an application for an Improvement Location Permit, the Building Official shall determine if the site is located within an identified floodway or within the floodplain where the limits of the floodway have not yet been determined.
>
> > 1. If the site is in an identified floodway the Building Official shall require the applicant to forward the application, along with all pertinent plans and specifications, to the Department of Natural Resources and apply for a permit for construction in a floodway.
> >
> > Under the provisions of IC 13-2-22 a permit from the Natural Resources Commission is required prior to the issuance of a local building permit for any excavation, deposit, construction or obstruction activity such as filling, grading, clearing and paving etc. undertaken before the actual start of construction of the building.
> >
> > *No action shall be taken by the Building Official until a permit has been issued by the Natural Resources Commission granting approval for construction in the floodway.* Once a permit has been issued by the Natural Resources Commission, the Building Officials may issue the local Improvement Location Permit, provided the provisions contained in § 153.05 and § 153.06 of this ordinance have been met. The Improvement Location [P]ermit cannot be less restrictive than the permit issued by the Natural Resources Commission.

§ 153.04(b)(1) (emphasis added).

Plaintiffs' claim against the City is not based on the allegation that the City failed to enforce the Ordinance against developers, which it also did, but rather that the City violated the Ordinance

itself.  In *Davis*, the prohibition animal control was enforcing was that "[n]o person shall own, keep, or harbor a dangerous animal . . . ."  948 N.E.2d at 1165.  In *Shumaker*, the Indiana Court of Appeals found that the police department was entitled to immunity for allowing a defendant to be released without posting the proper bond because "it is within the operational purpose or mission of the Department to enforce bond orders and run the jail."  812 N.E.2d at 1151.  This case is distinguishable from both *Davis* and *Shumaker* in that the prohibition is against the *City*'s building official taking any action to issue a Location Improvement Permit until a permit has been issued by the state Natural Resources Commission approving the construction in a floodway.  Although the City failed to require the developers to obtain the proper permits, the City also failed itself to comply with section 153.04(b)(1) by issuing an Improvement Local Permit without first ensuring the developers had obtained the proper state permits.  Section 3(8) does not provide the City with immunity from suit under the Crown Point Flood Control Ordinance.

## B.  Statute of Limitations

The City argues that Plaintiffs' claims are barred by the statute of limitations.  The parties agree that the six-year statute of limitations found at Indiana Code § 34-11-2-7(e) applies but disagree as to when the six-year time period began to run.  Indiana follows the discovery rule for determining when a cause of action accrues.  *See Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687-88 (Ind. Ct. App. 2006) (citing *Habig v. Bruning*, 613 N.E.2d 61, 64 (Ind. Ct. App. 1993), *trans. denied*).[8]  Under the discovery rule, a cause of action accrues–and the statute of limitations begins to run–not when the tortious conduct occurs, but when the plaintiff knows or in the exercise

---

[8]  The City suggests that a cause of action accrues when a wrongful act or omission first produces damages, citing *Bailey v. Martz*, 488 N.E.2d 716 (Ind. Ct. App. 1986), and *Hildebrand v. Hildebrand*, 736 F. Supp. 1512 (S.D. Ind. 1990).  Def. Br., p. 18.  However, the Indiana Court of Appeals in *Habig v. Bruning* recognized that the language cited by the City from *Bailey* "is not a correct statement of the law governing tort cases today; instead, the discovery rule is applied to determine when a cause of action accrues."  613 N.E.2d 61, 63 (Ind. Ct. App. 1993).

of ordinary diligence could discover "that an injury had been sustained as a result of the tortious act of another." *Id*. Plaintiffs argue, and the City does not disagree, that Plaintiffs first discovered the injuries resulting from the City's violations of the Indiana Flood Control Act and the Crown Point Flood Control Ordinance with the flooding event of September 2008 that caused flooding in the Stillwater Subdivision and Pine Hill, resulted in damage to homeowners' real property. This case was filed on June 4, 2009, and, thus, is not barred.

The City has not identified any other evidence indicating knowledge of the City's violations by Plaintiffs prior to the September 2008 flooding. The Court notes that Plaintiffs have identified evidence from homeowner Kolodziej, that floodwaters rose in his yard, but not into his house, on several dates prior to the September 2008 floods: 1/15/2005; 6/5/2005; 4/17/2006; 7/15/2006; 9/13/2006; 12/16/2006; 4/25/2007; 8/31/2007; 1/8/2008; 3/15/2008; 8/25/2008; 12/27/2008; 2/15/2009; 2/27/2009; 3/8/2009; and 10/23/2009. Even if these flooding occurrences fall within the meaning of discovery rule such that this cause of action accrued on the first of those dates, January 15, 2005, the filing of this case would still be well within the six-year statute of limitations.

### C. Negligence Per Se

Plaintiffs have alleged a claim of negligence per se against the City and seek summary judgment in their favor on this claim to the extent they seek injunctive relief as a remedy. Pursuant to Indiana law, a person is liable under a theory of negligence per se if that person 1) violates a duty imposed by statute or ordinance; 2) where the statute or ordinance intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred; and 3) the violation proximately causes the plaintiff's injuries. *Erwin v. Roe*, 928 N.E.2d 609, 616 (Ind. Ct. App. 2010); *see also Kho v. Pennington*, 875 N.E.2d 208, 212-13 (Ind. 2007). Negligence *per se* does not mean liability *per se*. *Id*. A plaintiff must still prove causation

and damages just as in any other negligence claim. *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 704 (Ind. Ct. App. 2004) (citing *City of Gary v. Smith & Wesson, Corp.*, 801 N.E.2d 1222, 1245 (Ind. 2003)). Because Plaintiffs bear the burden of proof at trial, Plaintiff must establish all the elements of the claim.

Generally, the trier of fact determines whether the statute is applicable, whether a violation of the statute occurred, and, if so, whether the violation proximately caused the alleged injury. *Douglas*, 808 N.E.2d 690, 704 (citing *Dawson by Dawson v. Long*, 546 N.E.2d 1265, 1268 (Ind. Ct. App.1989), *trans. denied*). In response to the motion, the City does not oppose and makes no legal or evidentiary argument against Plaintiffs' showing that the statutory duty was imposed on the City, that the City violated the statutory duty, and that Plaintiffs were the class of people intended to be protected by the statute against the type of harm that occurred. The City's only opposition to the claim of negligence per se is on the element of causation. The Court considers each element in turn.

1.     *Statutory Duty and Violation*

Plaintiffs assert that the City violated Indiana Code § 14-28-3-5, Indiana Administrative Code § 10-1-3, and the City of Crown Point Flood Control Ordinance by permitting the construction of the Stillwater Subdivision and Pine Hill, despite the fact that neither the developers nor the City had sought or obtained a floodway construction permit for the Crossings.

The Indiana Flood Control Act ("Flood Control Act") regulates development activities within floodways with a drainage area of greater than or equal to one square mile at the downstream end of the project. Ind. Code § 14-28-1-12; 312 Ind. Admin. Code 10-1-2. The Floodway Control Act and the regulations define a floodway, for purposes of Ind. Code § 14-28-1, Ind. Code § 14-28-3, and Ind. Code § 14-34, to mean "(1) the channel of a river or stream; and (2) the parts of the flood plain adjoining the channel that are reasonably required to efficiently carry and discharge the flood

water or flood flow of a river or stream."  Ind. Code § 14-8-2-102; 312 Ind. Admin. Code 1-1-16.

The Flood Control Act requires IDNR approval prior to the erection of structures or deposits in such

floodways.  Ind. Code §§ 14-28-1-20, 14-28-1-22 (1998); 312 Ind. Admin. Code 10-1-2.

Under the Flood Control Act, a county or municipality is specifically prohibited from

permitting the construction of structures in a floodway without a floodway construction permit from

IDNR:

> A county or municipality may not issue a permit for a structure, an obstruction, a
> deposit, or an excavation within a flood hazard area or part of a flood hazard area
> that lies within a floodway without the prior written approval of the commission as
> provided in IC 14-28-1.

Ind. Code § 14-28-3-5 (1998).  The IDNR regulations implementing the requirements of the Flood

Control Act also provide that "a county or municipality must not authorize a structure, obstruction,

deposit, or excavation within a floodway without the applicant first receiving a license from the

department under IC 14-28-1."  312 Ind. Admin. Code 10-1-5.

The City of Crown Point has incorporated these construction restrictions into the City's

Flood Control Ordinance.  The Flood Control Ordinance imposes upon the City the duty to "[e]nsure

that construction authorization has been granted by the Indiana Natural Resources Commission for

all development projects subject to § 153.05 if this ordinance, and maintain a record of such

authorization (either copy of actual permit or letter of recommendation)."  Flood Control Ordinance

§ 153.02(c).  "Development" is defined to include the construction of roads, the construction of

bridges or culverts, and filling, grading, and excavating operations.  *Id*. at § 153.01(b).  Projects are

subject to § 153.05 of the Flood Control Ordinance if they "will cause any increase in the elevation of the [100 year frequency] flood."[9]  *Id.* § 153.05(a).

In addition, § 153.04 of the Flood Control Ordinance provides that, upon receipt of an application for a building permit for a development located within an identified floodway, the City official

> shall require the applicant to forward the application, along with all pertinent plan and specifications, to the Department of Natural Resources and apply for a permit for construction in a floodway.

> Under the provisions of IC 13-2-22 [now IC 14-28-1] a permit from the Natural Resources Commission is required prior to the issuance of a local building permit for any excavation, deposit, construction or obstruction activity such as filling, grading, clearing, and paving etc. undertaken before the actual start of construction of the building.

> No action shall be taken by the Building Official until a permit has been issued by the Natural Resources Commission granting approval for construction in the floodway. . . . .

*Id.* at § 153.04(b)(1).

It is undisputed by these parties that the Crossings are all in designated floodways and subject to IDNR's jurisdiction pursuant to the Flood Control Act.  Jones, Plaintiffs' expert, opines that the three Crossings were constructed in an identified floodway and that a floodway construction permit from the IDNR was required for all three of the Crossings.  The City does not offer any contrary evidence.  Neither the developers of the Stillwater Subdivision and Pine Hill nor the City

---

[9] The language of section 153.05(a) provides that projects are subject to § 153.05 of the Flood Control Ordinance if they "will cause any increase in the elevation of the regulatory flood."  "Regulatory flood" is defined as "the flood having a one percent probability of being equaled or exceeded in any given year, as calculated by a method procedure which is acceptable to and approved by the Indiana Natural Resources Commission.  The regulatory flood elevation at any location is as defined in § 153.03 of this ordinance.  The 'Regulatory Flood' is also known by the term 'Base Flood.'"  Flood Control Ordinance § 153.03.  Section 153.03 defines a regulatory flood in the Main Beaver Dam Ditch and all tributaries, which would include Smith Ditch, as is "delineated on the 100 year flood profiles in the Flood Insurance Study of the City of Crown Point prepared by the Federal Emergency Management Agency and dated September, 1979."  *Id.* at § 153.03(a).

sought or obtained a floodway construction permit from IDNR for any of the Crossings in Smith Ditch prior to commencement of construction. Said differently, the IDNR did not issue floodway construction permits for any of the Crossings prior to their construction. Thus, the City issued permits for the construction of the Stillwater Subdivision and Pine Hill, including the Crossings, without floodway construction permits from the IDNR in violation of its duties under the Flood Control Act and Flood Control Ordinance. The City's breach of duty was an unexcused violation of Indiana Code § 14-28-3-5, 312 Ind. Admin. Code 10-1-3, and Crown Point's Flood Control Ordinance.

2.    *Intended Purpose of the Statute*

The unexcused violation of the Flood Control Act and the Flood Control Ordinance "constitutes negligence per se if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation." *Kho*, 875 N.E.2d 212-13 (citation and internal quotation marks omitted). The Flood Control Act and Flood Control Ordinance are intended to protect the citizens of Indiana and of the City of Crown Point (like Plaintiffs) from the hazards of development in floodways. Ind. Code §§ 14-28-1-1, 14-281-22(e); Crown Point Ordinance 1638, section 1.

The Flood Control Act sets out its purpose explicitly in the section entitled "Legislative intent":

> (1) The loss of lives and property caused by floods and the damage resulting from floods is a matter of deep concern to Indiana affecting the life, health, and convenience of the people and the protection of property. To prevent and limit floods, all flood control works and structures and the alteration of natural or present watercourses of all rivers and streams in Indiana should be regulated, supervised, and coordinated in design, construction, and operation according to sound and accepted engineering practices so as to best control and minimize the extent of floods and reduce the height and violence of floods.

28

(2) The channels and that part of the flood plains of rivers and streams that are the floodways should not be inhabited and should be kept free and clear of interference or obstructions that will cause any undue restriction of the capacity of the floodways.

Ind. Code § 14-28-1-1.

In addition, the Flood Control Act sets forth the factors that IDNR considers in determining whether to allow a permit applicant to construct in a floodway.

(e) An applicant must receive a permit from the director for the work before beginning construction. The director shall issue a permit only if in the opinion of the director the applicant has clearly proven that the structure, obstruction, deposit, or excavation will not do any of the following:

(1) Adversely affect the efficiency of or unduly restrict the capacity of the floodway.

(2) Constitute an unreasonable hazard to the safety of life or property.

(3) Result in unreasonably detrimental effects upon fish, wildlife, or botanical resources.

Ind. Code § 14-28-1-22.

Similarly, the Flood Control Ordinance explicitly sets forth its purposes and the type of harm it is designed to prevent:

The purpose of this ordinance is to guide development in the flood hazard areas in order to reduce the potential for loss of life and property, and to reduce the potential for health and safety hazards . . . . [T]he City of Crown Point adopts the following floodplain management regulations in order to . . . prevent unwise developments from increasing flood or drainage hazards to others . . . [and] to protect human life and health from flood hazards . . . .

Ordinance 1638, Section 1.

The Flood Control Ordinance accomplishes this purpose by, among other things, requiring that the City ensure that construction activities conducted in a floodway are performed only with the approval of IDNR. *Id*. at §§ 153.02, 153.04. The Plaintiffs, as residents of the City of Crown Point and property owners immediately adjacent to the floodway, are within the class of people the Flood

Control Act and Flood Control Ordinance were enacted to protect from flooding hazards as occurred in September 2008. They deserve the safety protections mandated by these minimum requirements for floodway construction in order to prevent an unduly restricted floodway from creating unreasonable hazards to the safety of their lives, property, and botanical resources.

*3. Proximate Cause*

Liability is established when the violation of a statute or ordinance is the proximate cause of the injury sustained. *Town of Montezuma v. Downs*, 685 N.E.2d 108, 112, 114 (Ind. Ct. App. 1997). "A negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." *Id.* at 114 (citing *City of Portage v. Lindbloom*, 655 N.E.2d 84, 86 (Ind. Ct. App. 1995), *trans. denied*). "In order to find that an injury was the proximate result of a statutory violation, the injury must have been a foreseeable consequence of the violation and would not have occurred if the requirements of the statute had been observed." *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1260 (Ind. Ct. App. 2009) (quoting *Inland Steel v. Pequignot*, 608 N.E.2d 1378, 1383 (Ind. Ct. App. 1993)).

In their motion, Plaintiffs argue that the City's negligence per se resulted in the construction of the three crossings in Smith Ditch with culverts that are too small to convey the flow during a reasonably anticipated storm and expose Plaintiffs, and the general public, to an unreasonable risk of flooding, including the flooding that occurred in September 2008. Plaintiffs reason that it is not necessary to show that the City's negligence was the *sole* proximate cause of the Plaintiffs' injuries but only *a* proximate cause of the injuries. *Indian Trucking v. Harber*, 752 N.E.2d 168, 173 (Ind. Ct. App. 2001). "[L]iability arises if the act, concurring with one or more other causes, is a proximate cause of the injury." *Nat'l R.R. Passenger Crop. v. Everton by Everton*, 655 N.E.2d 360,

366 (Ind. Ct. App. 1995) (citing *Elder v. Fisher*, 217 N.E.2d 847, 852 (Ind. 1966)). "'At a minimum, proximate cause requires that the injury would not have occurred but for the defendant's conduct.'" *Pope v. Hancock Cnty. Rural Elec. Membership Corp.*, 937 N.E.2d 1242, 1247-48 (Ind. Ct. App. 2010) (quoting *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003)).

Under the Flood Control Act, IDNR may not issue a floodway construction permit for a project if the structure, deposit, or obstruction will

> (1) Adversely affect the efficiency of or unduly restrict the capacity of the floodway.
>
> (2) Constitute an unreasonable hazard to the safety of life or property.
>
> (3) Result in unreasonably detrimental effects upon fish, wildlife, or botanical resources.

Ind. Code § 14-28-2-22(e). Jones opined that the Crossings, constructed without authorization from IDNR, violate the first two of these prohibited conditions.

The Crossings, as constructed, will result in an increase of the 100 year frequency flood elevation just upstream of the Crossings of 2.58 - 4.10 feet. Under IDNR regulations, a structure, deposit, or obstruction restricts the capacity of the floodway if it causes an increase in the elevation of the 100 year frequency flood more than 0.14 feet. 312 Ind. Admin. Code 10-2-3. Thus, the Crossings, as built without authorization from IDNR, will increase the 100 year frequency flood elevation between 18 and 29 times the maximum allowable level.[10] In other words, IDNR-approved crossings would have increased the 100 year flood elevations by less than 0.15 feet instead of the 2.58 - 4.10 feet with the Crossings in place. Both Plaintiffs' and the City's experts have opined that

---

[10]  In their brief, Plaintiffs conclude that "[t]he Crossings, as built without authorization from IDNR, will thus increase the 100 year frequency flood elevation at least 24 times the maximum allowable amount." Pl. Br., p. 5. Plaintiffs draw this conclusion by comparing a 100 year flood elevation with the Crossings of 3.42-4.10 feet and the allowable amount of .14 feet under the statute. However, Jones' report shows a range of increased flood elevation with the crossings of 2.58 - 4.10, not 3.42-4.10.

larger crossings are necessary in order for the Crossings to be approvable by IDNR pursuant to § 14-28-1-22(e).

On September 28, 2007, the IDNR denied the application for an after-the-fact construction permit for the existing Crooked Creek Trail crossing because the crossing with the two 36-inch culverts "adversely affects the efficiency of, or unduly restricts the capacity of, the floodway" and "creates an increase in the 100-year frequency flood elevation that poses an unreasonable threat to the safety of life or property." Pl. Br., Exh. 9, p. 3. Plaintiffs' expert has opined that the Crossings create an unreasonable hazard to the safety of property by causing increased water depths for properties in the Subdivision and Pine Hill.

Plaintiffs argue that the City's negligence per se was the proximate cause of flooding injuries to Plaintiffs' properties as a result of the unduly restricted floodway, specifically identifying flooding experienced by three Plaintiffs. First, the McKennas' home experienced severe flooding in September 2008 when water entered the home through the sump pump and then started to pour in through the windows, leaving three to four feet of water in the lower level. Although flood water also backed up onto the McKennas property multiple times during heavy rains in 2009 and 2010, the water did not enter the McKenna home on these occasions because the McKennas paid to have a soil berm constructed behind their house after the severe flooding in September 2008. Second, Plaintiff Mahoney's home experienced severe flooding in September 2008, and in 2009, floodwater backed up at the Crossings and resulted in water entering Mahoney's property, but not his home, multiple times during heavy rains. Third, Plaintiff Kolodziej's home experienced severe flooding in September 2008 and flood water from the Crossings entered his property, but not his home, at least on the following dates: 1/15/2005; 6/5/2005; 4/17/2006; 7/15/2006; 9/13/2006; 12/16/2006;

4/25/2007; 8/31/2007; 1/8/2008; 3/15/2008; 8/25/2008; 12/27/2008; 2/15/2009; 2/27/2009; 3/8/2009; and 10/23/2009.

Plaintiffs offer an analysis of the pre- and post-Crossings 100 year frequency flood elevations in relation to the residence of Plaintiff Kolodziej only. The pre-developed 100 year frequency flood elevation at the location of Kolodziej's residence is 698.86 feet. Kolodziej's residence has a basement door entrance elevation of 700.32 feet, based on the survey conducted for Jones. In contrast, the 100 year frequency flood elevation for the existing condition at the same location, with the Crossings as they currently are, is 702.80 feet, which is more than two feet above the door entrance elevation and almost four feet above the pre-developed 100 year frequency flood elevation. This is also almost four feet above the Flood Control Act's allowable 0.14 feet increase of the 100 year frequency flood elevation as a result of a structure, deposit, or obstruction that restricts the capacity of the floodway.

Plaintiffs reason that, if a floodway construction permit had been sought prior to the construction of the Crossings, the Flood Control Act would have required IDNR to require larger crossings before approving the floodway construction permit in order to prevent or limit the risk of flooding. Plaintiffs further reason that, if the City would have complied with its duties under the Flood Control Act and the Flood Control Ordinance, the Crossings would not have been constructed in such a way that adversely affects the efficiency of and unduly restricts the capacity of the floodway. Thus, Plaintiffs argue the flooding injuries to the Plaintiffs would not have occurred and the continuing hazard to the safety of the Plaintiffs' life and property would not exist but for the City's breach of its statutory duty because the maximum allowable flood would have been 0.14 feet or less above the pre-developed 100 year frequency flood elevation at the location of Kolodziej's residence of 698.86 feet, for a total of 699 feet, which is below the basement door entrance elevation

of 700.32 feet. Plaintiffs contend that the City should have foreseen that permitting the construction of a development in a floodway without a permit–or even any input–from IDNR prior to beginning construction in a floodway would result in flooding. As a result, Plaintiffs conclude that the failure to do so has proximately caused significant actual and potential flooding injuries to Plaintiffs.

The City contends that the City's actions were not the proximate cause of Plaintiffs' injuries because Kolodziej's residence was built at an elevation below that designed by the site engineer as shown in the Plat of Survey. The City's expert, Phillip E. Gralik, P.E., of RW Armstrong, opines in his July 9, 2010 opinion, that several properties along Smith Ditch "were constructed with finished floor elevations below those required on the subdivision grading plans and plat," including the Jenks and Kolodziej residences. Def. Br., Exh. 2, p. 3. The Plat of Survey for Kolodziej's residence, dated December 23, 2003, shows "706.65" at the front of the property and "699.0" at the back of the property. Pl. Reply, Exh. 16 The "Grading Notes" provide "1) 706.10 = Reference Elev. (Top of curb @ center of lot); 2) 708.15 = Prop. Finish Grade Elev. @ front line of house)". *Id*. In his expert report, Gralik stated that the "platted finished floor elevation" for the Kolodziej residence is 708.15 and that the "actual finished floor elevation" is 699.80. The City notes that Plaintiffs' brief points out that the existing 100 year frequency flood elevation with the culverts is 702.80 feet.[11] Thus, the City reasons that, if Kolodziej's home had been built at the elevation indicated in the finished plat at 708.15 feet, his basement would be almost six feet above the 100 year frequency flood elevation, even with the Crossings, rather than four feet beneath at 697.91. The City reasons that the same is true with the Jenks home in the Subdivision, which was platted to be

---

[11] The City does not dispute that 702.80 is the existing 100 year frequency flood elevation for purposes of this motion only.

built with a finished floor elevation of 706.00 feet, which would be four feet above the 100 year flood frequency elevation, but was built an "actual finished floor elevation" of 697.91.

Although Gralik's opinion raises an issue of fact as to whether the houses were in fact built below grade, with the facts viewed in the light most favorable to the City, it is not a material fact, as the City does not dispute that Kolodziej's and other homeowners' residences, as built, flooded in September 2008 because the City allowed the Crossings to be built without the proper permits. Plaintiffs have demonstrated that, if the Crossings had complied with the Flood Control Act, Smith Ditch would not have overtopped Greenview Place, Stillwater Parkway, and Crooked Creek Trail, the Association's common areas would not have been damaged, the Mahoney and McKenna homes would not have been flooded, Kolodziej's home would not have flooded, and Kolodziej's swing set, yard fixtures, and landscaping would not have been ruined by four feet of flood water. The City also does not dispute that a proximate cause need not be the only proximate cause. Accordingly, Plaintiffs have met their burden on summary judgment of establishing each element of their claim of negligence per se against the City, and the City has not raised a genuine issue of material fact to preclude summary judgment.

### D.  Injunctive Relief

Plaintiffs seek injunctive relief, requiring the City to replace or repair the Crossings in order to prevent the flooding hazard and future flooding injuries to Plaintiffs and their properties. Plaintiffs argue that, because the City owns the streets at the Crossings, Plaintiffs cannot unilaterally construct new crossings or install new culverts, only the City can. Thus, Plaintiffs assert that the only remedy for the City's negligence per se is an order directing the City to modify the Crossings, rather than an award of monetary damages to Plaintiffs.

The Court considers four criteria in deciding whether to grant injunctive relief: "(1) whether the plaintiff has [in fact succeeded] on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the granting of the injunction will harm the public interest." *Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).[12]

First, Plaintiffs have, in fact, succeeded on the merits of their negligence per se claim against the City, as set forth in this Opinion and Order. Second, the Court finds that Plaintiffs do not have an adequate remedy at law because Plaintiffs do not own the streets or the Crossings, nor do they own Smith Ditch on the north side of Greenview Place. Therefore, even an award of monetary damages in an amount sufficient to reconstruct the Crossings would be inadequate because Plaintiffs cannot unilaterally repair the Crossings. Moreover, the City has an ownership interest in the Crossings and is currently engaged in an administrative proceeding with the IDNR to repair the Crossings to the satisfaction of the IDNR.

Third, the Court must balance the hardships of the parties. The threatened harm the City suggests it will suffer is the cost of repairing the Crossings. In support, the City cites the Affidavit of Aaron Hurt, in which he estimates that the cost to modify the crossings is $2,700,000.00. The

---

[12] In *eBay Inc. v. MercExchange, LLC*, the United States Supreme Court recognized the traditional factors for injunctive relief:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-313 (1982); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542(1987)).

City argues that it would be inequitable to require the City to solely bear the burden of the crossing reconstruction when the Developers were originally responsible for the design of the crossings and obtaining permits. For several reasons, the Court, cognizant of the mandatory nature of this injunctive relief, finds that the balance weighs in favor of Plaintiffs. First, the continued risk of flooding and the danger of harm to persons and property remains as long as the crossings are not modified in such a way that is approvable under Indiana Code § 14-28-1-22. Second, the City may be correct that the developers may also be liable for part of the cost of reconstructing the Crossings, but given that only the City has the authority at this stage to modify the Crossings, any action the City may have to take against the developers for a contribution claim does not alter the balance in favor of Plaintiffs. Finally, the City, as it admits, has already "agreed" to modify the crossings to comply with IDNR standards. As previously noted, the IDNR has instituted proceedings against the City regarding the Crossings. The City's response brief represents, "The City agreed when it learned that the crossings were built without proper permits to work with IDNR to do the work necessary to obtain permits for the crossings according to IDNR's requirements." Def. Resp., p. 20. Thus, the City reasons that an Order of the Court is unnecessary. However, the City's ongoing cooperation with the IDNR does not preclude the Court from entering an Order requiring the City to go through with the repair or reconstruction of the Crossings in the interest of Plaintiffs' ongoing risk of exposure to flooding as a result of the inadequate Crossings.

Finally, for the same reason, the Court finds that the injunction will not harm the public interest, and, in fact, is consistent with the action being presently taken in the administrative enforcement action led by the INDR.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** Plaintiffs' Motion for Partial Summary Judgment Against Defendant City of Crown Point, Indiana [DE 97] and hereby **ORDERS** that the City of Crown Point timely repair or replace the crossings at Greenview Place, Stillwater Parkway, and Crooked Creek Trail in such a way that they are approvable under Indiana Code § 14-28-1-22 and the Crown Point Flood Control Ordinance and to obtain all necessary approval from the Indiana Department of Natural Resources for the Crossings.

All of Plaintiffs other claims against the City **REMAIN PENDING**.

SO ORDERED this 11th day of October, 2011.


  s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record
        Pro se Defendant Robert Stiglich