# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| STILLWATER OF CROWN POINT HOMEOWNER'S ASSOCIATION, INC., individually and on behalf of its members; ROGER P. MAHONEY; KENT KOLODZIEJ; and KEVIN J. and MARGARET MCKENNA, Plaintiffs, | ) ) ) ) ) ) ) | |
| v. | ) ) | CAUSE NO.: 2:09-CV-157-PRC |
| JACK KOVICH, INNOVATIVE ENTERPRISES, LTD., ROBERT STIGLICH, HAWK DEVELOPMENT CORP., and CITY OF CROWN POINT, INDIANA, Defendants. | ) ) ) ) ) ) | |

## OPINION AND ORDER

This matter is before the Court on (1) Defendant Hawk Development Corporation's Motion for Summary Judgment [DE 90], filed on March 1, 2011; (2) a Motion of Defendants Jack Kovich and Innovative Enterprises, Ltd. for Summary Judgment on Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 56(a) [DE 93], filed on March 4, 2011; (3) Plaintiffs' Motion for Partial Summary Judgment Against Defendants Jack Kovich, Innovative Enterprises, Ltd., Robert Stiglich, Stillwater Properties, LLC, and Hawk Development Corp. [DE 100],[1] filed by Plaintiffs Stillwater of Crown Point Homeowner's Association, Inc., individually and on behalf of its members; Roger P. Mahoney; Kent Kolodziej; Kevin J. McKenna; and Margaret McKenna on March 4, 2011; (4) Plaintiffs' Request for Oral Argument [DE 103], filed on March 4, 2011; (5) Defendants Innovative Enterprises, Ltd. and Jack Kovich's Request for Oral Argument [DE 125], filed on April 19, 2011; (6) a Motion to Strike Portions of the Affidavits of Eric P. Ellingson and Martin S. Mann [DE 135],

---

[1] Plaintiffs served a proper Notice of Summary Judgment Motion to Pro Se Litigant on pro se Defendant Robert Stiglich in conjunction with their Motion for Partial Summary Judgment. Robert Stiglich did not file a response to Plaintiffs' motion.

filed by Plaintiffs on April 28, 2011; and (7) Defendant Hawk Development Corp.'s Motion to Strike Paragraph 5(d) and 6 of the Affidavit of Jonathan Jones [DE 139], filed on May 17, 2011. All the motions are fully briefed and ripe for ruling.[2]

This is the story of two subdivisions and three road crossings in Crown Point, Indiana. The Stillwater of Crown Point Subdivision ("Stillwater Subdivision") was developed by Stillwater Properties, LLC, Innovative Enterprises, Ltd., Robert Stiglich, and Jack Kovich. The Pine Hill Subdivision ("Pine Hill") was developed by Hawk Development Corp. Located near the border of the Stillwater Subdivision and Pine Hill is Smith Ditch. Three road crossings–Greenview Place, Stillwater Parkway, and Crooked Creek Trail–span Smith Ditch. The crossings at Greenview Place and Stillwater Parkway are contained within the Stillwater Subdivision. The crossing at Crooked Creek Trail connects the Stillwater Subdivision and Pine Hill, with Hawk constructing a "stub section" of the crossing up to the property line, and Stillwater Properties, LLC constructing the remainder of the crossing, including that portion that spans the channel of Smith Ditch. Each crossing was constructed by placing fill material in Smith Ditch and the adjacent wetlands along with two thirty-six inch culverts to convey the flow of water in Smith Ditch under the crossings. In September 2008, flooding occurred in the subdivisions as water backed up behind the crossings, adversely affecting homes in the subdivisions, including those of Kent Kolodziej in Pine Hill and Roger P. Mahoney and Kevin J. and Margaret McKenna in Stillwater Subdivision.

## PROCEDURAL BACKGROUND

On June 4, 2009, Plaintiffs filed a Complaint against Jack Kovich, Innovative Enterprises, Ltd. ("Innovative Enterprises"), Robert Stiglich, Stillwater Properties, LLC, Hawk Development Corp. ("Hawk"), and the City of Crown Point, Indiana ("City"), seeking injunctive relief and

_____

[2] No reply briefs were submitted on the two motions to strike.

damages. Plaintiffs allege that, in 2008, the Stillwater Subdivision and at least one home in Pine Hill were affected by flooding and allege that the construction of the three crossings of the Smith Ditch created the flooding condition that caused the damages.

In Count I, Plaintiffs bring a Clean Water Act ("CWA") citizen suit pursuant to 33 U.S.C. § 1365(a), alleging that Kovich, Innovative Enterprises, Stiglich, Stillwater Properties, LLC, and Hawk's discharges of fill material to construct the crossings of Smith Ditch at Greenview Place and Stillwater Parkway violate the general and specific conditions set forth in the CWA § 401 water quality certification issued by the Indiana Department of Environmental Management ("IDEM") and the CWA § 404 permit issued by the U.S. Army Corps of Engineers and, therefore, violate an effluent standard or limitation under the CWA. Count I further alleges that Kovich, Innovative Enterprises, Stiglich, and Stillwater Properties, LLC's discharge of fill material to construct the crossing of Smith Ditch at Crooked Creek Trail without a CWA § 401 water quality certification and CWA § 404 permit violates an effluent standard or limitation under the CWA. Finally, Count I alleges that Hawk's discharge of fill material to construct the stub portion of the crossing of Smith Ditch at Crooked Creek Trail within Pine Hill violates the conditions set forth in the CWA § 404 permit issued by the Corps and therefore violates an effluent standard or limitation under the CWA.

In Count II, Plaintiffs allege a breach of the Wetlands Restriction and Covenants by Kovich, Innovative Enterprises, Stiglich, and Stillwater Properties, LLC by their development of undersized culverts at the three crossings.

In Count III, Plaintiffs allege a breach of the implied warranty of habitability by Kovich, Innovative Enterprises, Stiglich, Stillwater Properties, LLC, and Hawk because these Defendants knew or should have known that there were latent defects in the Stillwater Subdivision and Pine Hill, including but not limited to, the inability of the culverts placed in the three crossings to prevent

Smith Ditch, a natural watercourse, from flooding homes and common areas in the Stillwater Subdivision and Pine Hill during or following a heavy rain.

Count IV alleges negligence per se against Kovich, Innovative Enterprises, Stiglich, Stillwater Properties, LLC, and Hawk for violating their duties under the Indiana Flood Control Act and the City of Crown Point Flood Control Ordinance to obtain a floodway construction permit pursuant to Indiana Code § 14-28-1-22(c) before developing the three crossings.

In Count V, Plaintiffs' negligence claim alleges that Kovich, Innovative Enterprises, Stiglich, Stillwater Properties, LLC, and Hawk breached the duty owed to Plaintiffs to exercise reasonable care in undertaking, approving, and upgrading the development of streets and drainage infrastructure in the Stillwater Subdivision and Pine Hill.

Finally, in Count VI, Plaintiffs allege that the three crossings constitute public and private nuisances, and that Kovich, Innovative Enterprises, Stiglich, Stillwater Properties, LLC, and Hawk's development and authorization of the three crossings are unlawful pursuant to the City of Crown Point Flood Control Ordinance and are an unreasonable use of the land.

Hawk filed an Answer on August 6, 2009. Innovative Enterprises and Kovich filed an Answer on August 14, 2009. The City of Crown Point filed an Answer on September 1, 2009. Robert Stiglich filed an Answer on November 30, 2009.

On October 9, 2009, a Clerk's Entry of Default was entered against Stillwater Properties, LLC. On November 16, 2009, Defendant Stillwater Properties, LLC was severed as a party defendant for purposes of 28 U.S.C. § 636(c), and the case against Stillwater Properties, LLC only remains pending before Chief Judge Philip P. Simon.

As the remainder of the parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment

in this case, this case was reassigned to the undersigned Magistrate Judge.  Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323;  Fed. R. Civ. P. 56(c).  The moving party may discharge its initial responsibility by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus.*,

*Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not

to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## ANALYSIS

In their Motion for Partial Summary Judgment, Plaintiffs seek judgment against Kovich, Innovative Enterprises, Stiglich, and Hawk under the Clean Water Act; against Kovich, Innovative Enterprises, and Stiglich under the Declaration of Restrictions on Land Use and Restrictive Covenants of Stillwater Subdivision; and against Kovich, Innovative Enterprises, Stiglich, and Hawk under a theory of breach of the implied warranty of habitability. Plaintiffs are not seeking summary judgment against the developers on claims of negligence per se, negligence, or nuisance. Plaintiffs' claims against the City of Crown Point are addressed in a separate Opinion and Order. Also before the Court are Hawk's Motion for Summary Judgment and Kovich and Innovative Enterprises' Motion for Summary Judgment, each of which seeks summary judgment on all of Plaintiffs' claims. The Court first considers the cross motions of Hawk and Plaintiffs and then turns to the cross motions of Kovich/Innovative Enterprises and Plaintiffs.

### A. Hawk Development

Before addressing the cross motions for summary judgment, the Court first addresses two evidentiary motions to strike in relation thereto, one filed by Plaintiffs and one by Hawk.

### 1. *Motions to Strike*

Under the Federal Rules of Civil Procedure, an affidavit "used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4). On summary judgment, the Court does not consider parts of an affidavit that

fail to comply with the rule.  *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004).

       a.       Affidavits of Eric P. Ellingson and Martin S. Mann

In their Motion to Strike, Plaintiffs ask the Court to strike paragraph 8 of the Affidavit of Eric P. Ellingson and paragraph 5 of the Affidavit of Martin S. Mann.  Hawk designated both affidavits in support of its Motion for Summary Judgment.

       1)       Paragraph 8 of the Affidavit of Eric P. Ellingson

In his Affidavit, Eric P. Ellingson , C.P.G., P.W.S., discusses the steps his company, Earth Source, Inc., took to address the permitting for the work being performed in relation to the wetlands within Pine Hill.  In paragraph 7, Ellingson avers that a copy of the 401/404 applications that had been submitted to IDEM and the U.S. Army Corps of Engineers on September 5, 2001, was also "submitted to the Indiana Department of Natural Resources, Water Division, via certified mail, for review and determination of permit requirements administered by Division of Water, specifically construction within a floodway."    Hawk SJ Br., Exh. E.  Then, in paragraph 8, Ellingson avers: "The Indiana Department of Natural Resources Division of Water determined that no permit was required."  *Id.*

Plaintiffs argue that the statement in paragraph 8 purports to repeat the Indiana Department of Natural Resources' ("IDNR") determination regarding permit requirements and, therefore, is inadmissible hearsay.  Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801.  Hawk argues that the statement is not being offered for the truth of the matter asserted (whether the statement was true or false) but rather to establish that the statement was made.

Hawk reasons that the statement is offered for context and to show the effect on Ellingson's state of mind, suggesting that "Mr. Ellingson heard from IDNR that no floodway construction permit was necessary; he made no further attempts to secure a permit that was not needed." Hawk Resp. to Mot. to Strike, p. 2.

Paragraph 8 is a conclusion necessarily based on hearsay. First, there is no statement either in Ellingson's Affidavit or in Hawk's briefs that Ellingson "made no further attempts to secure a permit" as the result of a statement from IDNR that no floodway construction permit was required. Rather, paragraph 8 of Ellingson's Affidavit is offered in Hawk's brief for the truth of the matter asserted, namely for the fact that IDNR reviewed the application and determined that no permit was required. In its brief in support of summary judgment, Hawk cites to Ellingson's Affidavit for the statement: "The Application for 401/404 Permit submitted by Earth Source Inc. on behalf of Hawk Development was reviewed by the Indiana Department of Natural Resources to determine the need for a Floodway Construction Permit." Hawk SJ Br., p. 8.[3] Hawk relies on this fact to show that no floodway construction permit from the IDNR was necessary and, thus, that Hawk did not violate the Indiana Flood Control Act. Nor does the apparent verbal statement of the unknown individual from IDNR fall within the exception in Federal Rule of Evidence 803(8) for "public record and reports," which provides, in relevant part, an exception to the hearsay rule for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . ." Fed.

---

[3] The next sentence in Hawk's brief provides: "If the review revealed a need for a floodway permit, the Indiana Department of Natural Resources notifies the applicant." Hawk SJ Br., p. 8. In support, Hawk cites to both Ellingson's Affidavit and the Affidavit of Martin S. Mann. However, there is no statement in Ellingson's Affidavit to support this fact. Therefore, although the statement is made in the brief, it is not in Ellingson's Affidavit, and, thus, provides no support for paragraph 8 of Ellingson's Affidavit.

R. Evid. 803(8). Hawk has not produced the "records, reports, statements, or data compilations" upon which Ellingson may have relied. Therefore, the Court grants the Motion to Strike as to paragraph 8 of Ellingson's Affidavit and orders that paragraph 8 is stricken.

2)      Paragraph 5 of the Affidavit of Martin S. Mann

In paragraph 5 of his undated Affidavit, Martin S. Mann, P.E., states: "The Indiana Department of Natural Resources reviewed construction plans that included the portion of the Crooked Creek Trail constructed by Hawk Development as a part of a Section 401/404 permit review and did not notify Hawk Development that a Construction in a Floodway Permit would be required for construction." Hawk SJ Br., Exh. J, ¶ 5. Plaintiffs argue that this paragraph contains at least two hearsay statements– that someone told Mann that IDNR reviewed construction plans and that someone told Mann that IDNR did not notify Hawk that a floodway construction permit would be required. Plaintiffs argue that there are no grounds to apply a hearsay exclusion or exception and that no public record possibly reviewed by Mann has been offered to support either statement contained within paragraph 5.

Hawk responds that, even if these statements are hearsay, experts are permitted to consider inadmissible evidence in formulating their opinions under Federal Rule of Evidence 703. "[W]hen an expert testifies, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted if those facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *United States v. Thornton*, 642 F.3d 599, 607 (7th Cir. 2011) (internal quotation marks omitted) (citing *United States v. Moon*, 512 F.3d 359, 361 (7th Cir. 2008) (quoting Fed. R. Evid. 703)). However, the facts in paragraph 5 of Mann's Affidavit are not being offered only to support his opinion but rather are used in Hawk's

brief for the truth of the matter asserted, namely that IDNR did not notify Hawk that it would need a permit for construction in a floodway: "No Floodway Construction Permit was required by the Indiana Department of Natural Resources." Hawk SJ Br., p. 8. Notably, Hawk has not explained how these out-of-court statements by an unidentified person at IDNR were used by Mann to form his opinion. Accordingly, the Court grants the Motion to Strike as to paragraph 5 of Mann's Affidavit and orders that paragraph 5 is stricken.

      b.      Affidavit of Jonathan E. Jones

In turn, Hawk seeks to strike paragraphs 5(d) and 6(b)-(f) of the Affidavit of Plaintiffs' expert Jonathan E. Jones, P.E., D.WRE. Paragraph 4 of the Affidavit provides that Jones was retained by Plaintiffs to review and comment on the affidavits and associated reports filed on March 1, 2011, by Tammy St. Clair, M.S., P.E. and by Mann in this case. In paragraph 5, Jones then lists the tasks he undertook to perform the requested analysis, including in paragraph 5(d), "Phone conversation with a representative of IDNR concerning IDNR's role in the review of section 401/404 permits." Pl. Resp. to Hawk SJ, Exh. 6, p. 2. Hawk argues that this statement is inadmissible hearsay. However, the statement in paragraph 5(d) relays only the *fact* that Jones had a conversation and the topic of the conversation, which is within his personal knowledge; paragraph 5(d) does not include any out of court statements by the IDNR representative. Therefore, the Motion to Strike is denied as to paragraph 5(d).

As for Paragraph 6 of the Affidavit, Hawk argues that paragraphs 6(b)-6(f) should be stricken as untimely as the opinions were not previously offered by Jones and the expert report deadline in this case was July 2, 2010. Specifically, Hawk argues that Jones' original May 21, 2010 report did not contain Jones' opinion in paragraph 6(b) regarding a comparison of the elevations, in paragraph

6(c) that the elevations prove that fill was placed within the floodway, in paragraph 6(d) that the construction by Hawk impedes the flow within the floodway from a 100 year rain event (the previous report referenced only "culverts" impeding the flow), in paragraph 6(e) that Hawk Development did not notify IDNR of the proximity of the proposed fill and Smith Ditch, and in paragraph 6(f) that IDNR should have been contacted for a floodway construction permit determination. Hawk argues that the opinions in these paragraphs were not previously disclosed in accordance with Federal Rule of Civil Procedure 26(a)(2)(B)(i), nor are they supplements under Federal Rule of Civil Procedure 26(a)(2)(D)(ii) served within thirty days of the report issued by Mann and served on Plaintiffs within the expert report deadline. Thus, Hawk requests that the opinions be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1).

Paragraphs 6(b)-(d) of Jones' April 15, 2011 Affidavit are comprised of new opinions that specifically address the Pine Hill stub portion of the Crooked Creek Trail (as opposed to the Stillwater Subdivision portion), which was not discussed separately from the Crooked Creek Trail as a whole in Jones' original report. Plaintiffs argue that these paragraphs of the Affidavit do nothing more than clarify his original opinions about Crooked Creek Trail generally, including the Crooked Creek Trail on both sides of the property line. Plaintiffs also contend that the theory of liability in the Affidavit–a violation of the Flood Control Act–is not new. The Court finds that Jones' opinions in paragraphs 6(b)-(d) of the April 15, 2011 Affidavit are new and are not simply an extension of the opinions of his original May 21, 2010 report. Nowhere in his original report does Jones discuss or examine the separate impact of the Pine Hill stub portion of the Crooked Creek Trail by itself; he studies only the Crooked Creek Trail crossing as a whole. In contrast, the April 15, 2011 Affidavit describes specific measurements of the fill area for the Pine Hill stub portion of

the Crooked Creek Trail, compares the pre- and post-development road elevation at the Pine Hill property line on the Crooked Creek Trail, and draws conclusions about the impact the Pine Hill stub portion of the crossing, on its own, has on the passage of the regulatory 100 year flood in Smith Ditch.

Plaintiffs argue that, to the extent these opinions in Jones' Affidavit are new, they are so only to rebut the new opinions offered by Mann and Ellingson in their Affidavits submitted by Hawk on March 1, 2011, in support of summary judgment. Having reviewed Mann's original July 29, 2010 report and his March 1, 2011 Affidavit, Mann's opinions in paragraph 4 of the latter regarding the specific impact of Pine Hill's stub portion of the Crooked Creek Trail crossing were conclusively stated in his original report on pages 9, 11, 13, and 15. Therefore, the opinions in paragraphs 6(b)-(d), which are being offered to rebut Mann's opinions first set forth in his July 29, 2010 report, are untimely pursuant to Rule 26(a)(2)(D)(ii), which provides that a party must disclose an expert's opinions "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure." Any new calculations or analysis by Jones regarding the impact of the stub portion of the Crooked Creek Trail in Pine Hill should have been made within 30 days of Mann's original July 29, 2010 report. Notably, Mann's July 29, 2010 report explicitly recognizes that Jones' report "did not address or mention any connection between the issues associated with the subject stream crossings of Smith Ditch and the stub to Crooked Creek Trail constructed by Hawk Development within Pine Hill Subdivision." Hawk SJ Br., Exh. J, p. 8. Similarly, Jones' opinions in paragraphs 6(e) and 6(f) contain opinions not contained within his original report, and they are not clarifications of his original report.

As noted earlier, the face of Jones' April 15, 2011 Affidavit acknowledges that he is providing new opinions in that he was asked by Plaintiffs to "review and comment on the affidavits and associated reports filed on March 1, 2011" by St. Clair and Mann. St. Clair's and Mann's affidavits were premised on their earlier disclosed reports. Any opportunity to provide rebuttal testimony by Jones to those reports expired thirty days after St. Clair's and Mann's reports were produced. Therefore, the Court grants the Motion to Strike as to paragraphs 6(b)-(f) of Jones' April 15, 2011 Affidavit and orders that paragraphs 6(b)-(f) are stricken.

2.     *Material Facts*

Hawk began developing Pine Hill in 2001. Hawk hired Earth Source, Inc. to prepare and file applications for permits regarding the wetlands in Pine Hill. On September 5, 2001, Earth Source prepared and filed on Hawk's behalf an Application for § 401/404 Permit for this project with the Indiana Department of Environmental Management ("IDEM") and the U.S. Army Corps of Engineers respectively. The September 5, 2011 cover letter to IDEM shows at the bottom that a copy of the letter and the § 401 permit application that were sent to IDEM was also sent to the Indiana Department of Natural Resources ("IDNR"). The cover letter does not ask IDNR to perform a review of the application. The application submitted on September 5, 2001 did not include the stub portion of the Crooked Creek Trail contained within Pine Hill.

In a letter dated October 9, 2001, Hawk's petition for approval of Pine Hill Phase 3 was approved for secondary plat approval by the Crown Point Plan Commission Board subject to the enclosed recommendations of the City Engineer. At the same time Hawk was requesting approval for Pine Hill from the City of Crown Point, Stiglich was requesting approval of Phase V of Stillwater Subdivision. As a condition of the secondary plat approval, the developers of the

Stillwater Subdivision and Pine Hill were asked to build a roadway connecting the two subdivisions, which became the Crooked Creek Trail.

On May 2, 2002, Earth Source, on behalf of Hawk, filed an Amended Application for § 401/404 Permit ("Amended Application") with IDEM and the U.S. Army Corps of Engineers to address the construction within Pine Hill of the stub road at Crooked Creek Trail that extended to the border between Pine Hill and the Stillwater Subdivision.[4]  The Amended Application requested permission to install 40 cubic yards of fill to the easterly wetland area of Smith Ditch.  IDEM and the U.S. Army Corps of Engineers approved the Amended Application on November 15, 2002, and December 18, 2002, respectively.  Hawk was never notified by the IDNR Division of Water that a permit was required by the IDNR and no violation notice was ever sent by IDNR.  However, there is no evidence of record that a copy of the Amended Application was sent to the IDNR.  Unlike the September 5, 2001 letter, which listed the IDNR as receiving a copy of the § 401 permit application sent to IDEM based on the "cc" line at the bottom of the letter, the cover letter for the Amended Application, dated May 7, 2002, lists copies being sent to Todd Kleven, an employee of Hawk, and the U.S. Army Corps of Engineers but does not list IDNR.  Hawk did not separately seek a permit for construction in a floodway from the IDNR prior to constructing the Pine Hill portion of the crossing.

The CWA § 404 permit issued to Hawk by the U.S. Army Corps of Engineers requires, among other things, that the discharge of fill for the Pine Hill portion of the Crooked Creek Trail crossing must not permanently restrict or impede the passage of normal or expected high flows in Smith Ditch.  *See* Pl. Br., Exh. 15 (Regional General Permit, Public Notice, File No. 99-100-003-0,

---

[4] Hawk has not designated a copy of the Amended Application in support of its Motion for Summary Judgment, submitting only the cover letter to the Amended Application.  Hawk also did not designate the § 404 permit issued in December 2002 as a result of the Amended Application.

issued February 11, 2000). For its portion of Crooked Creek Trail, Hawk installed fill material to the easterly wetland area of Smith Ditch. This portion of Crooked Creek Trail constructed by Hawk within Pine Hill was paved with asphalt, and cement curbs were installed. Hawk's construction of Crooked Creek Trail was limited to the wetland area within Pine Hill Subdivision as described in the Amended Application for § 401/404 Permit. The Pine Hill and Stillwater Subdivision portions of Crooked Creek Trail meet and join at the property line between the two subdivisions.

Stiglich, through Stillwater Development, Inc.'s contractors, constructed the Stillwater Subdivision portion of Crooked Creek Trail by placing fill in the wetland and the channel of Smith Ditch and by placing two 36-inch culverts in the channel of Smith Ditch. This portion of the crossing was not paved. The developers of Stillwater Subdivision submitted a request to IDNR for a floodway determination, and the IDNR responded with a letter setting forth its official determination regarding the location of the floodway and the need for a floodway construction permit.

There was no partnership agreement between Hawk and Stillwater Properties, LLC regarding the construction at the crossings over Smith Ditch. The channel portion of Smith Ditch where the culverts are located is outside of Pine Hill; the stub road in the Pine Hill subdivision constructed by Hawk ends 55 feet[5] from the channel of Smith Ditch and the culverts installed by Stillwater Developers. Hawk's construction of the stub portion of the Crooked Creek Trail took place in 2002; the construction of Stillwater Subdivision portion of the crossing took place in 2004.

Plaintiffs' expert, Jonathan E. Jones, P.E., D.WRE, opines that the channel and banks of the Smith Ditch are a "floodway" as that term is defined under Indiana law and IDNR regulations and

---

[5] Hawk's brief represents the Pine Hill portion of the Crooked Creek Trail ends 85 feet from the channel of Smith Ditch, citing expert Tammy St. Clair's Affidavit. Hawk SJ Br., p. 3. However, her Affidavit provides that Pine Hill stub portion of the Crooked Creek Trail is 55 feet from the channel of Smith Ditch.

that the upstream drainage area at the Crooked Creek Trail is located within the floodway of Smith Ditch. Jones opines that the stub portion of the Crooked Creek Trail road constructed by Hawk is partially within the Smith Ditch floodway as it appears on the August 1997 DNR-issued floodway map. Jones further opined that the 40 cubic yards of fill was placed by Hawk in approximately 2,180 square feet of wetland area directly adjacent to Smith Ditch, as shown on the May 7, 2002 amended § 404 permit application prepared by Earth Source. Jones compared the Hawk portion of the Crooked Creek Trail length from the § 404 permit and his company's generated geo-referenced maps and determined that they show approximately the same road length, which further supports his finding that the fill area associated with the § 404 permit is within the 1997 IDNR floodway boundary.

In contrast, Hawk's expert, Martin S. Mann, P.E. opines that, based on an overlay of the floodway boundary contained in an August 1997 DNR-issued floodway map for UNT Main Beaver Dam Ditch onto an aerial photograph depicting the portion of the Crooked Creek Trail constructed by Hawk Development, it appears that there is no encroachment into the floodway by the portion of Crooked Creek Trail constructed by Hawk. He further opines that, based on a review of documents and an inspection of the site, the HECRAS (Hydrologic Engineering Center–River Analysis System) modeling data revealed zero impact on upstream flood elevations as the upstream elevations from the base line model did not increase as a result of adding the portion of Crooked Creek Trail constructed by Hawk Development within the Pine Hill subdivision to the base line model.

Jones opines in his original May 21, 2010 expert report that Crooked Creek Trail as a whole, as constructed, will result in an increase of the 100 year frequency flood elevation just upstream of the Crooked Creek Trail crossing of at least 3.89 feet. According to Jones, the pre-developed 100

year frequency flood elevation at this location is 698.86 feet. In contrast, the post-development 100 year frequency flood elevation is 702.80 feet. Plaintiffs' and Hawk's experts have both opined that larger crossings are necessary in order for the crossing to be approvable by IDNR pursuant to Indiana Code § 14-28-1-22(e). Jones also opines that Smith Ditch is a tributary of Beaver Creek, the drainage basin for which includes Stillwater Subdivision and Pine Hill, as well as areas upstream. Jones opines that the channel of Smith Ditch and the surrounding wetlands are "navigable waters" as that term is defined in 33 U.S.C. § 1362(7).

The other two crossings of Smith Ditch at Greenview Place and Stillwater Parkway are removed from any border with Pine Hill, and Hawk performed no construction at or near either crossing.

The IDNR issued a Notice of Violation to the City of Crown Point in January 2011 for the three crossings of Smith Ditch, including the Crooked Creek Trail, finding that the crossings violate the Indiana Flood Control Act because they are in a floodway but were not permitted.

On March 9, 2009, Plaintiffs gave timely notice of the alleged CWA violations to Hawk pursuant to 33 U.S.C. § 1365(b). Neither the Environmental Protection Agency ("EPA") nor IDEM has commenced a civil or criminal action against Hawk to require compliance with the applicable effluent standards and limitations.

Plaintiff Kolodziej purchased his home in August 2004. He was not the original owner. Pursuant to the restrictive covenants for Pine Hill, dated November 21, 2003, no construction was permitted in Pine Hill without the written approval of Hawk. Kolodziej's residence has a basement door entrance elevation of 700.32 feet. The plat survey of Kolodziej's home indicates that the "Prop[osed] Finish Grade Elev[ation] @ front line of house" would be 708.15 feet. The plans also

indicate that the lot would slope from a high of about 708.15 feet at the front of the house to 699.0 feet at the back of the lot, and that the house would have a walk out basement.

During September 2008, water flooded several Pine Hill and Stillwater Subdivision residents' homes and caused damage. During the September 2008 event, stormwater backed up behind the road crossings, overtopped roads in Stillwater, and caused water to enter the homes of residents in Stillwater Subdivision and Pine Hill, including Kolodziej's home. Kolodziej suffered personal property and other losses of at least $31,983 and additional losses to his real property, including the costs associated with the construction of an earthen barrier in his backyard to prevent future flooding.

3.    *Analysis*

Hawk seeks judgment in its favor on all of Plaintiffs claims, asserting that there is no evidence Hawk violated the Clean Water Act, that Hawk violated the Indiana Flood Control Act and the City of Crown Point Flood Control Ordinance, that the work performed by Hawk in Smith Ditch adversely affected the flow of water in Smith Ditch, or that the damages claimed by individual Plaintiff homeowners McKenna and Kolodziej were caused by the work performed by Hawk at the Crooked Creek Trail. In their Motion for Partial Summary Judgment, Plaintiffs contend that Hawk violated the § 401 and § 404 Clean Water Act permits and breached the implied warranty of habitability by failing to provide an adequate drainage system for Smith Ditch runoff.

a.    Clean Water Act

In Count I of their Complaint, Plaintiffs allege that the work performed by Hawk within the Pine Hill subdivision related to the stub portion of the Crooked Creek Trail violates the Federal Clean Water Act ("CWA"). Hawk contends that Plaintiffs have not designated any evidence to show that Hawk is in violation of the permits it properly obtained under the CWA.

The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987). Under the CWA, the "discharge of any pollutant by any person" is strictly prohibited, except in compliance with one of the permitting schemes set forth in the CWA, including the "wetlands" discharge permit program in 33 U.S.C. § 1344. *See Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 947 (7th Cir. 2004) (quoting 33 U.S.C. § 1311(a)); *United States v. Huebner*, 752 F.2d 1235, 1239 (7th Cir. 1985), *cert. denied*, 474 U.S. 817. "[D]ischarge of pollutant" is defined by the Act to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutant" includes fill material such as rock and dirt. *Id*. at § 1362(6).

Section 1344 authorizes the Secretary of the Army, through the Army Corps of Engineers, to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (quoting 33 U.S.C. § 1344(a), (d)). Section 1344 further provides that "[c]ompliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title." 33 U.S.C. § 1344(p). Civil penalties of up to $25,000 a day may be imposed for each violation of a condition or limitation in a permit issued by the Secretary of the Army. *Id*. at § 1319(d).

In addition, a private cause of action is available for citizens under 33 U.S.C. § 1365. The section authorizes citizens, like Plaintiffs in this case, to file a civil action against any person "who is alleged to be in violation of . . . an effluent standard or limitation . . . ." *Id*. at § 1365(a)(1). A term or condition in a permit issued under CWA § 404 or a water quality certification issued under

CWA § 401 is an "effluent standard or limitation" that can be enforced by way of a citizen suit under § 1365. Section 1365(f) defines "effluent standard or limitation" as "an unlawful act under subsection (a) of section 1311, . . . certification under section 1341, . . . and a permit or condition thereof issued under section 1342 of this title." *Id*. at § 1365(f).

The undisputed evidence is that Hawk, with the assistance of Earth Source, obtained § 401 and § 404 permits from IDEM and the U.S. Army Corps of Engineers in November and December 2002, respectively, related to the Amended Application that included Pine Hill's stub portion of the Crooked Creek Trail. Hawk placed fill in the wetlands of Smith Ditch to construct the Pine Hill portion of the Crooked Creek Trail. However, Todd Kleven, an employee of Hawk, and Ellingson, a certified professional geologist and professional wetland scientist who is President of Earth Source, both state that the work performed by Hawk complied with the terms of the permits issued.

In contrast, Plaintiffs argue that the fill placed by Hawk violates the terms of the CWA permit because it was performed in a floodway without authorization from IDNR. Hawk obtained authorization from the U.S. Army Corps of Engineers under Regional General Permit No. 99-100-003-0. General Condition Number 17 of the permit provides:

> The permittee shall, to the maximum extent practicable, design the project to maintain pre-construction downstream flow conditions. Furthermore, the work must not permanently restrict or impede the passage of normal or expected high flows (unless the primary purpose is to impound water) and that the structure or discharge of fill must withstand expected high flows. The project must provide, to the maximum extent practicable, for retaining excess flows from the site and for establishing flow rates from the site similar to preconstruction conditions.

Pl. Resp. to Hawk SJ, Exh. 14, p. 6. This condition applies to the stub portion of the crossing because it was constructed by placing fill materials into waters of the United States. This condition reflects (and incorporates) the Army Corps of Engineers' duty to protect floodplains:

> In accordance with the requirements of Executive Order 11988, district engineers, as part of their public interest review [applicable to all applications for Corps

21

permits] should avoid to the extent practicable, long and short term significant adverse impacts associated with the occupancy and modification of floodplains, as well as the direct and indirect support of floodplain development whenever there is a practicable alternative. For those activities which in the public interest must occur in or impact upon floodplains, the district engineer shall ensure, to the maximum extent practicable, that the impacts of potential flooding on human health, safety, and welfare are minimized, the risks of flood losses are minimized, and, whenever practicable the natural and beneficial values served by floodplains are restored and preserved.

33 C.F.R. § 320.4(l)(2) (1997).

Plaintiffs reason that, if Hawk had applied for and obtained a floodway construction permit from IDNR prior to commencing construction of the Pine Hill stub portion of the crossing, the Pine Hill portion of the crossing would not violate RGP No. 99-100-003-0 Condition No. 17 because IDNR would have required much larger culverts. In support, Plaintiffs reference Jones' opinion that the undersized culverts in the Smith Ditch at the Crooked Creek Trail crossing cause the flood elevations to increase by nearly 4 feet upstream from the crossing when the IDNR has determined that fill that causes the flood elevation to increase by 0.15 feet or more "adversely affect[s] the efficiency of and unduly restrict[s] the capacity of the floodway." Thus, Plaintiffs contend that, because the Pine Hill portion of the crossing violates the letter and intent of RGP No. 99-100-003-0 Condition No. 17, it violates § 1311(a).

As an initial matter, there is an issue of fact as to whether the stub portion of the crossing is even in the floodway because Plaintiffs' expert, Jones, opines that the Pine Hill portion of the Crooked Creek Trail is within the Smith Ditch floodway and Hawk's expert, Mann, opines that the Pine Hill stub portion is not within the floodway. Hawk further designates Mann's opinion that the stub portion of the crossing constructed by Pine Hill does not adversely affect the efficiency or capacity of the floodway. Def. Br., Exh. J, pp. 17, 19 (pages 9, 11 of July 29, 2010 report). Mann reviewed documents in this case and determined that the HECRAS modeling data developed by

IDNR, Short Elliott Hendrickson, Inc., and Wright Water Engineers, Inc. revealed zero impact on the upstream flood elevations, with the upstream elevations remaining the same for both the base line model and the model that included the portion of Crooked Creek Trail constructed by Hawk within Pine Hill. Mann is a trained Professional Engineer, Flood Control Engineer, Floodplain Engineer, and Drainage Engineer. He opines that construction outside of the floodway does not adversely affect the efficiency or capacity of the floodway and does not create an unreasonable hazard to the safety of life or property. He also opines that the portion of Crooked Creek Trail constructed by Hawk did not contribute to the flooding in September 2008. In his report, he noted that photos of the September 2008 flood damages at Crooked Creek Trail "appear to confirm that the damage occurred just west of the end of the stub road constructed by Hawk Development within Pine Hill subdivision. Therefore it is our opinion that the construction of the portion of the roadway by Hawk did not contribute to the flooding in September 2008." Pl. Resp. to Hawk SJ, p. 13.

However, as argued by Plaintiffs, the foundation of Mann's opinion regarding the effect of the stub portion on the efficiency and capacity of the floodway is based on his finding that the crossing is outside the floodway, which is in dispute. Mann did not conduct any independent engineering computations or modeling for his report. Therefore, the Court finds that Plaintiffs have raised a genuine issue of material fact as to whether the Pine Hill stub portion of the road, by itself, "permanently restrict[s] or impede[s] the passage of normal or expected high flows . . . and that the structure or discharge of fill must withstand expected high flows." RGP No. 99-100-003-0, Condition No. 17.

Plaintiffs have also designated Jones' original opinion that IDNR would not have permitted the existing crossing because its "severely undersized culverts cause flood elevations to increase by nearly 4 feet upstream of the crossing," Pl. Resp. to Hawk SJ, p. 20. Although Jones original report

did not separate out the impact of the Pine Hill stub portion of the crossing, and that portion of the crossing did not include the culverts, his opinion can be reasonably read to be an assessment of the impact of the crossing as a whole on the passage of normal or expected high flows. Thus, it is possible that, if Hawk had submitted an application to the IDNR for a floodway permit, the stub portion of the crossing would not violate RGP No. 99-100-003-0, because the IDNR would have considered the impact of both portions of the crossing and would have required much larger "culverts" or would have required different conditions for the stub portion of the crossing.

However, the Court is not persuaded, and Plaintiffs have not offered any law, that Hawk is liable for the portion of the Crooked Creek Trail crossing in the Stillwater Subdivision. Plaintiffs suggest that Hawk should have ensured that Stiglich applied for a permit for the Stillwater Subdivision portion of the crossing. The undisputed evidence shows that there was no partnership agreement between Hawk and Stillwater Properties, LLC regarding the construction at the crossings over Smith Ditch. There is no evidence that Hawk was involved with any aspect of the Stillwater Subdivision portion of the Crooked Creek Trail Crossing that included the undersized culverts. The fact that the two portions of the Crooked Creek Trail were built in compliance with the City's request and that Hawk knew that its portion of the crossing would meet the Stillwater Subdivision portion to eventually form a single crossing of Smith Ditch does not render Hawk liable for the portion of the crossing built by the Stillwater Subdivision developers.

Nevertheless, the Court finds that Plaintiffs have raised a genuine issue of material fact as to whether the stub portion of the Crooked Creek Trail in Pine Hill "permanently restrict[s] or impede[s] the passage of normal or expected high flows . . . and that the structure or discharge of fill must withstand expected high flows" in violation of RGP No. 99-100-003-0 Condition No. 17. Therefore, the Court denies Hawk's Motion for Summary Judgment and denies Plaintiffs' Motion

for Partial Summary Judgment on Count I of Plaintiffs' Complaint, leaving Plaintiffs' CWA claim against Hawk for trial.

        b.        State Law Claims

In Count IV of their Complaint for negligence per se, Plaintiffs allege that Hawk violated its duties under the Indiana Flood Control Act to obtain a floodway construction permit pursuant to Indiana Code § 14-28-1-22(c) before developing its portion of the crossing at Crooked Creek Trail. Pursuant to Indiana law, a person is liable under a theory of negligence per se if that person 1) violates a duty imposed by statute or ordinance; 2) where the statute or ordinance intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred; and 3) the violation proximately causes the plaintiff's injuries. *Erwin v. Roe*, 928 N.E.2d 609, 616 (Ind. Ct. App. 2010); *see also Kho v. Pennington*, 875 N.E.2d 208, 212-13 (Ind. 2007). Negligence *per se* does not mean liability *per se*. *Id.* A plaintiff must still prove causation and damages just as in any other negligence claim. *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 704 (Ind. Ct. App. 2004) (citing *City of Gary v. Smith & Wesson, Corp.*, 801 N.E.2d 1222, 1245 (Ind. 2003)).

The Indiana Flood Control Act provides that, a person desiring to:

(1) erect, make, use, or maintain a structure, an obstruction, a deposit, or an excavation; or

(2) suffer or permit a structure, an obstruction, a deposit, or an excavation to be erected, made, used, or maintained;

in or on a floodway must file with the director a verified written application for a permit accompanied by a nonrefundable fee of two hundred dollars ($200).

Ind. Code § 14-28-1-22(c). An applicant must receive such a permit before beginning construction. *Id.* at § 14-28-1-22(e). Once an application is received, IDNR can issue a permit for the construction only if

the applicant has clearly proven that the structure, obstruction, deposit, or excavation will not do any of the following:
(1) Adversely affect the efficiency of or unduly restrict the capacity of the floodway.
(2) Constitute an unreasonable hazard to the safety of life or property.
(3) Result in unreasonably detrimental effects upon fish, wildlife, or botanical resources.

*Id*. A structure, deposit, or obstruction "adversely affect[s] the efficiency of or unduly restrict[s] the capacity of the floodway" if it causes the 100-year flood elevation in the floodway to rise by 0.15 feet or more. 312 IAC 10-2-3. The Flood Control Act also provides that no person may "erect, make, use, or maintain in or on any floodway, or suffer or permit the erection, making, use, or maintenance in or on any floodway, a structure, an obstruction, a deposit, or an excavation" that will cause any of the conditions proscribed in Indiana Code § 14-28-1-22(e), except as authorized by Indiana Code § 14-28-1-26.5, which applies to the placement of mobile homes and construction of residences. Ind. Code § 14-28-1-20.

At the time of the development of Pine Hill, Hawk relied on Eric Ellingson at Earth Source, Inc. to determine the permits necessary for the development of work being performed specific to the wetlands in Pine Hill. On September 5, 2001, Earth Source prepared and filed on Hawk's behalf an Application for § 401/404 Permit for this project with IDEM and the U.S. Army Corps of Engineers. The September 5, 2011 cover letter shows that a copy of the letter and the 401 permit application that were sent to IDEM was also sent to the IDNR. The cover letter does not ask IDNR to perform a review of the application. More importantly, the original application did not include the stub portion of the Crooked Creek Trail contained within Pine Hill.

After the City of Crown Point required the developers of the two subdivisions to build the Crooked Creek Trail crossing, Earth Source, on behalf of Hawk on May 2, 2002, filed an Amended Application for § 401/404 Permit ("Amended Application") with IDEM and the U.S. Army Corps of Engineers to address the construction within Pine Hill of the stub road at Crooked Creek Trail that

extended to the border between Pine Hill and the Stillwater Subdivision. The Amended Application requested permission to install 40 cubic yards of fill to the easterly wetland area of Smith Ditch. IDEM and the U.S. Army Corps of Engineers approved the Amended Application on November 15, 2002, and December 18, 2002, respectively.

Hawk argues that it was never notified by the IDNR Division of Water that a floodway permit was required and that no violation notice was ever sent by IDNR. Hawk's expert, Mann, states that, if a review of a 401/404 application reveals the need for a floodway permit, the IDNR notifies the applicant. However, there is no evidence of record that a copy of the Amended Application was sent to the IDNR. Unlike the September 5, 2001 letter, which listed the IDNR as receiving a copy of the 401 permit application sent to IDEM based on the "cc" line at the bottom of the letter, the cover letter for the Amended Application, dated May 7, 2002, lists copies being sent to Todd Kleven, an employee of Hawk, and the U.S. Army Corps of Engineers, but does not list IDNR. There is no evidence of record that Hawk separately sought a permit for construction in a floodway from the IDNR prior to constructing the Pine Hill portion of the crossing. Therefore, Plaintiff has demonstrated that Hawk did not apply for an IDNR floodway permit.

An unexcused violation of the Flood Control Act and the Flood Control Ordinance "constitutes negligence per se if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation." *Kho*, 875 N.E.2d 212-13 (citation and internal quotation marks omitted). The Flood Control Act and Flood Control Ordinance are intended to protect the citizens of Indiana and of the City of Crown Point (like Plaintiffs) from the hazards of development in floodways. Ind. Code §§ 14-28-1-1, 14-281-22(e); Crown Point Ordinance 1638, section 1.

The Flood Control Act sets out its purpose explicitly in the section entitled "Legislative intent":

(1) The loss of lives and property caused by floods and the damage resulting from floods is a matter of deep concern to Indiana affecting the life, health, and convenience of the people and the protection of property. To prevent and limit floods, all flood control works and structures and the alteration of natural or present watercourses of all rivers and streams in Indiana should be regulated, supervised, and coordinated in design, construction, and operation according to sound and accepted engineering practices so as to best control and minimize the extent of floods and reduce the height and violence of floods.

(2) The channels and that part of the flood plains of rivers and streams that are the floodways should not be inhabited and should be kept free and clear of interference or obstructions that will cause any undue restriction of the capacity of the floodways.

Ind. Code § 14-28-1-1.

In addition, the Flood Control Act sets forth the factors that IDNR considers in determining whether to allow a permit applicant to construct in a floodway.

(e) An applicant must receive a permit from the director for the work before beginning construction. The director shall issue a permit only if in the opinion of the director the applicant has clearly proven that the structure, obstruction, deposit, or excavation will not do any of the following:

(1) Adversely affect the efficiency of or unduly restrict the capacity of the floodway.

(2) Constitute an unreasonable hazard to the safety of life or property.

(3) Result in unreasonably detrimental effects upon fish, wildlife, or botanical resources.

Ind. Code § 14-28-1-22.

Similarly, the Flood Control Ordinance explicitly sets forth its purposes and the type of harm it is designed to prevent:

The purpose of this ordinance is to guide development in the flood hazard areas in order to reduce the potential for loss of life and property, and to reduce the potential for health and safety hazards . . . . [T]he City of Crown Point adopts the following

28

> floodplain management regulations in order to . . . prevent unwise developments from increasing flood or drainage hazards to others . . . [and] to protect human life and health from flood hazards . . . .

Ordinance 1638, Section 1.

The Flood Control Ordinance accomplishes this purpose by, among other things, requiring developers to obtain permits from the IDNR for construction activities conducted in a floodway. The Plaintiffs, as residents of the City of Crown Point and property owners immediately adjacent to the floodway, are within the class of people the Flood Control Act and Flood Control Ordinance were enacted to protect from flooding hazards as occurred in September 2008. They deserve the safety protections mandated by these minimum requirements for floodway construction in order to prevent an unduly restricted floodway from creating unreasonable hazards to the safety of their lives, property, and botanical resources.

Finally, to avoid summary judgment in favor of Hawk on this claim of negligence per se and their other state law tort claims of negligence and nuisance, Plaintiffs must raise a genuine issue of material fact as to causation. As set forth in the previous section, there is an issue of material fact as to whether the Pine Hill stub portion of the Crooked Creek Trail crossing is, in fact, in the Smith Ditch floodway, which in turn undermines Mann's opinion that the stub portion of the crossing does not impede or restrict the floodway. There is also a genuine issue of material fact as to the extent of the Plaintiffs' damages caused by any violation of the Indiana Flood Control Act and the Crown Point City Ordinance by Hawk's construction of the stub portion of Crooked Creek Trail without a floodway permit.

Therefore, the Court denies Hawk's motion for summary judgment on the negligence per se claim in Count IV of Plaintiffs' Complaint, the negligence claim in Count V, and the nuisance claim in Count VI.

f.       Implied Warranty of Habitability

In Count III of their Complaint, Plaintiffs allege that Hawk developed storm water drainage improvements on the raw land in order to develop Pine Hill and that Hawk knew or should have known that there were latent defects in Pine Hill, including but not limited to the inability of the culverts at the three Crossings to prevent Smith Ditch, a natural watercourse, from flooding homes and common areas in Pine Hill.  Plaintiffs only attempt to hold Hawk liable for the damage to Plaintiff Kolodziej's home.  Plaintiffs seek summary judgment on this claim in their motion; Hawk does not address this claim in its motion.  The Court has set forth the legal standard for applying the implied warranty of habitability to developers in Part B.2.e below, including that an important factor in applying the warranty to developers is whether the developer know or should have discovered the latent defect.

Kolodziej lives in Pine Hill, developed by Hawk.  The Stillwater developers' contractors built their portion of the Crooked Creek Trail, including the installation of the culverts, in 2004. Kolodziej purchased his home, which was built by Mirar Development, in 2004.  Plaintiffs have offered no evidence that Hawk knew of the potential for flooding in Pine Hill.  The Kolodziej home was purchased in 2004, and the flood did not occur until 2008.  It is Plaintiffs' contention that the flooding was caused by the construction in Smith Ditch, not a flaw inherent in the land.  Based on this timing, Hawk argues that it could not have known of the condition currently complained of by Kolodziej, nor did Hawk have an opportunity to conceal the condition from Kolodziej.  Plaintiffs reason that, if Hawk had contacted the IDNR regarding a floodway permit, they would have known that the Smith Ditch floodway extended into Pine Hill and that the Pine Hill portion of the Crooked Creek Trail would be constructed in a floodway.

As noted above, there is a question of fact as to whether the stub portion of the Crooked Creek Trail is in the floodway and whether it impacted the flow of Smith Ditch. The pertinent issue is whether Hawk knew that Smith Ditch was susceptible to flooding to the level that occurred during the September 2008 event. The evidence of record is that Hawk was not involved with Stiglich and Stillwater Properties, LLCs' building of the Stillwater Subdivision portion of the Crooked Creek Trail, which was conducted with no CWA permit and no Indiana Flood Control Act permit or with Stillwater Properties, LLC's decision to build the Stillwater Parkway and Greenview Place crossings without an Indiana Flood Control Act permit. However, Hawk was aware that portions of Pine Hill were in wetlands, Hawk worked with Earth Source to obtain the proper CWA permits, and Hawk was aware of the presence of Smith Ditch close to the border of Pine Hill and Kolodziej's residence. Accordingly, the Court finds that there is a genuine issue of material fact for trial on the claim of breach of implied warranty of habitability in Count III of Plaintiffs' Complaint as to Hawk. Therefore, the Court denies Plaintiffs' Motion for Partial Summary Judgment on this issue.

4.    *Conclusion*

Based on the foregoing, the Court denies Hawk's Motion for Summary Judgment and denies Plaintiffs' Motion for Partial Summary Judgment to the extent it addressed Plaintiffs claims against Hawk. Plaintiffs' claims against Hawk remain for trial.

## B.  Jack Kovich and Innovative Enterprises, Ltd.

In their Motion for Partial Summary Judgment, Plaintiffs seek judgment in their favor against Kovich and Innovative Enterprises on the claims brought in Counts I, II, and III of their Complaint for violation of the Clean Water Act, breach of the Restrictive Covenants, and breach of the implied warranty of habitability. Defendants Kovich and Innovative Enterprises (jointly the "Innovative Defendants") seek summary judgment on all of Plaintiffs' claims. The parties agree that the claims

against the Innovative Defendants involve only the construction of Greenview Place and Stillwater Parkway as Kovich and Innovative Enterprises were not involved in the construction of the Crooked Creek Trail.

*1. Material Facts*

Smith Ditch is a tributary of Beaver Creek, the drainage basin for which includes the Stillwater Subdivision and Pine Hill, as well as areas upstream. The Greenview Place and Stillwater Parkway crossings were constructed by placing dirt and other fill material on the banks and in the channel of Smith Ditch, and by placing two 36-inch culverts to convey the flow in Smith Ditch under each road crossing. Jonathan E. Jones, Plaintiffs' expert, concluded that the three crossings are located in the floodway of Smith Ditch and are subject to IDNR jurisdiction.

On November 21, 1989, Kovich acquired an Option to Purchase 100 acres of land from David Wilson. However, the Option to Purchase was not exercised by Kovich. Instead, Stillwater Properties, LLC, an Indiana limited liability company, purchased the 100 acres, which were later developed into the Stillwater Subdivision, from Mr. Wilson, who executed a Warranty Deed on September 11, 1996. Stillwater Properties, LLC, owned the real property that was developed into the Stillwater subdivision until sometime in 2002. At some point in calendar year 2002, the land that was being developed into the Stillwater Subdivision was transferred to Land Trust no. 6687 u/t/a dated June 6, 2000, with Mercantile National Bank of Indiana as Trustee.

Stillwater Properties, LLC, was formed on July 1, 1996. Defendant Robert Stiglich is and has been a member of Stillwater Properties, LLC, since its formation. From July 1, 1996, until December 5, 2000, Kovich was a managing member of Stillwater Properties, LLC. Stiglich and Kovich were also shareholders of Stillwater Development, Inc., an Indiana corporation, upon its formation on May 6, 1998. Kovich controlled the day-to-day operations and management of

Stillwater Properties, LLC and Stillwater Development, Inc. Stiglich is and was the sole shareholder and officer of Diamond Veil Development, Inc., an Indiana corporation, since its formation on April 30, 1992.

Stiglich and Kovich each owned 50% of Stillwater Properties, LLC and Stillwater Development, Inc. from the formation of each entity until December 5, 2000, when Kovich, as Seller, and Stiglich, as Buyer, executed the Stillwater Properties, LLC, Equity Purchase Agreement. Pursuant to the Agreement, Kovich agreed to sell and did sell to Stiglich all of Kovich's equity and interest in Stillwater Properties, LLC, and Stillwater Development, Inc. Also, pursuant to the Agreement, Kovich acknowledged that, as of December 5, 2000, he was no longer a member or manager of Stillwater Properties, LLC. Pursuant to the Agreement, Kovich agreed to deliver to Stiglich "all correspondence, files, funds, documents including financial and accounting records, checkbooks and a list of materialmen, subcontractors, engineering and survey companies and names and addresses of contractors." Defs. SJ Br., Exh. F, p. 2, ¶ 3.

In his Affidavit, Kovich describes Innovative Enterprises, Ltd., an Indiana Corporation, as essentially a management company. At all relevant times, Kovich has been President of Innovative Enterprises. Innovative Enterprises has never held any ownership interest in the real property that comprises the Stillwater Subdivision, nor was it ever involved in the development or construction of the subdivision. Furthermore, Innovative Enterprises never held any shares or ownership interest in the entities that did own and/or develop Stillwater Subdivision, including Stillwater Properties, LLC, Stillwater Development, Inc., and Diamond Veil Development, Inc. Thus, Innovative Enterprises did not possess any ownership interest in the real property developed in the Stillwater Subdivision nor was it involved in the development or the construction of the Stillwater subdivision.

From September 11, 1996, to 2002, when Stillwater Properties, LLC owned the land that was

developed into the Stillwater Subdivision, Stillwater Properties, LLC executed and provided documents as the owner of the real property being developed into the Stillwater Subdivision. Stillwater Development, Inc. developed portions of the Stillwater Subdivision at issue in this case between approximately 1998 and 2000. Diamond Veil Development, Inc. developed portions of the Stillwater subdivision at issue in this case between approximately 2000 and 2007. As such, the development of the Stillwater subdivision, including planning, zoning, platting, permitting, grading, developing, or constructing of any section, street or crossing, was generally undertaken by Stillwater Development, Inc. and Diamond Veil Development, Inc., during each time period respectively.

Intercon Engineering Corp. ("Intercon") was the engineer that handled permits (other than wetland permits) for the development of the Stillwater Subdivision. On July 15, 1997, Intercon requested information from the IDNR regarding the location of any floodway in the Stillwater development. The IDNR responded on August 18, 1997, telling Intercon that the floodway of a tributary to Main Beaver Dam Ditch (a/k/a Smith Ditch) passes through the property. IDNR also provided a floodway map, showing the location and width of the floodway of Smith Ditch, and provided floodway construction permits, advising Intercon that "detailed plans for other types of work in the floodway should be submitted for formal approval by [IDNR]." Pl. Resp. to Innovative SJ, Exh. B, pp. 1, 3. On August 18, 1997, Intercon corresponded back to the IDNR by letter and copied Kovich.

J.F. New & Associates, Inc. ("J.F. New") served as an environmental/wetlands consultant in connection with the development of the Stillwater subdivision from approximately 1998 to 2004 and was "retained as the permitting agent for Innovative Enterprises, Ltd., 8960 North 1132 West, Monticello, Indiana, 47960" to assist in obtaining Clean Water Act permits for the Stillwater

Subdivision.  Among other things, J.F. New was hired to "perform a jurisdictional determination" and delineate the "waters of the United States" and wetlands within the Stillwater Subdivision.

On October 13, 1997, J.F. New submitted a request for a § 401 Water Quality Certification (of the federal Clean Water Act) to the Indiana Department of Environmental Management ("IDEM").  Revised plans were submitted on October 13, 1997, and December 11, 1997.  In its Preconstruction Notification and Wetlands Delineation Report, dated December 11, 1997, J.F. New & Associates, Inc. reported that the fill would impact "waters of the U.S." including wetlands.  Defs. SJ Br., Exh. G-1, p. 4.  The Water Quality application reflected that J.F. New had been retained as the permitting agent for "Innovative Enterprises, Ltd."  The submissions did not identify or refer to Stillwater Properties, LLC or Stillwater Development, Inc.  John B. Richardson, Vice President of Technical Services with J.F. New, states in his Affidavit dated February 25, 2011, that "the applicant on the Section 401 Water Quality Certification application should have been Stillwater Properties, LLC."  Defs. SJ Br., Exh. G, p. 3, ¶ 14.

IDEM published a public notice for this project, identifying the applicant as "Innovative Enterprises, Ltd."  The § 401 Water Quality Certification was approved (No. 97-45-MTM-00002-A) with certain delineated conditions, via correspondence from IDEM dated February 3, 1998, which referenced the applicant as "Innovative Enterprises" and required that the project be completed as described in the December 11, 1997 correspondence, that the wetland mitigation be completed within one year, and that a deed restriction be recorded that prohibits dredging, filling, flooding, or modification of wetland vegetation for all other wetland areas in the subdivision.

In November of 1997, J.F. New submitted a Pre-Construction Notification to the U.S. Army Corps of Engineers for coverage under Nationwide Permit ("NWP") 26 pursuant to § 404 of the federal Clean Water Act (Section 404 Application), which included the crossings at Greenview

Place and Stillwater Parkway. Submission of a Pre-Construction Notification is a general requirement of NWP 26, and the notification must include the name, address, and telephone numbers "of the prospective permittee," the location of the project, a description of the project, and a delineation of affected wetlands. The notice indicates that it was prepared for "Jack Kovich, Innovative Enterprises, Inc.," and that the developer was "Jack Kovich, Innovative Enterprises, Inc. 8960 North 1132 West, Monticello, Indiana 47960, 219-965-4788." The notice was copied to "Jack Kovich-Innovative Enterprises, Inc." The notice states that the purpose of the project is "[t]o develop a residential subdivision in Crown Point, Indiana within a natural wetland and lake setting" and that it is "Innovative Enterprises" who proposed to develop the subdivision. Under the heading "Mitigation," the notice states: "Restoration of original hydrology levels to all wetland areas and removal of olf[sic] fill from upland areas adjacent to the existing wetlands," and under the heading "Restoration Plant," that "[i]n order to compensate for the proposed impacts, Innovative Enterprises plans to restore the original hydrology levels." Defs. SJ Br., Exh. G-1. The notice does not identify or mention Stillwater Properties, LLC or Stillwater Development, Inc.

Thereafter, a NWP (File No. 97-145-042-OGC) to perform the work described in the referenced § 404 Application was subsequently authorized via a U.S. Army Corps of Engineers letter dated March 3, 1998. The NWP reflected that the application for the Permit was submitted on behalf of "Jack Kovich, Innovative Enterprises, Inc." *Id.*, Exh. G-2, p. 1. In his Affidavit, Richardson states that "[t]he applicant on the Section 404 application to the Army Corps of Engineers should have been Stillwater Properties, LLC." *Id.*, Exh. G-1, p. 2, ¶ 9.

The permit includes a number of special conditions, including:

(1) The permittee shall adhere to the conditions specified by the Indiana Department of Environmental Management's Section 401 Water Quality Certification dated February 3, 1998 . . . . .

36

(3) The permittee shall be responsible for the successful completion of compensatory mitigation in accordance with the wetland mitigation plan detailed in the document "Pre-Construction Notification and Wetland Delineation Report, Stillwater Subdivision, Crown Point, Indiana" prepared for Jack Kovich, Innovative Enterprises, Inc. . . .

. . .

(9) The permittee shall control purple loosestrife . . . .

(10) The permittee acknowledges that this permit allows reasonable use of the property, and in consideration for this, all wetlands within the boundary of this residential subdivision (as depicted in Figures 5-7), shall remain in their natural undisturbed condition in perpetuity and not be subject to any alteration of vegetation, soils or hydrology by the permittee and any heirs or assigns.  Areas of approved wetland fill are excluded.  Within 30 days from the date of this permit verification, the permittee shall provide this office with documentation that deed restrictions have been filed with the Registrar of Deeds for these areas in the development containing wetlands.  Upon receipt of the approved documentation, the Corps shall provide written notification to the permittee that work can proceed.

*Id.*, Exh. G-2.

The permit also includes a number of general conditions, including under the heading "Section 404 Only Conditions":

6.  Obstruction of high flows.  To the maximum extent possible, discharges must not permanently restrict or impede the passage of normal or expected high flows or cause the relocation of water (unless the primary purpose of the fill is to impound water).

*Id.*  The permit cautions the permittee that it "does not excuse you from the obligation to obtain any other Federal, state, and/or local authorization, if required.  You should not commence work until you receive the required authorizations."  *Id.*  The permit expired no later than December 13, 1999, and a copy of the permit was sent to Kovich.

Kovich, as the managing director of Stillwater Properties, LLC, executed, as grantor, a Declaration of Restrictions on Land Use ("Wetlands Restriction") and submitted it to the U.S. Army Corps of Engineers, as required by NWP 26.  The Wetlands Restriction identified certain wetlands within the subdivision as a "Conservation Area" and agreed to protect the Conservation Area in

exchange for and as a condition of obtaining authorizations to develop the Stillwater Subdivision.

In particular, Stillwater Properties, LLC agreed, therein, to

> voluntarily restrict all activities except management practices for native plants and animals within the . . . Conservation Area . . [and] to protect said Conservation Area in exchange for and as a condition of authorization of the discharges by the Department of the Army, Corps of Engineers in permit number 97-145-042-OGC, dated March 3, 1998.

Pl. Resp. to Innovative SJ, Exh. 10. With respect to wetlands in the Conservation Area, other than those authorized by permit 97-145-042-OGC, Stillwater Properties, LLC declared and covenanted that

> no discharge of fill or dredge material into the Conservation Area shall occur [and that] [t]he restriction and covenant created herein shall be perpetual, and shall be binding upon the Grantor and its legal representatives, heirs and assigns.

*Id*. Pursuant to the Wetland Restriction, any discharge in the Conservation Area, which included all three Crossings, except those performed in compliance with permit 97-145-042-OGC is prohibited.

The Wetlands Restriction is also incorporated into the Restrictive Covenants of Stillwater Subdivision (the "Covenants"). Paragraph 1 of the Covenants provides

> Wetlands within Stillwater Subdivision are to be preserved by the developer, contractor and homeowners, as stated in the Declaration of Restrictions on Land Use, filed April 3, 1009 [sic], Document #98023475.

Pl. Resp. to Innovative SJ, Exh. 11. Pursuant to the Covenant, the Association and the individual Plaintiffs are authorized to bring suit against the Stillwater Developers for breach of the Covenants and Wetland Restriction and to recover damages and attorney fees. Paragraph 22 of the Covenants provides:

> [I]f any owner or person in possession shall violate or attempt to violate any of these covenants, restrictions and conditions, it shall be lawful for the undersigned, "the

> Association," or any person or persons owning any lot in said subdivision, to file and prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any of these covenants, restrictions and conditions, to compel compliance with these covenants, restrictions and conditions or to recover damages caused by such violations, and the owner or owners shall pay court costs and reasonable attorney fees in the event judgment is rendered against him or her or them.

*Id*. In addition, Paragraph 25 authorizes suits by individual homeowners for damages resulting from any breach of the Covenants:

> Owner Enforcement.  Any aggrieved owner may enforce the provisions contained in this Declaration in any proceeding at law or in equity against any person or persons violating any provisions hereof, to restrain such violation and/or to recover damages incurred by the aggrieved owner.

*Id*.  Specifically, the Covenants provide that parties bringing suit to enforce the terms of the agreement may seek, among other things, sums due for damages, injunctive relief, and attorney fees:

> Additional Legal Remedies.  In addition to the administrative remedies set forth herein, the legal remedies may include without limitation, an action to recover sums due for damages, injunctive relief, foreclosure of lien, an action to enforce the sanctions imposed by administrative procedure, or any combination thereof.  The prevailing party shall be entitled to recover the costs of any legal proceeding, including reasonable attorney fees.

*Id*.

Sometime in 1998, after obtaining the CWA permits, Stillwater Development, Inc. placed the fill material into the wetlands in order to construct the crossings at Greenview Place and Stillwater Parkway.  No floodway construction permit was requested from IDNR prior to the construction of the crossings.  During the course of the project, Kovich communicated with the City and County regarding the location of fill and design of the culverts for the crossings.  Kovich never implemented the mitigation plan described in the December 11, 1997 report.  In a letter dated December 13, 2000, the U.S. Army Corps of Engineers informed Kovich and Stillwater Properties,

LLC that a November 29, 2000 compliance inspection revealed several instances of noncompliance with the terms and conditions of the March 3, 1998 permit.

As for the Crooked Creek Trail crossing, in a letter dated September 19, 2002, and addressed to Robert Stiglich, Stillwater Properties, LLC, the U.S. Army Corps of Engineers informed Stiglich that the construction of the portion of the Crooked Creek Trail crossing in the Stillwater Subdivision would violate the CWA § 404 wetlands permit for the Stillwater Subdivision and deed restriction protecting the Conservation Areas. In a letter dated May 14, 2004, the Army Corps of Engineers reminded Stiglich and Stillwater Properties, LLC that the discharge of any fill into wetlands or waters of the United States for the construction of the Crooked Creek Trail crossing would require authorization from the Corps pursuant to CWA § 404.

Thereafter, in May through July of 2004, without obtaining a CWA permit or a floodway construction permit, Diamond Veil Development, Inc. placed fill material into the wetland in order to construct the Crooked Creek Trail crossing. The discharge of fill material in Smith Ditch for the Crooked Creek Trail crossing was not proposed and is not authorized under permit 97-145-042-OGC. The U.S. Army Corps of Engineers discovered the unauthorized crossing during a site inspection, and, in a letter dated July 7, 2004, the Corps ordered Stillwater Properties, LLC to cease and desist its unauthorized filling within wetland, including the construction of the Crooked Creek Trail crossing.

On July 8, 2004, Stillwater Properties, LLC, filed an application requesting an after-the-fact authorization from the U.S. Army Corps of Engineers to install culverts and discharge fill material in Smith Ditch for the construction of two road crossings, Crooked Creek Trail and Stillwater Parkway. On March 22, 2005, the Corps granted, based upon a regional permit, the application pursuant to certain general and special conditions, including approval from the IDNR:

[Stillwater Properties, LLC shall adhere to any floodway construction permit conditions specified by [IDNR] when received. Please be aware that any conditions imposed by the IDNR permit will automatically become part of this permit verification. If the IDNR denies your floodway application, we will be obliged to consider your crossings project as denied without prejudice and subject to a restoration order.

Pl. Resp. to Innovative SJ, Exh. 20. The permit also includes general conditions requiring Stillwater Properties, LLC not to permanently restrict or impede the passage of high flows and to obtain a valid § 401 water quality certification. This § 404 after-the-fact permit conditionally authorized the earlier construction of the Stillwater Subdivision portion of the crossing. The permit was supposed to be valid until December 15, 2009. On July 8, 2004, Stillwater Properties, LLC applied for an after-the-fact § 401 water quality certification with IDEM. However, in the application for the certification, Stillwater Properties, LLC stated that a floodway construction permit had been received for the Crooked Creek Trail crossing, when it had not. Stillwater Properties, LLC did not submit an application for an after-the-fact floodway construction permit for the existing Crooked Creek Trail crossing until March 16, 2006. IDNR denied the application on September 29, 2007, for the existing Crooked Creek Trail crossing as not approvable because the two 36-inch culverts are too small to efficiently convey the runoff in Smith Ditch. Consequently, the after-the-fact § 404 permit was then considered denied, as well.

As of at least 2007, Stillwater Properties, LLC had still not restored the original hydrology level of Smith Ditch and the surrounding wetlands. The IDNR issued a Notice of Violation to the City of Crown Point in January 2011 for violations of the Indiana Flood Control Act because the three crossings of Smith Ditch, including the Crooked Creek Trail, are in a floodway but were not permitted.

Plaintiffs' expert Jonathan E. Jones opines that "the crossings, as constructed, would cause rises during a 100-year event in excess of the 0.14-feet allowed by IDNR regulations. The three

crossings of Smith Ditch are drainage structures that adversely affect the efficiency of and unduly restrict the capacity of the Smith Ditch floodway." Pl. Br., Exh. 2, p. 4. More specifically, Jones opines that the Crossings, as constructed, will result in an increase of the 100 year frequency flood elevation just upstream of the Crossings of 2.58 - 4.10 feet. Plaintiff Kolodziej's residence has a basement door entrance elevation of 700.32 feet. The pre-developed 100 year frequency flood elevation at this location is 698.86 feet. However, the 100 year frequency flood elevation for the existing conditions with the three Crossings is 702.80 feet, more than two feet above the basement door entrance to the Kolodziej residence.

In September 2008, a flooding event occurred in the Stillwater Subdivision and Pine Hill, in which water flooded the homes of Plaintiffs Kevin J. and Margaret McKenna and Roger P. Mahoney in the Stillwater Subdivision and the home of Kent Kolodziej in Pine Hill. The McKennas state in response to Hawk Development's Interrogatory No. 19 that their "Home experienced severe flooding in September 2008 . . . . Water first entered the Home through the sump pump, then started pouring in through the windows. There was three to four feet of water in our lower level. In 2009 and 2010, there were multiple events during heavy rains in which floodwater backed up at the Crossings and resulted in water entering the McKennas[sic] property. The McKennas paid to have a soil berm constructed behind their house after the severe flooding in September 2008. As a result, water did not enter the Home during the events in 2009 and 2010." Pl. Br., Exh. 11, p. 10.

In response to the same interrogatory, Kolodziej answered that his home experienced severe flooding in September 2008. He also answered that flood water from the Crossings had entered his property, but did not infiltrate his home, at least on the following dates: 1/15/2005; 6/5/2005; 4/17/2006; 7/15/2006; 9/13/2006; 12/16/2006; 4/25/2007; 8/31/2007; 1/8/2008; 3/15/2008; 8/25/2008; 12/27/2008; 2/15/2009; 2/27/2009; 3/8/2009; and 10/23/2009. Pl. Br., Exh. 12, p. 12.

Also in response to that interrogatory, Mahoney answered that his home experienced severe flooding in September 2008 and that "[i]n 2009, there were multiple events during heavy rains in which floodwater backed up at the Crossings and resulted in water entering Mahoney's property. Water did not enter Mahoney's Home during the events in 2009." Pl. Br., Exh. 13, p. 9.

On March 9, 2009, Plaintiffs gave timely notice of the alleged violations to the Stillwater developers pursuant to 33 U.S.C. § 1365(b). Neither EPA nor IDEM has commenced a civil or criminal action against the Stillwater developers.

2.    *Analysis*

    a.    Proper Party Defendant

    1)    Innovative Enterprises

Innovative Enterprises first argues in its Motion for Summary Judgment that it is an improper party defendant because it was improperly named on the CWA permits and did not own the real property in the Stillwater Subdivision or perform any of the construction work in the subdivision, including the crossings. However, Innovative Enterprises offers no legal basis for exonerating a permit holder for violations of the permit because someone else performed the work or owned the property. Innovative Enterprises is a "responsible" party.

Innovative Enterprises is correct that courts impose liability under the Clean Water Act upon a party who (1) performed the work or (2) had responsibility for or control over the performance of the work. *See Jones v. E.R. Snell Contractor, Inc.*, 333 F. Supp. 2d 1344, 1348 (N.D. Ga. 2004); *United Sates v. Lambert*, 915 F. Supp. 797, 802 (S.D.W.V. 1996); *United States v. Sargent County Water Res. Dist.*, 876 F. Supp. 1081, 1088 (D.N.D. 1992); *United States v. Bd. of Trs. of Florida Keys Cmty. College*, 531 F. Supp. 267, 274 (1981). But these cases do not suggest that the permittee is not also liable for a permit violation.

There is no support for Innovative Enterprises's contention that a person may obtain a CWA § 404 permit and then avoid liability for violations of the permit by allowing someone else to perform and manage the work authorized by the permit. To hold otherwise would upset the purpose and enforcement of the CWA. First, certain CWA § 404 permit conditions require compliance by the permittee and can only be enforced against the permittee. For example, the NWP 26 authorization issued to "Jack Kovich, Innovative Enterprises, Inc." places a number of requirements specifically on the "permittee," including to adhere to the conditions of the CWA § 401 water quality certification, successfully complete the mitigation, control purple loosestrife, provide the Corps with documentation that deed restrictions for wetlands have been recorded, and submit a preconstruction notification to the Corps. *See* Defs. SJ Br., Exh. G-2. Someone in addition to the permittee might also be liable for violating other conditions in the permit, but only the permittee could be liable for violating these permittee-specific conditions. And only the permittee is subject to the Corps' permit-enforcement authority, under which the Corps may issue a compliance order if the district engineer determines "that a permittee has violated the terms or conditions of the permit," and recommend legal action "[i]f the permittee fails to comply with the order in the specified period of time." 33 C.F.R. § 326.4(d). To make sure that the Corps knows immediately who to hold accountable for permit violations, the Corps requires applications to identify the name, address and telephone number of the prospective permittee. *See* Defs. SJ Br., Exh. G-2, p. 7; 33 C.F.R. § 325.1(d)(7) (requiring applications for individual permits to be signed by the permittee or a duly authorized agent, identifying the applicant). This enforcement scheme works only if the person identified as the "permittee" is in fact responsible for complying with the permit.

Second, Innovative's theory of CWA liability would eviscerate the Corps' ability to assure that permit applications are truthful. If an applicant misrepresents the amount of fill to be discharged

into a wetland, or the nature of the wetland to be impacted, the Corps cannot discharge its duty to protect the waters of the United States. To deter against such behavior, the CWA provides criminal punishment of up to $100,000 and/or imprisonment for up to two years for any person who "knowingly makes any false material statement, representation, or certification in any application, record, report, plan or other document" submitted to the Corps. 33 U.S.C. § 1319(c)(4). The name of the prospective permittee is material–it fixes certain permit responsibilities and enables the Corps to take quick action to enforce permits. It also fixes responsibility for the duty to be truthful in the application or pre-construction notification. Just as violations of CWA § 404 are deemed to be continuing violations to deter violators from concealing their work until the statute of limitations has run, *see infra* Part B.2.b(1), so too permittees must be held liable for permit violations, to deter the evasion of responsibility by using one entity to obtain a permit and a second entity to perform the work on property owned by a third entity.

Innovative Enterprises is correct that the undisputed evidence demonstrates that it never had any ownership interest in the real property comprising the Stillwater Subdivision. Innovative Enterprises was not an entity involved in the development or construction of the Stillwater Subdivision. From September 11, 1996, until the present, the only entities involved in the development of the Stillwater Subdivision are Stillwater Properties, LLC, Stillwater Development, Inc., and Diamond Veil Development, Inc. From 1996 to 2002, Stillwater Properties, LLC, owned the real property that was developed into the Stillwater Subdivision. At some point in 2002, after Kovich had already disposed of his equity and interest in Stillwater Properties, LLC, the land that was being developed into the Stillwater Subdivision was transferred to Land Trust No. 6687 u/t/a dated June 6, 2000, with Mercantile National Bank of Indiana as trustee. According to Stiglich's sworn Interrogatory Answers, the development of the Stillwater Subdivision, including planning,

zoning, platting, permitting, grading, developing, or constructing of any section, street, or crossing, was generally undertaken by Stillwater Development, Inc. or Diamond Veil Development, Inc. Stiglich does not mention Innovative Enterprises as an entity involved in the development of the Stillwater Subdivision.

However, every document submitted to the U.S. Army Corps of Engineers or IDEM while Kovich was involved in the development of the Stillwater Subdivision identified Innovative Enterprises as the developer or applicant. In the PCN submitted to IDEM and the Corps, J.F. New identifies itself as the permitting agent for Innovative Enterprises, Ltd. The PCNs identify "Jack Kovich, Innovative Enterprises, Inc.," with his Monticello address and phone number, as required for the prospective permittee by NWP 26 General Condition 13. The PCNs identify "Jack Kovich – Innovative Enterprises, Inc." and "Innovative Enterprises" as the person who proposed to develop the subdivision and who would be responsible for the restoration plan. The submissions convinced the U.S. Army Corps of Engineers and IDEM that Innovative Enterprises is the permittee. In the March 3, 1998 NWP 26 authorization, the U.S. Army Corps of Engineers states that it is authorizing the project described in the application J.F. New submitted "on behalf of Jack Kovich, Innovative Enterprises, Inc." IDEM published a public notice identifying "Innovative Enterprises, Ltd." as the application for the CWA § 401 certification and identified "Innovative Enterprises" as the applicant when issuing the final water quality certification.

The permittee is not Stillwater Properties, or any person other than Kovich or Innovative Enterprises. No one except Kovich and Innovative Enterprises is mentioned in any way, explicitly or implicitly, in the documents submitted to the U.S. Army Corps of Engineers and IDEM or the permits issued by those agencies. Moreover, Kovich received copies of the applications and permits in 1997-98. He is the sole owner and president of Innovative Enterprises and could have objected

to the use of Innovative Enterprises' name in the applications and permits, but he did not do so until this lawsuit was filed.

Innovative Enterprises is the permittee under all the applicable CWA permits and, thus is liable for violations of the permits. Innovative Enterprises cannot escape this liability by asserting that inadvertent mistakes were made by J.F. New as to the correct name of the applicant on the § 401 and § 404 applications. The Court also declines Innovative Enterprises' invitation to "reform" the permit to make the permittee the actual entity that owned and/or managed and controlled the development, since Innovative asserts that the placement of "Innovative" on the applications was a mistake.[6] Several applications were made in Innovative's name, and no efforts were made to correct the CWA permits with the U.S. Army Corps of Engineers or IDEM once they were issued. Innovative is a proper party defendant as to Plaintiffs' CWA claim. Therefore, the Court denies Innovative Enterprises' Motion for Summary Judgment on this ground.

2)      Jack Kovich as an Individual

Plaintiffs make no argument in their opening brief in support of their Motion for Summary Judgment to place personal liability on Jack Kovich in this matter. In contrast, in the Innovative Defendants' Motion for Summary Judgment, Kovich asserts that he acted only in his capacity as a member of Stillwater Properties, LLC or as an officer of Stillwater Development, Inc., as opposed to acting in his individual capacity, and that he is not liable either under a theory of piercing the corporate veil or the responsible corporate officer doctrine. Plaintiffs pursue liability only under the responsible corporate officer doctrine. Kovich argues that the responsible corporate officer doctrine

---

[6] In support of this relief, Innovative cites *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 821 (7th Cir. 2010). *Young*, an ERISA case, is not persuasive because the court found that the decision to reform a plan that is shown, by clear and convincing evidence, to contain a drafting error is authorized under ERISA and because the drafting error was evidenced by prior drafts of the document.

does not apply to civil actions under the Clean Water Act or any state law cause of action in this matter.

a)       Clean Water Act–Responsible Corporate Officer Doctrine

The United States Supreme Court first articulated the responsible corporate officer doctrine in *United States v. Dotterwich*, 320 U.S. 277, 284 (1943), a criminal prosecution under the Federal Food, Drug, and Cosmetic Act ("FDCA"). The Supreme Court held that criminal liability under the 1938 version of the FDCA extended to responsible corporate officers, notwithstanding the omission of the explicit language holding corporate officers liable that had been in the 1906 version of the FDCA. The Supreme Court reasoned that "[t]o hold that the Act of 1938 freed all individuals, except when proprietors, from the culpability under which the earlier legislation had placed them is to defeat the very object of the new Act. Nothing is clearer than that the later legislation was designed to enlarge and stiffen the penal net and not to narrow and loosen it." *Id*. at 282. The Supreme Court held that a corporate officer is criminally liable under a public welfare statute if he had "a responsible share in the furtherance of the transaction which the statute outlaws." *Id*. at 284. Although *Dotterwiech* recognizes the application of the responsible corporate officer doctrine for criminal liability, the case did not apply the doctrine to civil suits.

The Supreme Court in *United States v. Park* expanded on the concept of a "responsible share" in the criminal conduct articulated in *Dotterweich* and held that the Government may satisfy its burden of proof by introducing "evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so." 421 U.S. 658, 673-74 (1975).

Like the Food, Drug, and Cosmetic Act, the Clean Water Act ("CWA") specifically provides for responsibility under the responsible corporate officer doctrine for criminal penalties. 33 U.S.C. § 1319(c) (titled "criminal penalties"). For the purposes of the criminal penalties in subsection (c) of § 1319, "the term 'person' means, in addition to the definition contained in § 1362(5) of this title, any responsible corporate officer." *Id*. at § 1319(c)(6) (titled "responsible corporate officer as 'person'"). Section 1319(c) sets forth the criminal penalties for a person who violates certain sections of the CWA. *Id*. at § 1319(c)(1), (2), (3), (4). In contrast, there is no such provision adding a "responsible corporate officer" as a person for purposes of subsection (d) of § 1319, which addresses "civil penalties" of the type that can be brought by citizens pursuant to a citizen suit. 33 U.S.C. §§ 1319(d), 1365(a) ("civil penalties" and "citizen suits," respectively). Section 1362(5) defines a "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a state, or any interstate body." 33 U.S.C. § 1362(5).

Kovich reasons that, if Congress had intended for the responsible corporate officer doctrine to apply to civil penalties under the CWA, then it would have made the same provision for that section as it made for criminal penalties. Since it did not do so, Kovich reasons that Congress' intent was to provide for personal responsibility of responsible corporate officers only for criminal penalties, and not for civil penalties.

The Court has not identified any decisions in this circuit addressing the question of whether the responsible corporate officer doctrine applies in a civil CWA case, and more specifically a citizen suit under the Act. Nor does the Seventh Circuit Court of Appeals appear to have addressed the application of the doctrine to a civil suit under any other public welfare act. However, two district courts within the circuit have applied the definition of "person" that includes responsible corporate officers set forth in 33 U.S.C. § 1319(c)(6) in criminal cases under the CWA without

discussing the case law. *See United States v. Hagerman*, 525 F. Supp.1058, 1061 (S.D. Ind. 2007); *see also United States v. Metalite Corp.*, No. NA 99-008-CR-B/N, 2000 WL 1234389, at * 9 (S.D. Ind. July 28, 2000).

Courts in several circuits have expressly found that the responsible corporate officer doctrine *does* apply in civil citizen suits brought under the CWA, 33 U.S.C. § 1365, and several have rejected the argument made by Kovich that the explicit application of the doctrine in the CWA to criminal penalties precludes its application to civil cases and citizen suits. *See City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 160-162 (S.D.N.Y. 2010) (finding the responsible corporate officer doctrine applies to claims against individuals under the CWA) (citing *Puget Soundkeeper Alliance v. Tacoma Metals, Inc.*, No. 07 Civ. 5227, 2008 WL 3166767, at *12 (W.D. Wash. Aug. 5, 2008) (holding that an individual can be held liable under the doctrine in a citizen suit and rejecting the defendant's argument that the doctrine applies only to criminal penalties); *Humboldt Baykeeper v. Simpson Timber Co.*, No. 06 Civ. 4188, 2006 WL 3545014, at *4 (N.D. Cal. Dec. 8, 2006); *Waterkeepers N. Cal. v. AG Indus.* Mfg., No. 00 Civ. 1967, 2005 WL 2001037, at *13 (E.D. Cal. Aug. 19, 2005) (denying summary judgment in favor of the individual defendant under the CWA after discussing the holding in *United States v. Iverson*, 162 F.3d 1015 (9th Cir. 1998), recognizing that *Iverson* was a criminal case, and noting that the doctrine has been applied in civil cases, citing *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 561 (6th Cir. 1985)); *Franklin v. Birmingham Hide & Tallow Co.*, No. CV-BU-0259-S, 1999 U.S. Dist. LEXIS 22489, *45-46 (N.D. Ala. Apr. 22, 1999) (applying the responsible corporate officer doctrine under the CWA and rejecting argument that the doctrine applies only to criminal cases) (citing *United States v. Gulf Park Water Co.*, 972 F. Supp. 1056 (S.D. Miss. 1997) (finding individual liability in a state enforcement action under 33 U.S.C. § 1319(a)(1) in appropriate cases when the individual participated in or was responsible for the

violations, even when purporting to act through a corporate entity, because the definition of "person" specifically includes "individuals" under 33 U.S.C. § 1362(5)); *United States v. Mac's Muffler Shop, Inc.*, Civ. A. No. C85-138R, 1986 WL 15443, at *7 (N.D. Ga. Nov. 4, 1986) (holding, in an action for civil penalties under the Clean Air Act, that the statute contemplates that corporate officials as well as the corporation itself can be liable for civil penalties for violations because "person" is defined in the Clean Air Act as any "individual [or] corporation . . . and any officer, agent or employee thereof")); *United States v. Conservation Chem. Co.*, 660 F. Supp. 1236, 1245-46 (N.D. Ind. 1987) (holding corporate officer to be a "person" within meaning of RCRA and, thus, can be personally liable); *but see Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145, 1148 (N.D. Ill. 1980) (declining to apply the responsible corporate officer doctrine in a civil suit under Clean Air Act, in the absence of any case authority to the contrary, because the court was "unwilling to disregard what it considers to be the clear intent of Congress to exempt individual corporate officers from liability under citizen's suits of this type"); *Illinois v. Celotex Corp.*, 516 F. Supp. 716 (C.D. Ill. 1981) (holding that, given the absence of language specifically defining "person" to include a responsible corporate officer for citizen suits when the term was included for EPA enforcement actions, Congress did not intend that corporate officers be subject to civil citizen suits).

The Sixth Circuit, in the context of the Radiation Control for Health and Safety Act of 1968 ("RCHSA"), another public welfare statute, found the individual corporate officer individually liable for civil penalties for RCHSA violations. *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557 (6th Cir. 1985). The court relies on the definition of "manufacturer" under the RCHSA as "any person engaged in the business of manufacturing, assembling, or importing of electronic products" and reasons that because the individual defendant was the major shareholder and president of the company, "the conclusion that he was included in this definition is self-evident." *Id*. at 560. The

court relied generally on the holdings in *Park* and *Dotterweich* "that corporate officers could be held individually liable for violations of public health legislation." *Id.* at 561. The court dismissed the defendant's argument that *Park* and *Dotterweich* applied to criminal, rather than civil liability, finding that

> the rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved, which at most would result in a monetary penalty. The fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders civil liability appropriate as well.

*Id.*

Kovich argues that the authorities cited by Plaintiffs are not mandatory authority and those courts did not consider the rules and mandates of statutory construction set forth by the United States Supreme Court and the Seventh Circuit Court of Appeals, specifically the general principle of statutory construction that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (internal quotation marks and citations omitted).

However, the Court is persuaded by the weight of the case law and the rationale articulated in *Hodges X-Ray, Inc.* and finds that the responsible corporate officer doctrine extends to civil violations under the Clean Water Act.

One of the key factors courts have relied upon to hold a person liable under the doctrine is whether the individual held himself out to the regulatory agency as the primary contact for compliance issues. *See Golf Park Water*, 972 F. Supp. at 1064 (finding defendant liable, as a "responsible corporate officer," for a water company's violations because he corresponded and met with wastewater authority on behalf of water company and sent compliance letters on another

company's letterhead but signed by defendant as president of the water company); *Indiana Dep't of Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 561-63 (Ind. 2001) (noting that the permit applications identified the defendant as the person responsible for ensuring compliance with environmental permits); *Matter of Dougherty*, 482 N.W.2d 485, 490 (Minn. Ct. App. 1992) (considering that defendant was "primary contact with all regulatory bodies").

In this case, Kovich was the corporate person in communication with the regulatory agencies. Although the correspondence with IDNR, IDEM, and the U.S. Army Corps of Engineers passed through the engineers, it was copied to Kovich and identified Kovich as the person who had hired the engineers. Kovich also managed the day-to-day activities of Stillwater Properties, LLC. In 1998, Kovich wrote to the City of Crown Point, on Stillwater Properties, LLC letterhead as the managing partner of Stillwater Properties, that he had instructed the engineer to relocate the Greenview Place crossing within the right-of-way because "it makes more sense to fill the adjacent ditch area to the north rather than the lake itself." Pls. Resp. to Innovative SJ, Exh. H. In 1999, the county engineer asked Stillwater Properties, LLC to change the wetland mitigation plan and lower the invert elevations of the culverts in the Greenview Place crossing. Kovich wrote the county engineer–again on Stillwater Properties, LLC letterhead as the managing partner–that the proposed change is "unacceptable." When the mitigation was not completed on time, J.F. New in a September 9, 2002 letter to IDEM, represents that "Mr. Jack Kovich never implemented the original IDEM and Corps approved mitigation plan prepared by our office dated December 11, 1997. As I mentioned, Mr. Kovich is no longer associated with the project." Pl. Resp. to Innovative SJ, Exh. I.

Accordingly, Plaintiffs have raised a genuine issue of material fact for trial as to whether Kovich can be held personally liable under the applicable responsible corporate officer doctrine for

CWA violations by Stillwater Properties, LLC.  The Court denies Kovich's Motion for Summary Judgment on this issue.

  b)  Liability of Kovich for State Law Claims

Plaintiffs have also asserted state law claims against Kovich for negligence per se related to the Indiana Flood Control Act, breach of the Restrictive Covenants, breach of the implied warranty of habitability, negligence, and nuisance.  Kovich does not argue that he is not personally liable for these claims nor does he discuss the common principal of liability of a corporate officer for torts. Indiana law provides that "[a corporate] officer is personally liable for the torts in which she has participated or which she has authorized or directed."  *Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000); *see also DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 346 (7th Cir. 2004) (recognizing that, "[u]nder Indiana state law, an officer or shareholder of a corporation can be held individually liable, without the need to pierce the corporate veil, if he personally participates in the fraud" and that the principal applies to other common law causes); *Cantrell v. Morris*, 849 N.E.2d 488, 493-94 (Ind. 2006) (recognizing holding in *County Line Park*).  Under this principle, Kovich cannot escape liability for the state law tort claims simply because he was a corporate officer.  The Court finds that, for the reasons set forth in the previous section, Plaintiffs have raised a genuine issue of material fact as to whether Kovich participated in or authorized or directed the tortious activity.  Accordingly, the Court denies the Innovative Defendants' Motion for Summary Judgment on this ground.[7]

---

[7] Notably, Kovich also discusses the applicability of the responsible corporate officer doctrine generally under Indiana common law in the context of an enforcement action by IDEM under the Indiana Environmental Management Act but does not explain how it applies to him on Plaintiffs' state law tort claims.  Under Indiana law, the responsible corporate officer doctrine has been held to apply to an enforcement action by IDEM for a corporation's violations of the Indiana Environmental Management Act.  *Indiana Dept. of Envt'l Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 561-63 (Ind. 2001).  In *RLG, Inc.*, the Indiana Court of Appeals noted the development of the responsible corporate officer doctrine, beginning with *Dotterweich* and *Park* and recognized that other states have applied the doctrine to violations of public welfare statutes if a "statute is intended to improve the common good and [for which] the legislature eliminates the normal requirement for culpable intent, resulting in strict liability for all those who have a responsible share in the

b.       Plaintiffs' Clean Water Act Claim

In Count I of their Complaint, Plaintiffs bring a Clean Water Act ("CWA") citizen suit pursuant to 33 U.S.C. § 1365(a), alleging that Kovich, Innovative Enterprises, and Stillwater Properties, LLC's discharges of fill material to construct the crossings of Smith Ditch at Greenview Place and Stillwater Parkway violate the general and specific conditions set forth in the CWA § 401 water quality certification issued by IDEM and the CWA § 404 permit issued by the U.S. Army Corps of Engineers and, therefore, violate an effluent standard or limitation under the CWA. Plaintiffs further allege that the unlawful discharges have not been removed from Smith Ditch and the surrounding wetlands.

In their Motion for Summary Judgment, Innovative Enterprises and Kovich seek judgment in their favor on the CWA claim, arguing first that Plaintiffs' citizen suit under the CWA is barred because the alleged violation is a past violation and is not a violation of a permit limitation that was in effect under the CWA when the Complaint was filed and arguing second that the CWA claim is barred by the applicable statute of limitations. On summary judgment, Plaintiffs contend that the failure of the Innovative Defendants to remove the crossings constitutes a continuing violation of the CWA not barred by the limitations period. Plaintiffs further seek summary judgment in their favor on this claim.

---

offense." 755 N.E.2d at 560 (quoting *Matter of Dougherty*, 482 N.W.2d 485, 489 (Minn. Ct. App. 1992)). The Court recognized that, although the doctrine originated as a criminal law doctrine, the doctrine has been applied to civil liability under several federal statutes, *id*. (citing *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 743-44 (8th Cir. 1986); *Hodges X-Ray, Inc.*, 759 F.2d at 560-61; *Conservation Chem. Co.*, 660 F. Supp. at 1245-46), and has been applied by several states to legislation addressing public safety, in particular, disposal of hazardous waste, *id*. (citing *Matter of Dougherty*, 482 N.W.2d at 488-90; *State ex rel. Webster v. Mo. Resource Recovery, Inc.*, 825 S.W.2d 916, 924-26 (Mo. Ct. App. 1992); *State, Dep't of Ecology v. Lundgren*, 971 P.2d 948, 951-53 (1999); *State v. Rolfink*, 475 N.W.2d 575, 576 (1991)). However, unlike the citizen suit brought by Plaintiffs in this case under the CWA, the enforcement action brought by IDEM in *RLG, Inc.*, or the enforcement action brought by IDEM in *Indiana Dept. of Environmental Management v. Boone County Resource Recovery Systems, Inc.*, 803 N.E.2d 267, 275 n.2 (Ind. Ct. App. 2004), cited by Kovich, Plaintiffs are not bringing suit under an enforcement provision of the Indiana Flood Control Act but rather seek damages under a theory of negligence per se for a violation by the Innovative Defendants for a breach of the statutory duty set forth in the Indiana Flood Control Act.

The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987). Under the Clean Water Act, the "discharge of any pollutant by any person" is strictly prohibited, except in compliance with one of the permitting schemes set forth in the Act, including the "wetlands" discharge permit program in 33 U.S.C. § 1344. *See Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 947 (7th Cir. 2004) (quoting 33 U.S.C. § 1311(a)); *United States v. Huebner*, 752 F.2d 1235, 1239 (7th Cir. 1985), *cert. denied*, 474 U.S. 817. "[D]ischarge of pollutant" is defined by the Act to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutant" includes fill material such as rock and dirt. *Id*. at § 1362(6). "Fill material" is defined as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a [ ] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under Section 402 of the Clean Water Act." 33 C.F.R. § 323.2(e). The term "discharge of fill material" is defined at 33 C.F.R. § 323.2(f) as the addition of fill material to the waters of the United States. This includes "the building of any . . . infrastructure . . . requiring rock, sand, dirt, or other material for its construction" in a wetland. In addition, causeways or road fills in wetlands are specifically included as examples of discharges that require a § 404 permit. *Id.*

Section 1341(a) provides that any applicant for a federal license or permit to conduct any activity that will result in a discharge into navigable waters shall obtain and provide to the permitting agency a water quality certification from the State (from IDEM, in this case), certifying that the discharge will comply with all applicable provisions, including § 1311. Any condition set forth in

the water quality certification becomes a condition of the federal license or permit. 33 U.S.C. 21 1341(d).

Section 1344 authorizes the Secretary of the Army, through the U.S. Army Corps of Engineers, to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (quoting 33 U.S.C. § 1344(a), (d)). Section 1344 further provides that "[c]ompliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title." 33 U.S.C. § 1344(p). Civil penalties of up to $25,000 a day may be imposed for each violation of a condition or limitation in a permit issued by the Secretary of the Army. 33 U.S.C. § 1319(d).

In addition, a private cause of action is available for citizens under 33 U.S.C. § 1365. The section authorizes citizens, like Plaintiffs in this case, to file a civil action against any person "who is alleged to be in violation of . . . an effluent standard or limitation . . . ." *Id.* at § 1365(a)(1). A term or condition in a permit issued under CWA § 404 or a water quality certification issued under CWA § 401 is an "effluent standard or limitation" that may be enforced by way of a citizen suit under § 1365. Section 1365(f) defines "effluent standard or limitation" as "an unlawful act under subsection (a) of section 1311, . . . certification under section 1341, . . . and a permit or condition thereof issued under section 1342 of this title." *Id.* at § 1365(f).

1)      Continuing Violation

In their Motion for Summary Judgment, the Innovative Defendants first argue that the harm to be addressed in a citizen suit under the CWA must be brought to address a present or future harm, not a past violation, citing *Gwaltney*, 484 U.S. at 59-60; *Bettis v. Town of Ontario, N.Y.*, 800 F.

Supp. 1113, 1118-19 (W.D.N.Y. 1992). However, *Gwaltney* is distinguishable because the defendant in that case discharged wastewater in violation of CWA § 402, not fill material in violation of CWA § 404. *See, e.g.*, *City of Mountain Park, Georgia v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2008) (discussing the application of *Gwaltney* to discharges of fill material); *Informed Citizens United, Inc. v. USX Corp.*, 36 F. Supp. 2d 375, 377 (S.D. Tex 1999) (concluding that *Gwaltney* does not apply to discharges of fill material because *Gwaltney* involved a wastewater violation.). *Bettis*, cited by Defendants, has been found to be an "aberration" in light of the weight of authority, *USX Corp.*, 36 F. Supp. 2d at 377, and is ignored even by the Western District of New York. *See Stepniak v. United Materials, LLC*, No. 03-CV-0569A, 2009 WL 3077888, * 4 (W.D.N.Y. Sept. 24, 2009).

This Court finds the weight of authority, notwithstanding the Supreme Court's ruling in *Gwaltney*, to be persuasive that the continued presence of fill material in the waterway constitutes a continuing violation. *See Stepniak*, 2009 WL 3077888, at *4 (holding that "the weight of authority supports plaintiffs' position that the continued presence of fill material constitutes a continuing violation") (citing cases); *Greenfield Mills, Inc. v Goss*, No. 1:00-CV-0219, 2005 WL 1563433, at *2-5 (N.D. Ind. June 28, 2005) (discussing extensively *Gwaltney*) (citing cases); *Sasser v. United States EPA*, 990 F.2d 127, 129 (4th Cir. 1993); *Lakeside at Ansley*, 560 F. Supp. 2d at 1296; *United States v. Reaves*, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996); *North Carolina Wildlife Fed'n v. Woodbury*, No. 87-584-CIV-5, 1989 WL 106517, *2-3 (E.D.N.C. Apr. 24 1989). The Court agrees that "to hold that no continuing violation exists when the very consequence of an illegal discharge is the harm, would provide no remedy to plaintiffs such as the ones in this case, where the relief sought is remediation" of the continued presence of fill in the waterway. *Greenfield Mills*, 2005 WL 1563433, at *5. Similarly, the fact that the CWA § 404 permits for the crossings in this case have

expired does not preclude a citizen suit and to hold so would thwart the CWA's remedial purpose. The continued presence of the fill material in Smith Ditch at each of the Crossings constitutes a continuing violation. Therefore, the Court denies the Innovative Defendants' Motion for Summary Judgment on this ground as to the alleged CWA violation.

2)      Statue of Limitations

The parties agree that the five-year statute of limitations set forth in 28 U.S.C. § 2462 applies to citizen suits under the CWA. *See Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir. 1987). To support their claim that Plaintiffs' Clean Water Act claim is barred by the Statute of Limitations, the Innovative Defendants rely solely on their position that this is not a continuing violation case, citing two Clean Air Act cases in which the courts found that there was not a continuing violation, *United States v. S. Ind. Gas & Elec. Co.*, No. IP 99-1692-C-M/F, 2002 WL 1760752, *3 (S.D. Ind. 2002); *Nat'l Parks and Conservation Assoc., Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007). However, "[u]nder the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period." *Nat'l Parks and Conservation Ass'n Inc. v. Sierra Club*, 502 F.3d 1316 (11th Cir. 2007) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-91 (1982)).[8] Therefore, the five-year statute of limitations for claims that a person unlawfully placed fill in a wetland does not begin to run as long as the fill remains in place. *See Reaves*, 923 F. Supp. at 1534. It is undisputed that the fill placed to construct the crossings in the Stillwater Subdivision that allegedly violate the § 404 permit remain in place. Therefore, the

---

[8] Interestingly, the courts in both *United States v. Southern Indiana Gas & Electric Co.* No. IP 99-1692-C-M/F, 2002 WL 1760752, *3 (S.D. Ind. 2002), and *National Parks and Conservation Association, Inc. v. Tenn. Valley Authority*, 502 F.3d 1316, 1322 (11th Cir. 2007), recognize that the statute of limitations is tolled as long as the violation occurs and cite in support *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).

five-year statute of limitations has not yet begun to run, and the Court denies Defendants' Motion for Summary Judgment on this ground as to the alleged CWA violation.

       3)       Plaintiffs' Motion for Partial Summary Judgment–CWA Violations

In their Motion for Partial Summary Judgment, Plaintiffs ask the Court to enter summary judgment in their favor on their CWA claim against Kovich and Innovative Enterprises, arguing that the discharge of fill material to construct the Crossings violates the CWA because the crossings at Greenview Place and Stillwater Parkway violate the general and specific conditions set forth in the CWA § 401 water quality certification issued by IDEM and the § 404 wetlands permit issued by the U.S. Army Corps of Engineers and, therefore, violate an effluent standard or limitation under the CWA.

IDEM's and the Army Corps of Engineers' approval of the § 401 and § 404 permits for these two crossings were expressly conditioned on Stillwater Property, LLC's commitment to construct the crossings in conformance with the December 11, 1997 applications, including the implementation of wetlands mitigation to "restore the original hydrology levels" to all wetland areas. However, as set forth in the material facts, Stillwater Property LLC did not construct the development as described in the December 11, 1997 applications. The drainage culverts installed at these crossings are too small to efficiently convey storm water runoff that flows into and through Smith Ditch. In addition, boundaries between wetlands and uplands were not properly demarcated and separated by properly installed silt fencing. As a result, all wetlands in the Stillwater Subdivision were not restored to original hydrology levels. This was a violation of the explicit terms of the permits and, accordingly, the discharge of fill into Smith Ditch was not in compliance with a valid CWA permit and was unlawful pursuant to 33 U.S.C. § 1311.

In response to Plaintiffs' motion, the Innovative Defendants contest whether Smith Ditch and the surrounding wetlands are covered by the CWA. Defendants dispute that the channel of Smith Ditch, a tributary of Beaver Creek, and the surrounding wetlands are "navigable waters" as defined within the CWA, 33 U.S.C. § 1362(7). Defendants also dispute that Smith Ditch and the wetlands constitute "the waters of the United States" as interpreted in the decision of *Rapanos*, 547 U.S. 715 or constitute relatively permanent, standing, or continuously flowing bodies of waters "forming geographic feature" such as streams, oceans, rivers, and lakes. Defendants argue that Plaintiffs bear the burden on their Motion for Summary Judgment of making a showing that Smith Ditch and the wetlands referenced in the Complaint are properly defined as "navigable waters" under the CWA and that Plaintiffs have not designated evidence to establish, as a matter of law, that Smith Ditch and the wetlands are "navigable waters" under the CWA much less a prima facie showing. However, Defendants offer no evidence that Smith Ditch and the wetlands at issue are not covered under the Act and, in fact, do not even argue that Smith Ditch and the wetlands do *not* constitute the "waters of the United States" subject to the U.S. Army Corps of Engineers jurisdiction under the CWA.

The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The U.S. Army Corps of Engineers historically interpreted "the waters of the United States" expansively to include not only traditional navigable waters, but also defined waters, tributaries of such waters, and wetlands adjacent to such waters and tributaries. *Rapanos v. United States*, 547 U.S. 715 (2006) (plurality opinion) (citing 33 C.F.R. § 328.3(i)(1), (2), (3), (5), and (7). In *Rapanos*, the plurality opinion provides that "'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . oceans, rivers, [and] lakes.'" *Id*. at 739 (citing Webster's New International Dictionary 2882 (2d ed. 1954)).

The plurality then articulated a two-part test for determining when adjacent wetlands are covered by the CWA: "First, that the adjacent channel contains a 'wate[r] of the United States,' . . . and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id*. at 742.

In his concurring opinion, Justice Kennedy rejected the two-part test, instead adopting the significant nexus test outlined in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001), to determine whether wetlands adjacent to non-navigable in fact waterways are subject to regulation by the CWA. *Id*. at 779. Justice Kennedy found that

> wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Id*. at 780. The dissenting Justices would defer to the Army Corps of Engineers and the EPA. *Id*. at 2252.

In *United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006), the Seventh Circuit Court of Appeals acknowledged that "[w]hen a majority of the Supreme Court agrees only on the outcome of a case and not on the ground for that outcome, lower-court judges are to follow the narrowest ground to which a majority of the Justices would have assented if forced to choose." 464 F.3d at 724 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). The Seventh Circuit then recognized this to be Justice Kennedy's ground in *Rapanos*:

> The plurality Justices thought that Justice Kennedy's ground for reversing was narrower than their own, because they concluded their extensive and in places harsh criticism of the concurrence by saying that "Justice Kennedy tips a wink at the agency [i.e. the Corps of Engineers], inviting it to try its same expansive reading again." 126 S.Ct at 2234 n. 15. Justice Kennedy expressly rejected two "limitations"

imposed by the plurality on federal authority over wetlands under the Clean Water Act, one being the requirement of a "continuous surface connection" between the wetland and the conventional waterway that it abuts. *Id.* at 2242 (concurring opinion). He accused the majority of being "unduly dismissive of the interests asserted by the United States in these cases. Important public interests are served by the Clean Water Act in general and by the protection of wetlands in particular." Id. at 2246.

The test he proposed is that "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable water,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on the water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.' " *Id.* at 2248. This test is narrower (so far as reining in federal authority is concerned) than the plurality's in most cases, though not in all because Justice Kennedy also said that "by saying the Act covers wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small), the plurality's reading would permit application of the statute as far from traditional federal authority as are the waters it deems beyond the statute's reach." Id. at 2246.

Thus, any conclusion that Justice Kennedy reaches in favor of federal authority over wetlands, in a future case will command the support of five Justices (himself plus the four dissenters), and in most cases in which he concludes that there is no federal authority he will command five votes (himself plus the four Justices in the Rapanos plurality), the exception being a case in which he would vote against federal authority only to be outvoted 8-to-1 (the four dissenting Justices plus the members of the Rapanos plurality) because there was a slight surface hydrological connection. The plurality's insistence that the issue of federal authority be governed by strict rules will on occasion align the Justices in the plurality with the Rapanos dissenters when the balancing approach of Justice Kennedy favors the landowner. But that will be a rare case, so as a practical matter the Kennedy concurrence is the least common denominator (always, when his view favors federal authority).

*Gerke*, 464 F.3d at 724-25.

In support of their Motion for Partial Summary Judgment, Plaintiffs offer several forms of evidence to establish that the crossings were constructed by placing fill in "navigable waters," including the CWA § 404 permit issued to Innovative Enterprises, the Declaration of Restrictions in Land Use signed by Kovich, the opinions of experts Jonathan Jones, Martin Mann, and Phil

Gralik, the applications for CWA § 401/404 permits for Crooked Creek Trail, and enforcement letters sent by the U.S. Army Corps of Engineers. Although the plurality in *Rapanos* takes issue with the Corps' expansive view of "the waters of the United States," and the CWA § 404 permits were issued prior to *Rapanos*, the Corps' August 9, 2006 letter to Stiglich was written almost two months after *Rapanos*. Notably, Defendants, as the party opposing summary judgment, do not identify any evidence that Smith Ditch and the wetlands are outside the Corps' jurisdiction under the CWA.

The Innovative Defendants' own wetland consultant, J.F. New, evaluated Smith Ditch and the surrounding wetlands and found that the Greenview Place and Stillwater Parkway crossings would be constructed by placing fill in "waters of the United States," albeit prior to the decision in *Rapanos*. Nevertheless, he provided a factual basis for his decision, noting that "wetland 1," across the northern part of which Greenview Place was constructed, and "wetland 2," through which Stillwater Parkway was constructed, are identified on the National Wetland Inventory Map as "permanently flooded" and "seasonally flooded" respectively. J.F. New found hydric soils, hydrology, and hydrophylic vegetation in both wetland 1 and wetland 2.

There is no dispute that Smith Ditch is a tributary of Main Beaver Dam Ditch, which is a tributary of Deep River, which is itself a tributary of Little Calumet River, which is a traditionally navigable water. *See* http://www.lrc.usace.army.mil/co-r/section10.htm (visited October 11, 2011) (Army Corps of Engineers' list of "Navigable Waters of the United States" including the Little Calumet River); *United States v. Fabian*, 522 F. Supp. 2d 1078, 1092-93 (finding the Little Calumet River to be navigable in fact).

In *United States v. Fabian*, J.F. New, the same wetlands consultant used by Innovative Enterprises, conducted a wetland determination in 1997 of property Fabian wanted to develop on

the other side of a 15-foot high levee from the Little Calumet River in Lake County. The property had no direct connection to a navigable water because of the levee, but J.F. New found the same primary and secondary indicators of wetlands hydrology–hydric soils, hydrology, and hydrophylic vegetation– that J.F. New found on the Stillwater property (also in 1997). Based on these findings, J.F. New determined that the property contained wetlands. Nevertheless, Fabian graded the property and placed fill in the designated wetlands without a CWA § 404 permit. In an enforcement action brought years later, Fabian argued–like Kovich here–that the property was outside the Corps' jurisdiction, but Fabian–again, like Kovich–did not produce any evidence other than a post-construction hydrologic test and his own opinion that the property did not contain wetlands. 522 F. Supp. 2d at 1097. Applying Justice Kennedy's test in *Rapanos*, the district court held that the *pre-Rapanos* wetland delineation by J.F. New and historic photographs were enough to demonstrate that the property contained wetlands, *id*. at 1090-91, and that the wetlands were "navigable waters" because they were adjacent to a traditionally navigable water, *id*. at 1091-93. The court denied Fabian's motion for summary judgment because Fabian did not introduce any evidence, except his own opinion, that the property did not contain wetlands or that the wetlands were not adjacent to a navigable water. *Id*. at 1090-91, 1097-99.

This case differs from *Fabian* in that the wetlands at issue are not themselves adjacent to the Little Calumet River but rather are adjacent to a tributary to a tributary to the Little Calumet River. However, given the reasoning of Justice Kennedy's concurrence and the resulting significant nexus test, the Court finds that Plaintiffs have established as a matter of law that Smith Ditch and the wetlands at issue are covered as "waters of the United States" under the CWA and the plurality opinion and Justice Kennedy's concurring opinion in *Rapanos*. Thus, the Innovative Defendants

have failed to create any genuine issue of material fact that Smith Ditch and the surrounding wetlands are not "navigable waters."

Nor, in response to Plaintiffs' Motion for Summary Judgment, do Innovative Enterprises or Kovich argue that the placement of fill to construct the crossings violates the terms of the permit, and, therefore, 33 U.S.C. § 1131.

The CWA provides that, when a citizen, like any of the Plaintiffs, brings an action to enforce an effluent standard or limitation–including a discharge of fill in violation of a permit issued pursuant to CWA § 404–the Court has jurisdiction to enforce the effluent standard or limitation and apply any appropriate civil penalties under 42 U.S.C. § 1319(d). *See* 42 U.S.C. § 1365(a). Section 1319(d) provides that "any person who violates section 1311. . . or any permit condition or limitation implementing any of such sections . . . in a permit issued under section 1344 [CWA § 404] . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d). As set forth above, Innovative Enterprises and Kovich are liable for the damages caused by the violation of the "floodway" condition of the CWA § 404 permits authorizing them to construct Greenview Place and Stillwater Parkway because Innovative Enterprises is the permittee to whom the CWA § 404 permit was issued and because Kovich is personally liable under the responsible corporate officer doctrine.

Accordingly, Innovative Enterprises and Kovich are subject to civil penalties, the amount of which is determined by factors provided in 42 U.S.C. § 1319(d). Although the amount of the civil penalties will require facts to be elicited at trial, the Court grants Plaintiffs' Motion for Partial Summary Judgment in this regard, holding that Innovative Enterprises and Kovich are subject to civil penalties for these violations. In addition, the Court grants Plaintiffs' Motion for Partial

Summary Judgment, holding that Innovative Enterprises and Kovich are liable for attorney fees and costs pursuant to 42 U.S.C. § 1365(d) in an amount to be determined following trial.

c. Statute of Limitations–State Law Claims

The Innovative Defendants argue that Plaintiffs' state law claims are barred by the applicable statutes of limitations. The parties agree that the six-year statute of limitations found at Indiana Code § 34-11-2-7(e) applies to Plaintiffs' claims that the flood in September 2008 damaged homes, fixtures, landscaping, yards, and common areas. The six-year statute of limitations also applies to claims that flooding denied (and continues to deny) Plaintiffs the free use of their homes, yards, and common areas. *Heath v. Wal-Mart Stores, Inc.*, 113 F. Supp. 2d 1294, 1300 (S.D. Ind. 2000). The parties also agree that the two-year statute of limitations in Indiana Code § 34-11-2-4 applies to the individual homeowners' claims that the flood in September 2008 damaged their furniture and other personal property. The parties disagree as to when the limitations period began to run. Innovative Enterprises and Kovich argue that any acts or omissions of Kovich with regard to the Stillwater Subdivision occurred from 1997 to December 5, 2000, when he disposed of his interests in Stillwater Properties, LLC and Stillwater Development, Inc., thus any claims against these parties accrued 8 - 12 years before the Complaint was filed in June 2009 and are time barred.

Indiana follows the discovery rule for determining when a cause of action accrues. *See Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687-88 (Ind. Ct. App. 2006) (citing *Habig v. Bruning*, 613 N.E.2d 61, 64 (Ind. Ct. App. 1993), *trans. denied*). Under the discovery rule, a cause of action accrues–and the statute of limitations begins to run–not when the tortious conduct occurs, but when the plaintiff knows or in the exercise of ordinary diligence could discover "that an injury had been sustained as a result of the tortious act of another." *Id.* Plaintiffs argue that they first discovered the injuries resulting from the Innovative Defendants' violations of the Indiana Flood

Control Act and the Crown Point Flood Control Ordinance with the flooding event of September 2008 that caused flooding in the Stillwater Subdivision and resulted in damage to homeowners' real property. Defendants, who bear the burden of establishing the statute of limitations defense argue that the named homeowners and others would have had continual opportunities to observe the crossings of Stillwater Parkway and Greenview Place to observe any indicia of excessive water, puddling, overflowing onto the streets of the subdivision, and other signs of problematic aspects of the crossings in question prior to September 2008 but offer no evidence in support. Based upon the evidence before the Court on this motion, Plaintiffs may have known that the Crossings existed before 2008, but they did not–and could not–know that the Crossings would cause their property to flood during expected high flows in Smith Ditch until the flood of September 2008. This case was filed on June 4, 2009, and, thus, is not time barred. Therefore, the Court denies the Innovative Defendants' Motion for Summary Judgment on this ground.

       d.     Restrictive Covenants

In its Motion for Summary Judgment, the Innovative Defendants argue that they did not owe any duties to Plaintiffs pursuant to the Restrictive Covenants because neither Innovative nor Kovich in his individual capacity was a party to that agreement and never owned or sold any of the land. The Declaration of Restrictions on Land Use dated March 31, 1998 was made by Stillwater Properties, LLC, not by Jack Kovich in his individual capacity, nor by Innovative Enterprises, Ltd. Plaintiffs do not offer any argument in response to the Innovative Defendants' motion for summary judgment in support of this claim brought in Count II of their Complaint. Although Plaintiffs seek summary judgment generally against the "developers" on this claim, Defendants argue in response that they are not liable, and Plaintiffs do not address the claim in their reply brief. Accordingly, the Court grants the Innovative Defendants' Motion for Summary Judgment and denies Plaintiffs'

Motion for Partial Summary Judgment on Count II of Plaintiffs' Complaint brought for a breach of the restrictive covenants against Kovich and Innovative Enterprises.

      e.      Implied Warranty of Habitability

In Count III of their Complaint, Plaintiffs allege a breach of the implied warranty of habitability by Kovich and Innovative Enterprises because they knew or should have known that there were latent defects in the Stillwater Subdivision, including but not limited to the inability of the culverts placed in the three Crossings to prevent Smith Ditch, a natural watercourse, from flooding homes and common areas in the Stillwater Subdivision during or following a heavy rain. The Innovative Defendants argue that they are entitled to summary judgment on this claim because the warranty applies only to a builder-vendor and not to a mere vendor and does not apply to an entity or officer that was not associated with the building or selling of the home. In their response brief to Defendants' motion and in their Motion for Partial Summary Judgment, Plaintiffs cite Indiana law that extends the implied warranty of habitability to developers, which Plaintiffs argue likewise extends to Innovative Enterprises and Kovich.

When there is privity between the homeowner and the builder-vendor, breach of the warranty is established by showing a defect that substantially impairs the owner's use and enjoyment of his home. *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 740 (Ind. Ct. App. 2000); *Wagner Constr. Co. v. Noonan*, 403 N.E.2d 1144, 1148-49 (Ind. Ct. App. 1980). When privity is lacking, the implied warranty of habitability applies to a subsequent purchaser if the latent defect is not "discoverable upon the purchaser's reasonable inspection and which manifest themselves after the purchase." *Smith*, 741 N.E.2d at 740 (citing *Barnes v. Mac Brown & Co., Inc.*, 264 Ind. 227, 229, 342 N.E.2d 619, 621 (1976)). Indiana courts have extended the implied warranty of habitability to

developers.  *See Smith*, 741 N.E.2d 731; *Jordan v. Talaga*, 532 N.E.2d 1174, 1178 (Ind. Ct. App. 1989), *reh'g denied, trans. denied*.

In *Jordan*, experienced developers, who had participated in the development of seven subdivisions, platted a subdivision on marshy property and hired an engineer to develop a storm water drainage plan.  532 N.E.2d at 1185.  The developers rough graded the property and put in sanitary sewers, storm sewers, and streets, all for the express purpose of facilitating the building of homes.  *Id.*  The developers and their engineer determined that enlarging an existing natural swale would adequately handle storm water draining into the subdivision from an adjacent property.  *Id.* A builder purchased a lot in the subdivision, constructed a house, and sold the lot and house.  *Id.* at 1178.  Subsequently, the storm water channel flooded the lot and, eight years later, entered the house as well.  *Id.* at 1178-79.  The Indiana Court of Appeals found that these "facts and circumstances are particularly appropriate for the imposition of an implied warranty of habitability."  *Id.* at 1185.  One important factor in applying the implied warranty to the developer is whether the developer knew or should have discovered the latent defect.  *Id.* at 1184.  In that case, the developers knew about the water channel.  The court found that the developers were "in the best position to absorb the loss attributable to the latent, undisclosed defect in the real estate they sold."  *Id.* at 1185-86.

In this case, the developers of the Stillwater Subdivision constructed crossings that restrict the floodway and impede high flows of Smith Ditch, leaving the subdivision susceptible to flooding. The developers of Stillwater Subdivision knew that Smith Ditch was located in a 100-year flood plain and that Smith Ditch drains through the subdivision.  Nevertheless, they participated in the design and construction of the developments.  Innovative Enterprises was more than an investor given that it applied for the CWA § 401/404 permits and requested a floodway determination from IDNR.  Kovich controlled Innovative Enterprises and controlled Stillwater Properties, LLC when

Greenview Place and Stillwater Parkway were constructed. Given the egregious nature of the facts in *Jordan*, the Court finds that it cannot say as a matter of law that Innovative Enterprises and Kovich knew or should have known the extent of the latent defect resulting from the insufficient culverts. Rather, there is a genuine issue of material fact for trial as to what Innovative Enterprises and Kovich knew or should have known regarding the potential for flooding in the Stillwater Subdivision.

Therefore, the Court denies the Innovative Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for Partial Summary Judgment on the claim of breach of implied warranty of habitability as to Innovative Enterprises and Jack Kovich for the damages to the Mahoney and McKenna homes.

f.    Negligence Per Se

In Count IV of their Complaint, Plaintiffs allege a claim of negligence per se against Innovative Enterprises, Kovich, and Stillwater Properties, LLC for violations of the Indiana Flood Control Act and the City of Crown Point Flood Control Ordinance for failing to obtain a floodway construction permit pursuant to Indiana Code § 14-28-1-22(c) before developing the crossings at Greenview Place and Stillwater Parkway.[9]

Pursuant to Indiana law, a person is liable under a theory of negligence per se if that person 1) violates a duty imposed by statute or ordinance; 2) where the statute or ordinance intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred; and 3) the violation proximately causes the plaintiff's injuries. *Erwin v. Roe*, 928 N.E.2d 609, 616 (Ind. Ct. App. 2010); *see also Kho v. Pennington*, 875 N.E.2d

---

[9] The claims against Innovative and Kovich, even as to Kovich as a member of Stillwater Properties, LLC, are limited to the crossings at Greenview Place and Stillwater Parkway because Kovich sold his interest in Stillwater Properties, LLC to Robert Stiglich on December 5, 2000, after which he was no longer a member or manager of Stillwater Properties, LLC.

208, 212-13 (Ind. 2007). The Court notes that the Innovative Defendants do not contest in their Motion for Summary Judgment that a violation of the Indiana Flood Control Act constitutes negligence per se, that the crossings constitute violations of Indiana Code § 14-28-1-20 and Indiana Code § 14-28-1-22, that Plaintiffs are in the class of persons the statute is intended to protect, that Plaintiffs damages are the type of harm the statute is intended to protect against, or that violations caused Plaintiffs' damages. Therefore, those issues are not before the Court on Defendants' motion.

Rather, the Innovative Defendants' only argument on summary judgment is that they cannot be liable under a theory of negligence per se because they never owned the land or performed any of the work on the Stillwater Subdivision and were never involved in the development or construction of the subdivision and, thus, did not violate any statutes or ordinances.

To achieve the goal of protecting life and property from flooding, *see* Ind. Code § 14-28-1-1(1), the Flood Control Act requires IDNR approval before erecting, using or maintaining–or suffering or allowing someone else to erect, use or maintain–a structure or obstruction in a floodway. Ind. Code §§ 14-28-1-20, 14-28-1-22 (1998); 312 IAC 10-1-2. A structure or obstruction that will "adversely affect the efficiency of or unduly restrict the capacity of the floodway" or "constitute an unreasonable hazard to the safety of life or property" cannot be permitted and is expressly prohibited. Ind. Code § 14-28-1-20 and 1-22(e). Because Innovative Enterprises was the permittee under the CWA § 404 permit, it had a duty not to "permanently restrict or impede the passage of . . . expected high flows", see CWA § 404 permit Condition No. 6–in other words a duty to comply with the Indiana Flood Control Act–but failed to do so. Accordingly, the Court denies the Innovative Defendants' Motion for Summary Judgment on the negligence per se claim as to Innovative Enterprises.

Kovich, an officer of Stillwater Properties, LLC, may be liable for any breach of the statute by Stillwater Properties, LLC for which he participated in, authorized, or directed the tortious activities. Accordingly, the Court denies the Innovative Defendants' Motion for Summary Judgment on the negligence per se claim as to Kovich.

g.    Negligence

In Count V of their Complaint, Plaintiffs allege that Kovich, Innovative, and Stillwater Properties owed Plaintiffs a duty to exercise reasonable care in undertaking, approving, and upgrading the development of streets and drainage infrastructures in the Stillwater Subdivision and that the Defendants negligently and recklessly breached these duties owed to Plaintiffs, leading to damages suffered by Plaintiffs.

In order to recover under a theory of negligence, Plaintiffs must establish:

(1) a duty on the part of the defendant to conform to a standard of care arising from its relationship with the plaintiff; (2) a failure on the part of the defendant to conform its conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by the breach.

*Pope v. Hancock Cnty. Rural Elec. Membership Corp.*, 937 N.E.2d 1242, 1246 (Ind. Ct. App. 2010). "Absent a duty, there can be no breach and, therefore, no recovery in negligence." *Id*. The Innovative Defendants seek summary judgment in their favor on this claim, arguing that they did not owe Plaintiffs a duty because they never owned the land, performed the work, developed or constructed the subdivision, entered into any agreements with Plaintiffs, or had any relationships with Plaintiffs. Plaintiffs do not offer any response in support of this claim of general negligence to argue that Kovich and Innovative Enterprises owed Plaintiffs a duty and, thus, the claim is waived. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003). Moreover, other than identifying Innovative Enterprises as the permittee on the CWA permits, Plaintiffs have not offered any evidence that Innovative owned the land or performed any of the work to develop or construct

the subdivision, entered into any agreements with Plaintiffs, and never built or sold any homes in the subdivision.  Therefore, the Court finds that Innovative Enterprises did not owe a general duty to Plaintiffs, and the Court grants Innovative Enterprises' Motion for Summary Judgment in its favor on Plaintiffs' negligence claim in Count V of the Complaint.

However, as held above, Kovich, as an officer of Stillwater Properties, LLC and Stillwater Development, Inc., may be liable for his company's tortious actions if he participated in, authorized, or directed the related activities.  Accordingly, the Court denies Kovich's Motion for Summary Judgment as it applies to Plaintiffs' negligence claim against Kovich as a member or managing director of Stillwater Properties, LLC.

h. Nuisance

In Count VI of their Complaint, Plaintiffs allege that the three crossings constitute public and private nuisances, that Innovative Enterprises' and Kovich's development of the crossings was unlawful pursuant to the City of Crown Point Flood Control Act because they did not obtain floodway permits from the IDNR, and that Plaintiffs have been harmed by the nuisance.  Innovative Enterprises and Kovich contend that the "common enemy" doctrine bars Plaintiffs' claims for water diversion resulting from the flow of surface water, citing *Pickett v. Brown*, 569 N.E.2d 76, 707 (Ind. Ct. App. 1991) (citing *Argyelan v. Haviland*, 435 N.E.2d 973 (Ind. 1982)).  The Indiana Court of Appeals has defined "surface water" as

> As distinguished from the waters of a natural stream, lake, or pond, surface waters are such as diffuse themselves over the surface of the ground, following no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh. They generally originate in rains and melting snows, but the *flood waters of a river may also be considered as surface waters if they become separated from the main current, or leave it never to return, and spread out over lower ground*. Water derived from rains and melting snows that is diffused over surface of the ground [is surface water], and it continues to be such and may be impounded by the owner of the land until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, or until it reaches some

74

permanent lake or pond, whereupon it ceases to be "surface water" and becomes a "water course" or a "lake" or "pond," as the case may be.

*Long v. IVC Indus. Coatings, Inc.*, 908 N.E.2d 697, 702 (Ind. Ct. App. 2009) (emphasis added) (citing *Trowbridge v. Torabi*, 693 N.E.2d 622, 626 (Ind. Ct. App. 1998) (citing Black's Law Dictionary 1427 (5th ed. 1979))). "A natural watercourse is established when 'surface water begins to flow in a definite direction and there is a regular channel formed with well defined banks and bottom and water flows therein, not necessarily continually but from time immemorial and for a substantial period of each year.'" *Id.* (citing *Lowe v. Loge Realty Co.*, 214 N.E.2d 400, 402 (1966)). "The essential characteristics of a watercourse that give it recognition as such are substantial existence and unity, regularity, and dependability of flow along a definite course." *Birdwell v. Moore*, 439 N.E.2d 718, 721 (Ind. Ct. App. 1982) (citing *Vandalia R. Co. v. Yeager*, 110 N.E. 230, 234 (1915)). Whether a watercourse exists is a question of fact. *See Trowbridge*, 693 N.E.2d at 628; *Birdwell*, 439 N.E.2d at 721.

Neither party specifically designates any facts on this issue in support of or in opposition to the Innovative Defendants' Motion for Summary Judgment on the nuisance claim. However, the common enemy is an affirmative defense, and the burden rests with the Innovative Defendants to prove it. Moreover, the evidence of record of the flow of Smith Ditch, its banks, and the necessity of crossings to traverse it tend to suggest that Smith Ditch is a watercourse sufficient, at a minimum, to raise a genuine issue of material fact that the floodwaters of Smith Ditch in September 2008 were a result of the flow of a natural watercourse. Accordingly, the Court denies the Innovative Defendants' Motion for Summary Judgment on the Count VI claim of nuisance.

## C.  Robert Stiglich

Despite a proper notice to pro se defendant, served by Plaintiffs on Defendant Robert Stiglich along with their Motion for Summary Judgment, Robert Stiglich did not file a response to Plaintiffs' Motion for Partial Summary Judgment.  Plaintiffs are correct that a non-moving party who fails to respond to a motion for summary judgment accepts as true the facts set forth by the moving party and admits that there are no genuine issues of material fact for trial.  *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995).  However, Plaintiffs in this case still bear the burden of designating evidence to show that there is no genuine issue of material fact and that Plaintiffs are entitled to judgment against Robert Stiglich as an individual on their claims under the Clean Water Act, for breach of the Restrictive Covenants, and for breach of the implied warranty of habitability.  Plaintiffs have not met their burden on the instant Motion for Partial Summary Judgment.  Plaintiffs have designated no evidence that Stiglich personally took any action related to the development of the Stillwater Subdivision as an individual as opposed to his capacity as a corporate officer.  Plaintiffs designate very little evidence regarding Stiglich personally in their Summary Judgment Brief, discussing him only in the context of Stillwater Properties, LLC and Stillwater Developers, Inc.  There is no analysis in the brief regarding Stiglich's individual liability as a corporate officer either under the responsible corporate officer doctrine or Indiana common law.

Plaintiffs have designated evidence in support of their motion for summary judgment to show that Stillwater Properties, LLC constructed the Stillwater Subdivision portion of the Crooked Creek Trail without a Clean Water Act § 404 permit, in violation of § 301 of the CWA and the Wetlands Restrictions for the subdivision, that the undue restrictions on the floodway at each crossing are a latent defect that breach the implied warranty of habitability, and that these violations contributed to the homeowner's flood damage in 2008.  However, they have failed to establish facts and law and

to make any argument sufficient to hold Stiglich liable on summary judgment. Accordingly, the Court denies Plaintiffs' Motion for Partial Summary Judgment as to Stiglich, and all claims against him remain for trial.

**CONCLUSION**

Based on the foregoing, the Court hereby:

(1) **DENIES** Defendant Hawk Development Corporation's Motion for Summary Judgment [DE 90];

(2) **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Partial Summary Judgment Against Defendants Jack Kovich, Innovative Enterprises, Ltd., Robert Stiglich, Stillwater Properties, LLC, and Hawk Development Corp. [DE 100];

(3) **DENIES as moot** Plaintiffs' Request for Oral Argument [DE 103];

(4) **GRANTS in part** and **DENIES in part** the Motion of Defendants Jack Kovich and Innovative Enterprises, Ltd. for Summary Judgment on Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 56(a) [DE 93];

(5) **DENIES as moot** Defendants Innovative Enterprises, Ltd. and Jack Kovich's Request for Oral Argument [DE 125];

(6) **GRANTS** the Motion to Strike Portions of the Affidavits of Eric P. Ellingson and Martin S. Mann [DE 135]; and

(7) **GRANTS in part** and **DENIES in part** Defendant Hawk Development Corp.'s Motion to Strike Paragraph 5(d) and 6 of the Affidavit of Jonathan Jones [DE 139], filed on May 17, 2011.

SO ORDERED this 11th day of October, 2011.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record
        Pro se Defendant Robert Stiglich