**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| STILLWATER OF CROWN POINT ) | |
| HOMEOWNER'S ASSOCIATION, INC., ) | |
| individually and on behalf of its members; ) | |
| ROGER P. MAHONEY; KENT KOLODZIEJ; and ) | |
| KEVIN J. and MARGARET MCKENNA, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:09-CV-157-PRC |
| ) | |
| ROBERT STIGLICH, ) | |
| Defendant. ) | |

**OPINION AND ORDER**

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment Against Defendant Robert Stiglich [DE 196], filed by Plaintiffs Stillwater of Crown Point Homeowner's Association, Inc., individually and on behalf of its members; Roger P. Mahoney; Kent Kolodziej; Kevin J. McKenna; and Margaret McKenna on April 2, 2013.

This is part two of the story of two subdivisions and three road crossings in Crown Point, Indiana. The Stillwater of Crown Point Subdivision ("Stillwater Subdivision") was developed by Defendants Stillwater Properties, LLC, Innovative Enterprises, Ltd., Robert Stiglich, and Jack Kovich. The Pine Hill Subdivision ("Pine Hill") was developed by Hawk Development Corp. Smith Ditch is located near the border of Stillwater Subdivision and Pine Hill. Three road crossings–Greenview Place, Stillwater Parkway, and Crooked Creek Trail–span Smith Ditch. The crossings at Greenview Place and Stillwater Parkway are within Stillwater Subdivision. The crossing at Crooked Creek Trail, the upstream-most crossing, connects Stillwater Subdivision and Pine Hill; Hawk Development Corp. constructed a "stub section" of the crossing up to the property line within Pine Hill, and Stillwater Properties, LLC constructed the remainder of the crossing, including the portion that spans the channel of Smith Ditch. Each crossing was constructed by placing fill material

in Smith Ditch and the adjacent wetlands along with two thirty-six inch culverts to convey the flow of water in Smith Ditch under the crossings. In September 2008, flooding occurred in the subdivisions as water backed up behind the crossings, adversely affecting homes in the subdivisions, including those of Kent Kolodziej in Pine Hill and Roger P. Mahoney and Kevin J. and Margaret McKenna in Stillwater Subdivision.

In October 2011, this Court ruled on cross-motions for summary judgment. Following the rulings and subsequent settlement negotiations, this case was dismissed against Defendants City of Crown Point, Jack Kovich, Innovative Enterprises, Ltd., and Hawk Development Corp. The only defendant remaining in the case pending before the undersigned Magistrate Judge is Robert Stiglich. This case also remains pending before Chief Judge Philip Simon as to defaulted Defendant Stillwater Properties, LLC.

## PROCEDURAL BACKGROUND

On June 4, 2009, Plaintiffs filed a Complaint against Jack Kovich, Innovative Enterprises, Ltd. ("Innovative Enterprises"), Robert Stiglich, Stillwater Properties, LLC ("Stillwater Properties"), Hawk Development Corp. ("Hawk"), and the City of Crown Point, Indiana ("City"), seeking injunctive relief and damages. Plaintiffs allege that, in 2008, Stillwater Subdivision and at least one home in Pine Hill were affected by flooding and allege that the construction of the three crossings of Smith Ditch created the flooding condition that caused the damage.

In Count I, Plaintiffs bring a Clean Water Act ("CWA") citizen suit pursuant to 33 U.S.C. § 1365(a), alleging that Stiglich, Stillwater Properties, Kovich, Innovative Enterprises, and Hawk's discharge of fill material to construct the crossings of Smith Ditch at Greenview Place and Stillwater Parkway violates the general and specific conditions set forth in the CWA § 401 water quality certification issued by the Indiana Department of Environmental Management ("IDEM") and the

CWA § 404 permit issued by the U.S. Army Corps of Engineers and, therefore, violate an effluent standard or limitation under the CWA. Count I further alleges that Stiglich, Stillwater Properties, Kovich, and Innovative Enterprises' discharge of fill material to construct the crossing of Smith Ditch at Crooked Creek Trail *without* a CWA § 401 water quality certification and CWA § 404 permit violates an effluent standard or limitation under the CWA. Finally, Count I alleges that Hawk's discharge of fill material within Pine Hill to construct the stub portion of the crossing of Smith Ditch at Crooked Creek Trail violates the conditions set forth in the CWA § 404 permit issued by the Corps and, therefore, violates an effluent standard or limitation under the CWA.

In Count II, Plaintiffs allege a breach of the Wetlands Restriction and Covenants by Stiglich, Stillwater Properties, Kovich, and Innovative Enterprises by their development of undersized culverts at the three crossings.

In Count III, Plaintiffs allege a breach of the implied warranty of habitability by Stiglich, Stillwater Properties, Kovich, Innovative Enterprises, and Hawk because these Defendants knew or should have known that there were latent defects in Stillwater Subdivision and Pine Hill, including but not limited to, the inability of the culverts placed in the three crossings to prevent Smith Ditch, a natural watercourse, from flooding homes and common areas in Stillwater Subdivision and Pine Hill during or following a heavy rain.

Count IV alleges negligence *per se* against Stiglich, Stillwater Properties, Kovich, Innovative Enterprises, and Hawk for violating their duties under the Indiana Flood Control Act and the City of Crown Point Flood Control Ordinance to obtain a floodway construction permit pursuant to Indiana Code § 14-28-1-22(c) before developing the three crossings.

In Count V, Plaintiffs' negligence claim alleges that Stiglich, Stillwater Properties, Kovich, Innovative Enterprises, and Hawk breached the duty owed to Plaintiffs to exercise reasonable care

in undertaking, approving, and upgrading the development of streets and drainage infrastructure in Stillwater Subdivision and Pine Hill.

Finally, in Count VI, Plaintiffs allege that the three crossings constitute public and private nuisances and that Stiglich, Stillwater Properties, Kovich, Innovative Enterprises, and Hawk's development and authorization of the three crossings are unlawful pursuant to the City of Crown Point Flood Control Ordinance and are an unreasonable use of the land.

Robert Stiglich filed an Answer on November 30, 2009. An Answer was filed by each of the other defendants with the exception of Stillwater Properties. On October 9, 2009, a Clerk's Entry of Default was entered against Stillwater Properties. On November 16, 2009, Defendant Stillwater Properties was severed as a party defendant for purposes of 28 U.S.C. § 636(c), and the case against Stillwater Properties only remains pending before Chief Judge Philip P. Simon.

As the remainder of the parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case, this case was reassigned to the undersigned Magistrate Judge. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

On October 11, 2011, the Court issued two Opinions with the following rulings: (1) granting Plaintiffs' Motion for Partial Summary Judgment Against Defendant City of Crown Point, Indiana and ordering the City of Crown Point to timely repair or replace the crossings at Greenview Place, Stillwater Parkway, and Crooked Creek Trail, but leaving the remainder of Plaintiffs' claims against the City pending; (2) denying Defendant Hawk Development Corporation's Motion for Summary Judgment; (3) granting in part and denying in part Plaintiffs' Motion for Partial Summary Judgment Against Defendants Jack Kovich, Innovative Enterprises, Robert Stiglich, Stillwater Properties, and Hawk; and (4) granting in part and denying in part the Motion of Defendants Jack Kovich and

4

Innovative Enterprises for Summary Judgment on Plaintiffs' Complaint. The Court denied Plaintiffs' Motion for Partial Summary Judgment as brought against Defendant Robert Stiglich, finding that Plaintiffs did not establish facts and law or make any argument in that motion sufficient to hold Stiglich liable on summary judgment.

On November 3, 2011, Defendants Innovative Enterprises and Jack Kovich were dismissed with prejudice on a joint motion to dismiss. On August 3, 2012, Defendants Hawk and the City of Crown Point, Indiana were dismissed with prejudice on Plaintiffs' motion.

On August 21, 2012, a Notice of Filing Bankruptcy was filed as to Stiglich, and the Court issued an order on September 13, 2012, finding that this matter was stayed as to Stiglich. On March 18, 2013, the Court granted Plaintiffs' Motion to Lift Stay and this matter was restored to the docket.

On April 2, 2013, Plaintiffs filed the instant Motion for Summary Judgment and served on Defendant Stiglich a Notice of Summary Judgment Motion to Pro Se Litigant, setting forth the rules governing Stiglich's response to the summary judgment motion. Defendant Stiglich, pro se, filed a response brief on April 30, 2013, and Plaintiffs filed a reply brief on May 17, 2013.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and

the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). When, as with Plaintiffs' motion, the movant bears the burden of persuasion at trial, it must establish all the essential elements of its claim to prevail on summary judgment. *Celotex*, 477 U.S. at 322; *accord Surles v. Anderson,* 678 F.3d 452, 455-56 (6th Cir. 2012) (recognizing that when the movant bears the burden of persuasion at trial, it "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it") (internal citation and quotation marks omitted).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with

6

'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)).

In this case, Defendant Stiglich is proceeding pro se. In his response brief, Stiglich fails to comply with Northern District of Indiana Local Rule 56-1(b)(2), which requires the party opposing summary judgment to include in its brief or appendix "a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." N.D. Ind. L.R. 56-1(b)(2). Although Stiglich includes a section titled "Statement of Genuine Disputes," it fails to identify any disputed material facts, as it provides in its entirety: "As I so stated above, I am not an attorney and am Pro Se, therefore I will simply say that I do dispute many of the alleged 'undisputed facts' found in section II [Plaintiffs' Statement of Material Facts]; specifically, B., C., D., E., and F. Given the opportunity to present the supporting evidence that will clearly illustrate my position." (Def. Resp., p. 2). Misapprehending the purpose of a motion for summary judgment, Stiglich also requests that the Court deny the motion and allow a jury to hear the facts. The only evidence Stiglich submits in support of his response brief is a copy of Plaintiffs' exhibits with his handwritten notations in the margins. The Court has reviewed his notations; none of the evidence that he references raises a genuine issue of material fact as to the issues before the Court. To the extent that his notations could be construed as argument, the Court considers those arguments in its analysis.

Nevertheless, in viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to

determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50. Although Stiglich has not raised any genuine issues of material fact, the burden rests on Plaintiffs to establish all essential elements of their claims.

## MATERIAL FACTS

### A. The Subdivisions and the Crossings

Stillwater Subdivision is a residential subdivision in Crown Point, Indiana. Smith Ditch is a tributary of Beaver Creek, the drainage basin for which includes Stillwater Subdivision and Pine Hill, as well as areas upstream. Three crossings within Stillwater Subdivision–Greenview Place, Stillwater Parkway, and Crooked Creek Trail ("the Crossings") (listed in order from downstream to upstream)–were constructed by placing dirt and other fill material on the banks and in the channel of Smith Ditch, and by placing two 36-inch culverts to convey the flow in Smith Ditch under each road crossing. Jonathan E. Jones, Plaintiffs' expert, concluded that the three Crossings are located in the floodway of Smith Ditch and are subject to Indiana Department of Natural Resources ("IDNR") jurisdiction. In its August 9, 2006 letter to Stiglich, the U.S. Army Corps of Engineers recognized Smith Ditch as part of the navigable waters of the United States.

### B. The Stillwater Developers

Stillwater Properties, LLC ("Stillwater Properties"), an Indiana limited liability company, was formed on July 1, 1996, with Defendant Robert Stiglich and Defendant Jack Kovich each a 50% member. Stillwater Development, Inc. ("Stillwater Development") was formed on May 6, 1998, with Stiglich and Kovich each owning 50% of its shares. Kovich controlled the day-to-day operations and management of Stillwater Properties and Stillwater Development.

On December 5, 2000, Kovich, as Seller, and Stiglich, as Buyer, executed the Stillwater Properties, LLC, Equity Purchase Agreement. Pursuant to the Agreement, Kovich agreed to sell and

did sell to Stiglich all of Kovich's equity and interest in Stillwater Properties and Stillwater Development. Pursuant to the Agreement, Kovich acknowledged that, as of December 5, 2000, he was no longer a member or manager of Stillwater Properties.

Stiglich is and was the sole shareholder and officer of Diamond Veil Development, Inc. ("Diamond Veil Development"), an Indiana corporation, since its formation on April 30, 1992.

From approximately 1996 to 2002, Stillwater Properties owned the real property that was developed into Stillwater Subdivision. At some point in calendar year 2002, that land was transferred to Land Trust no. 6687 u/t/a dated June 6, 2000, with Mercantile National Bank of Indiana as Trustee. The development of Stillwater Subdivision, including planning, zoning, platting, permitting, grading, developing, or constructing of any section, street or crossing, was generally undertaken by Stillwater Development and Diamond Veil Development.

Stillwater Development developed portions of Stillwater Subdivision at issue in this case between approximately 1998 and 2000. Diamond Veil Development developed portions of Stillwater Subdivision at issue in this case between approximately 2000 and 2007. Stillwater Properties, during the time it owned the land that was developed into Stillwater Subdivision (until sometime in 2002), executed and provided documents as the owner of the real property being developed into Stillwater Subdivision.

### C. Permits

J.F. New & Associates, Inc. ("J.F. New") served as an environmental/wetlands consultant in connection with the development of Stillwater Subdivision through 2004. Jack Kovich is the sole owner of Innovative Enterprises, Ltd. ("Innovative Enterprises"), which Kovich states was not involved in the development of Stillwater Subdivision.

On October 13, 1997, J.F. New, on behalf of Innovative Enterprises, submitted a request for a § 401 Water Quality Certification (under the federal Clean Water Act ("CWA")) to the Indiana Department of Environmental Management ("IDEM"). Revised plans were submitted on October 13, 1997, and December 11, 1997.

By correspondence from IDEM dated February 3, 1998, which referenced the applicant as Innovative Enterprises, the CWA § 401 Water Quality Certification was approved (No. 97-45-MTM-00002-A) with certain delineated conditions, requiring that the project be completed as described in the December 11, 1997 correspondence, that the wetland mitigation be completed within one year, and that a deed restriction be recorded that prohibits dredging, filling, flooding, or modification of wetland vegetation for all wetland areas in the subdivision.

On behalf of Kovich and Innovative Enterprises, J.F. New also submitted an application for a CWA § 404 wetlands permit to the U.S. Army Corps of Engineers. On March 3, 1998, the U.S. Army Corps of Engineers issued a CWA § 404 wetlands permit (File No. 97-145-042-OGC), including authorization under Nationwide Permit ("NWP") 26 to discharge 660 cubic yards of clean fill material into .69 acre of wetlands and other waters to facilitate the construction of Stillwater Subdivision. The permit allowed for the use of 225 cubic yards of fill for the construction of three road crossings, two of which were the crossings at Greenview Place and Stillwater Parkway (but not Crooked Creek Trail). The permit included a number of special conditions, including:

> (1) The permittee shall adhere to the conditions specified by the Indiana Department of Environmental Management's Section 401 Water Quality Certification dated February 3, 1998 . . . .
> (3) The permittee shall be responsible for the successful completion of compensatory mitigation in accordance with the wetland mitigation plan detailed in the document "Pre-Construction Notification and Wetland Delineation Report, Stillwater Subdivision, Crown Point, Indiana" prepared for Jack Kovich, Innovative Enterprises, Inc. . . . .
> (4) Construction of the mitigation areas, including seeding and re-vegetation, shall be concurrent with construction of the authorized work, . . . .

10

. . .

(9) The permittee shall control purple loosestrife . . . .

(10) The permittee acknowledges that this permit allows reasonable use of the property, and in consideration for this, all wetlands within the boundary of this residential subdivision (as depicted in Figures 5-7), shall remain in their natural undisturbed condition in perpetuity and not be subject to any alteration of vegetation, soils or hydrology by the permittee and any heirs or assigns. Areas of approved wetland fill are excluded. Within 30 days from the date of this permit verification, the permittee shall provide this office with documentation that deed restrictions have been filed with the Registrar of Deeds for these areas in the development containing wetlands. Upon receipt of the approved documentation, the Corps shall provide written notification to the permittee that work can proceed.

(Pl. Br., Exh. 8).

NWP 26 also contains a number of general conditions, including under the heading "Section 404 Only Conditions":

6. Obstruction of high flows. To the maximum extent possible, discharges must not permanently restrict or impede the passage of normal or expected high flows or cause the relocation of water (unless the primary purpose of the fill is to impound water).

*Id.* The permit cautions the permittee that it "does not excuse you from the obligation to obtain any other Federal, state, and/or local authorization, if required. You should not commence work until you receive the required authorizations." *Id*. The permit expired no later than December 13, 1999, and a copy of the permit was sent to Kovich.

### D. Wetlands Restriction and Covenants

On March 31, 1998, Kovich, as the managing director of Stillwater Properties, executed, as grantor, a Declaration of Restrictions on Land Use ("Wetlands Restriction") and submitted it to the U.S. Army Corps of Engineers, as required by NWP 26. The Wetlands Restriction identified certain wetlands within the subdivision as a "Conservation Area" and agreed to protect the Conservation Area in exchange for and as a condition of obtaining authorizations to develop Stillwater Subdivision. In particular, Stillwater Properties agreed, therein, to "voluntarily restrict all activities

11

except management practices for native plants and animals within the . . . Conservation Area," and "to protect said Conservation Area in exchange for and as a condition of authorization of the discharges by the Department of the Army, Corps of Engineers in permit number 97-145-042-OGC, dated March 3, 1998." (Pl. Br., Exh. 7). With respect to wetlands in the Conservation Area, other than those authorized by permit 97-145-042-OGC, Stillwater Properties declared and covenanted that "no discharge of fill or dredge material into the Conservation Area shall occur [and that] [t]he restriction and covenant created herein shall be perpetual, and shall be binding upon the Grantor and its legal representatives, heirs and assigns." *Id*. Pursuant to the Wetlands Restriction, any discharge in the Conservation Area, which included the Crossings, except those performed in compliance with permit 97-145-042-OGC is prohibited.

The Wetlands Restriction is also incorporated into the Restrictive Covenants of Stillwater Subdivision (the "Covenants"). Paragraph 1 of the Covenants provides: "Wetlands within Stillwater Subdivision are to be preserved by the developer, contractor and homeowners, as stated in the Declaration of Restrictions on Land Use, filed April 3, 1009 [sic], Document #98023475." (Pl. Br., Exh. 7). Pursuant to the Covenants, the Association and the individual Plaintiffs are authorized to bring suit for breach of the Covenants and Wetlands Restriction and to recover damages and attorney fees:

> [I]f any owner or person in possession shall violate or attempt to violate any of these covenants, restrictions and conditions, it shall be lawful for the undersigned, "the Association," or any person or persons owning any lot in said subdivision, to file and prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any of these covenants, restrictions and conditions, to compel compliance with these covenants, restrictions and conditions or to recover damages caused by such violations, and the owner or owners shall pay court costs and reasonable attorney fees in the event judgment is rendered against him or her or them.

12

(*Id.* ¶ 22). In addition, Paragraph 25 authorizes suits by individual homeowners for damages resulting from any breach of the Covenants:

> Owner Enforcement. Any aggrieved owner may enforce the provisions contained in this Declaration in any proceeding at law or in equity against any person or persons violating any provisions hereof, to restrain such violation and/or to recover damages incurred by the aggrieved owner.

(*Id.* ¶ 25). Specifically, the Covenants provide that parties bringing suit to enforce the terms of the agreement may seek, among other things, sums due for damages, injunctive relief, and attorney fees:

> Additional Legal Remedies. In addition to the administrative remedies set forth herein, the legal remedies may include without limitation, an action to recover sums due for damages, injunctive relief, foreclosure of lien, an action to enforce the sanctions imposed by administrative procedure, or any combination thereof. The prevailing party shall be entitled to recover the costs of any legal proceeding, including reasonable attorney fees.

(*Id.* ¶ 25(D)).

## E. Development and Compliance

In a letter addressed to "Jack Kovich, Sweetwater[sic] Properties, LLC," dated December 13, 2000, the U.S. Army Corps of Engineers reported that a November 29, 2000 compliance inspection revealed several instances of noncompliance with the terms and conditions of the March 3, 1998 permit all of which constituted CWA § 404 violations: none of the required wetlands mitigation that was to be completed by February 3, 1999, had been attempted; unauthorized wetland fill was observed on the north edge of Wetland 3; excavated soil was stockpiled next to the wetland with no silt fence; unauthorized fill was placed in the wetland adjacent to a home under construction and there was no form of erosion control along the perimeter of the wetland; and unauthorized fill was placed in Wetland 1 on lots 203-209.

13

The City of Crown Point received notification by the IDNR that the two crossings of the Smith Ditch at Greenview Place and Stillwater Parkway were installed without a Construction in a Floodway Permit and that the then-existing two 36-inch culverts were undersized and must be modified to IDNR standards. The IDNR requested that the City modify the crossings to meet IDNR standards and submit an application for a Construction in a Floodway Permit.

In his May 21, 2010 Opinion, Plaintiffs' expert Jonathan E. Jones, P.E., D.WRE, opined that the original culverts, which continued to exist at that time, were undersized for the design flow rate and caused rises upstream of the crossings that exceed the IDNR allowable rise criterion. He also opined that Smith Ditch falls under the definition of a floodway and the IDNR jurisdiction defined in the Flood Control Act at all three locations. Jones confirmed this by conversation with the IDNR. Hawk's expert, Martin S. Mann, P.E., opined that Stillwater Subdivision and Pine Hill Subdivision contain wetlands regulated by the CWA.

The third crossing, at Crooked Creek Trail, crosses Smith Ditch near the boundary between Stillwater Subdivision and Pine Hill, with the majority of the crossing contained within Stillwater Subdivision, and is upstream from the Greenview Place and Stillwater Parkway crossings. In a letter dated September 19, 2002, and addressed to Robert Stiglich, Stillwater Properties, the U.S. Army Corps of Engineers informed Stiglich that the construction of the portion of the Crooked Creek Trail crossing in Stillwater Subdivision would violate the CWA § 404 wetlands permit for Stillwater Subdivision and the deed restriction protecting the Conservation Area.

In a letter dated May 14, 2004, the Army Corps of Engineers reminded Stiglich and Stillwater Properties that the discharge of any fill into wetlands or waters of the United States for the construction of the Crooked Creek Trail crossing would require prior authorization from the

Corps pursuant to CWA § 404 because the original permit issued on March 3, 1993, had expired and all new work would require a new application and authorization.

On July 7, 2004, the U.S. Army Corps of Engineers wrote a letter to Stiglich and Stillwater Properties indicating that, during a site inspection, it had discovered that the unauthorized crossing had been built. The letter warned that the failure to obtain the appropriate authorization prior to the initiation of work is seen as a knowing violation of the CWA. The U.S. Army Corps of Engineers ordered Stillwater Properties to cease and desist its unauthorized activities. The letter held in abeyance further proceedings pending the receipt of an after-the-fact permit application on or before July 23, 2004. It also warned that if authorization were to be denied, Stiglich would be informed of enforcement proceedings, including the possible requirement of full and complete site restoration.

On July 8, 2004, Stillwater Properties filed an after-the-fact application for authorization from the U.S. Army Corps of Engineers to install culverts and to discharge fill material in Smith Ditch for the construction of two road crossings, Crooked Creek Trail and Stillwater Parkway. On March 22, 2005, the Corps granted, based upon a regional permit, the application pursuant to certain general and special conditions, including approval from the IDNR:

> The permittee shall adhere to any floodway construction permit conditions specified by [IDNR] when received. Please be aware that any conditions imposed by the IDNR permit will automatically become part of this permit verification. If the IDNR denies your floodway application, we will be obliged to consider your crossings project as denied without prejudice and subject to a restoration order.

(Pl. Br., Exh. 17, p. 2). The permit also includes general conditions requiring Stillwater Properties not to permanently restrict or impede the passage of high flows and to obtain a valid CWA § 401 water quality certification. This CWA § 404 after-the-fact permit conditionally authorized the earlier construction of the Stillwater Subdivision portion of the crossing. The permit provided that it was valid until December 15, 2009.

15

On July 9, 2004, Stiglich applied for a CWA § 401 water quality certification with IDEM. However, the application for the certification stated that a floodway construction permit had been received for the Crooked Creek Trail crossing, when it had not. No application for an after-the-fact floodway construction permit for the existing Crooked Creek Trail crossing was submitted until approximately March 17, 2006. In a September 28, 2007 Denial Notice addressed to Stiglich and Stillwater Properties, IDNR denied the application for the existing Crooked Creek Trail crossing as not approvable because the project "adversely affects the efficiency of, or unduly restricts the capacity of, the floodway" and creates an increase in the 100-year frequency flood elevation that poses an unreasonable threat to the safety of life or property." (Pl. Br., Exh. 18). Consequently, the after-the-fact CWA § 404 permit was then considered denied, as well.

## F. Flooding Events

In his 2010 opinion, Plaintiffs' expert Jonathan E. Jones opined that "the crossings, as constructed, would cause rises during a 100-year event in excess of the 0.14-feet allowed by IDNR regulations. The three crossings of Smith Ditch are drainage structures that adversely affect the efficiency of and unduly restrict the capacity of the Smith Ditch floodway." (Pl. Br., Exh. 2, p. 4). More specifically, Jones opines that the Crossings, as constructed, will result in an increase of the 100-year frequency flood elevation just upstream of the Crossings of 2.58–4.10 feet. Plaintiff Kolodziej's residence has a basement door entrance elevation of 700.32 feet. The pre-developed 100-year frequency flood elevation at this location is 698.86 feet. However, the 100-year frequency flood elevation for the existing conditions with the three Crossings is 702.80 feet, more than two feet above the basement door entrance to the Kolodziej residence.

In September 2008, a flooding event occurred in Stillwater Subdivision and Pine Hill, in which water flooded the homes of Plaintiffs Kevin J. and Margaret McKenna and Roger P. Mahoney

16

in Stillwater Subdivision and the home of Kent Kolodziej in Pine Hill. The McKennas state in an interrogatory response that their "Home experienced severe flooding in September 2008 . . . . Water first entered the Home through the sump pump, then started pouring in through the windows. There was three to four feet of water in our lower level. In 2009 and 2010, there were multiple events during heavy rains in which floodwater backed up at the Crossings and resulted in water entering the McKennas[sic] property. The McKennas paid to have a soil berm constructed behind their house after the severe flooding in September 2008. As a result, water did not enter the Home during the events in 2009 and 2010." (Pl. Br., Exh. 20, Resp. to Inter. No. 19). It appears that the McKennas' home is located upstream from the Greenview Place crossing and downstream from the Stillwater Parkway crossing.

In response to the same interrogatory, Kolodziej answered that his home experienced severe flooding in September 2008. He also answered that flood water from the Crossings had entered his property, but did not infiltrate his home, at least on the following dates: 1/15/2005; 6/5/2005; 4/17/2006; 7/15/2006; 9/13/2006; 12/16/2006; 4/25/2007; 8/31/2007; 1/8/2008; 3/15/2008; 8/25/2008; 12/27/2008; 2/15/2009; 2/27/2009; 3/8/2009; and 10/23/2009. (Pl. Br., Exh. 21, Resp. to Inter. No. 19). The Kolodziej residence is upstream from the Crooked Creek Trail crossing, the upstream-most crossing of the three Crossings.

Also in response to that interrogatory, Mahoney answered that his home experienced severe flooding in September 2008 and that "[i]n 2009, there were multiple events during heavy rains in which floodwater backed up at the Crossings and resulted in water entering Mahoney's property. Water did not enter Mahoney's Home during the events in 2009." (Pl. Br., Exh. 22, Resp. to Inter. No. 19). It is not clear from the evidence where the Mahoney residence is located in relation to the Crossings.

17

### G. Notice of Citizen Suit

On March 9, 2009, Plaintiffs gave timely notice of the alleged violations pursuant to 33 U.S.C. § 1365(b). Neither EPA nor IDEM has commenced a civil or criminal action against Stiglich or the other defendants.

### ANALYSIS

In their Motion for Partial Summary Judgment, Plaintiffs seek judgment against Stiglich on their claims under the Clean Water Act, a negligence *per se* theory under Indiana law, and the Declaration of Restrictions on Land Use and Restrictive Covenants of Stillwater Subdivision. Plaintiffs are not seeking summary judgment against Stiglich on their claims of breach of the implied warranty of habitability, negligence, or nuisance. The Court considers each argument in turn.

### A. Clean Water Act

In the instant motion, Plaintiffs seek summary judgment against Stiglich on the Clean Water Act claim, arguing that the discharge of fill material to construct the Crossings violates the CWA. Plaintiffs assert that the crossings at Greenview Place and Stillwater Parkway violate the general and specific conditions set forth in the CWA § 401 water quality certification issued by IDEM and the CWA § 404 wetlands permit issued by the U.S. Army Corps of Engineers and, therefore, violate an effluent standard or limitation under the CWA. As for the crossing at Crooked Creek Trail, Plaintiffs argue that it was constructed without any CWA § 401 water quality certification or CWA § 404 wetlands permit. Plaintiffs contend that Stiglich is personally liable for these CWA violations because he was one of two individuals responsible for the development of Stillwater Subdivision, because he was the only individual responsible for the subdivision's development after December 5, 2000, and because he was a responsible corporate officer of Stillwater Properties during the continuing violations. Recognizing that the three Crossings have recently been removed or mostly

removed by the City of Crown Point pursuant to this Court's Order, Plaintiffs contend that Stiglich remains liable for the CWA violations and that Plaintiffs are entitled to recover from Stiglich their litigation costs incurred as a result of his CWA violations.

The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987). Under the CWA, the "discharge of any pollutant by any person" is strictly prohibited, except in compliance with one of the permitting schemes set forth in the CWA, including the wetlands discharge permit program in 33 U.S.C. § 1344. *See* 33 U.S.C. § 1311(a); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 947 (7th Cir. 2004) (quoting § 1311(a)); *United States v. Huebner*, 752 F.2d 1235, 1239 (7th Cir. 1985), *cert. denied*, 474 U.S. 817.

Under 33 U.S.C. § 1341(a), the CWA requires that any applicant for a federal license or permit to conduct any activity that will result in a discharge into navigable waters shall obtain and provide to the permitting agency a water quality certification ("CWA § 401 permit") from the State (from IDEM, in this case), certifying that the discharge will comply with all applicable provisions, including § 1311. *See* 33 U.S.C. § 1341(a). The Secretary of the Army, through the U.S. Army Corps of Engineers, is authorized under 33 U.S.C. § 1344 to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (quoting 33 U.S.C. § 1344(a), (d)). Any condition set forth in the CWA § 401 water quality certification becomes a condition of the CWA § 404 federal license or permit. 33 U.S.C. § 1341(d).

A private cause of action is authorized under 33 U.S.C. § 1365, allowing any citizen to file a civil action on his own behalf against any person "who is alleged to be in violation of . . . an effluent standard or limitation" under the CWA. *Id*. at § 1365(a)(1). Section 1365(f) defines "effluent standard or limitation" as including, but not limited to, "an unlawful act under subsection (a) of section 1311" and "certification under section 1341." *Id*. at § 1365(f). Thus, a term or condition in a permit issued under CWA § 404 or a water quality certification issued under CWA § 401 is an "effluent standard or limitation" that may be enforced by way of a citizen suit under § 1365. Under § 1344, "[c]ompliance with a permit issued pursuant to [§ 1344], including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title." 33 U.S.C. § 1344(p).

The available remedies in a citizen suit are injunctive relief and the assessment of civil penalties not to exceed $25,000 per day for each violation. *See* 33 U.S.C. § 1365(a); 33 U.S.C. § 1319(d); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 175 (2000). The statute further allows for an award of litigation costs, including reasonable attorney and expert witness fees, to a "prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d).

To prevail, Plaintiffs must establish the five elements of the prima facie case for a violation of the CWA: (1) Stiglich is a person who controlled, performed, or was otherwise responsible for the activities at issue; (2) Stiglich discharged pollutants; (3) from a point source; (4) into streams or wetlands that qualify as jurisdictional "waters of the United States;" (5) without a permit or other statutory authorization for such discharge, or in violation of a permit issued under CWA § 404. *See*

*United States v. Bedford*, CIV.A.2:07CV491, 2009 WL 1491224, at *9 (E.D. Va. May 22, 2009) (citing 33 U.S.C. §§ 1311(a), 1344(a), 1362; *Avoyelles Sportsman's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983); *United States v. Lambert*, 915 F. Supp. 797, 802 (S.D. W. Va. 1996)); *see also United States v. Brace*, 41 F.3d 117, 120 (3d Cir. 1994); *United States v. Scruggs*, CIV.A. G-06-776, 2009 WL 81921 (S.D. Tex. Jan. 12, 2009); *United States v. RGM Corp.*, 222 F. Supp. 2d 780, 786 (E.D. Va. 2002). Plaintiffs offer evidence in support of these elements, and Stiglich does not contest any element either as a matter of law or by offering evidence to create a genuine issue of material fact.

The Court begins with the fourth element. The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). To determine whether wetlands adjacent to non-navigable in fact waterways are subject to regulation by the CWA, the Seventh Circuit Court of Appeals follows the significant nexus test adopted by Justice Kennedy's concurring opinion in *Rapanos v. United States*, 547 U.S. 715 (2006). *See United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir. 2006) (following Justice Kennedy's concurring opinion in *Rapanos*, which adopts the significant nexus test outlined in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001)).[1]

---

[1] The decision in *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir. 2006), was issued prior to the June 5, 2007 Memorandum in which the U.S. Army Corps of Engineers and the Environmental Protection Agency originally announced that they will apply *Rapanos* to assert jurisdiction if the wetlands or tributaries meet *either* Justice Kennedy's *or* the plurality's standard. *See* Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (June 5, 2007), available at http://water.epa.gov/lawsregs/guidance/wetlands/upload/2007_6_5_wetlands_RapanosGuidance6507.pdf (last visited Feb. 24, 2014). A subsequent Memorandum was issued on December 2, 2008, which incorporated revisions to the June 5, 2007 Memorandum "after careful consideration of public comments received and based on the agencies' experience in implementing the *Rapanos* decision." Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008), available at http://water.epa.gov/lawsregs/guidance/wetlands/upload/2008_12_3_wetlands_CWA_Jurisdiction_Following_Rapanos120208.pdf (last visited Feb. 24, 2014). The Seventh Circuit Court of Appeals has not revisited the issue since *Gerke Excavating*.

In its August 9, 2006 letter to Stiglich, the U.S. Army Corps of Engineers identified Smith Ditch as part of the navigable waters of the United States. Smith Ditch is a tributary of Main Beaver Dam Ditch, which is a tributary of Deep River, which is a tributary of Little Calumet River, a traditionally navigable water. *See* http://www.lrc.usace.army.mil/Missions/Regulatory/NavigableWaters.aspx (visited February 12, 2014) (Army Corps of Engineers' list of "Navigable Waters of the United States" within the Chicago District, which lists the Little Calumet River); *United States v. Fabian*, 522 F. Supp. 2d 1078, 1092-93 (N.D. Ind. 2007) (finding the Little Calumet River to be navigable in fact). Stiglich offers no legal argument nor does he raise any genuine issue of material fact to contest that Smith Ditch is a navigable water of the United States for purposes of the CWA.

In its October 11, 2011 Opinion in this case, this Court held that, under Justice Kennedy's concurring opinion in *Rapanos*, which was issued two months prior to the U.S. Army Corps of Engineer's August 9, 2006 letter, the channel of Smith Ditch and the surrounding wetlands are "navigable waters" as defined within the CWA, 33 U.S.C. § 1362(7).[2] Stiglich filed no response in

---

[2] In the October 11, 2011 Opinion, this Court recognized that the U.S. Army Corps of Engineers historically interpreted "the waters of the United States" expansively to include not only traditionally navigable waters, but also defined waters, tributaries of such waters, and wetlands adjacent to such waters and tributaries. *See* (Oct. 11, 2011 Opinion and Order, docket entry 157, p. 61) (citing *Rapanos v. United States*, 547 U.S. 715 (2006) (plurality opinion) (citing 33 C.F.R. § 328.3(i)(1), (2), (3), (5), and (7)). This Court explained that, in *Gerke Excavating*, 464 F.3d at 724-25, the Seventh Circuit Court of Appeals followed Justice Kennedy's concurring opinion in *Rapanos*, which adopted the significant nexus test to determine whether wetlands adjacent to non-navigable in fact waterways are subject to regulation by the CWA. *Id.* at 62. Justice Kennedy found that

> wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Rapanos*, 547 U.S. at 780. This Court recognized that, based on the evidence submitted on the cross-motions for summary judgment by Plaintiffs and the Innovative Defendants, J.F. New (the Innovative Defendants' wetland consultant) had evaluated Smith Ditch and the surrounding wetlands and found that the Greenview Place and Stillwater Parkway crossings would be constructed by placing fill in "waters of the United States," albeit prior to the decision in *Rapanos*. *Id.* at 64-65. Nevertheless, J.F. New provided a factual basis for the decision, noting that "wetland 1," across the northern part of which Greenview Place was constructed, and "wetland 2," through which Stillwater Parkway was constructed, are identified on the National Wetland Inventory Map as "permanently flooded" and "seasonally flooded" respectively. *Id.* at 64. J.F. New found hydric soils, hydrology, and hydrophylic vegetation in both wetland 1 and wetland

opposition to Plaintiffs' first Motion for Summary Judgment against him, on which the Court issued the October 11, 2011 Opinion. Thus, Smith Ditch is part of the navigable waters under the CWA for purposes of Plaintiffs' claim.

Next, as to the second and fifth elements, the three Crossings at Greenview Place, Stillwater Parkway, and Crooked Creek Trail constitute the discharge of pollutants without a permit or other statutory authorization or in violation of a permit issued under CWA § 404. The term "discharge of a pollutant" is defined by the CWA to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term "pollutant" includes fill material such as rock and dirt. *Id.* at § 1362(6). The regulations define "fill material":

> (e)(1) Except as specified in paragraph (e)(3) of this section, the term fill material means material placed in waters of the United States where the material has the effect of:
> (i) Replacing any portion of a water of the United States with dry land; or
> (ii) Changing the bottom elevation of any portion of a water of the United States.
> (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.
> (3) The term fill material does not include trash or garbage.

33 C.F.R. § 323.2(e)(1). The term "discharge of fill material" is defined as "the addition of fill material to the waters of the United States." 33 C.F.R. § 323.2(f). This includes "[p]lacement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States" and "the building of any . . . infrastructure . . . requiring rock, sand, dirt, or other material

---

2. *Id.* In the instant case, the Court found that, given the reasoning of Justice Kennedy's concurrence in *Rapanos* and the resulting significant nexus test, Plaintiffs had established as a matter of law that Smith Ditch and the wetlands at issue are covered as "waters of the United States" under the CWA. *Id.* at 65.

for its construction," as well as "causeways or road fills." *Id.* The Crossings constitute the discharge of a pollutant under the CWA.

IDEM's and the Army Corps of Engineers' approval of the CWA § 401 and CWA § 404 permits for the Greenview Place and Stillwater Parkway crossings was expressly conditioned on Stillwater Property's commitment to construct the crossings in conformance with the December 11, 1997 applications, including the implementation of wetlands mitigation to "restore the original hydrology levels" to all wetland areas. However, as set forth in the material facts, Stillwater Property did not construct the development as described in the December 11, 1997 applications. The drainage culverts installed at the crossings were too small to efficiently convey storm water runoff that flows into and through Smith Ditch. In addition, boundaries between wetlands and uplands were not properly demarcated and separated by properly installed silt fencing. As a result, all wetlands in Stillwater Subdivision were not restored to original hydrology levels. This was a violation of the explicit terms of the permits and, accordingly, the discharge of fill into Smith Ditch was not in compliance with a valid CWA permit and was unlawful pursuant to 33 U.S.C. § 1311. The Court made this holding in its October 11, 2011 Opinion on Plaintiffs' first Motion for Summary Judgment, to which Stiglich filed no response.

The Crooked Creek Trail crossing violates the CWA because it was built without Stiglich first obtaining any CWA § 401 water quality certification or CWA § 404 permit. This was in spite of several communications by the U.S. Army Corps of Engineers informing Stiglich that construction of the portion of the Crooked Creek Trail crossing in Stillwater Subdivision would require a CWA § 404 wetlands permit.

24

Moreover, Stiglich never obtained after-the-fact authorization from IDEM and the U.S. Army Corps of Engineers for the construction of the Crooked Creek Trail crossing. After the U.S. Army Corps of Engineers discovered the unauthorized crossing at Crooked Creek Trail and ordered Stiglich to cease and desist the unauthorized filling within wetlands (just months after advising Stiglich that a permit was required), Stiglich submitted an after-the-fact permit application to the U.S. Army Corps of Engineers. The permit was granted, but only on the condition that Stillwater Properties adhere to any floodway construction permit conditions specified by IDNR. The after-the-fact permit provided: "If the IDNR denies your floodway application, we will be obliged to consider your crossings project as denied without prejudice and subject to a restoration order." (Pl. Br., Exh. 17). Stiglich then submitted to IDNR an after-the-fact floodway construction permit application for the Crooked Creek Trail crossing, but it was denied because the application did not demonstrate that the project would not unduly restrict the capacity of the floodway. Specifically, IDNR found that the modeling submitted in support of the application demonstrated that the Crooked Creek Trail crossing "creates an increase in the 100-year frequency flood elevation that poses an unreasonable threat to the safety of life or property." (Pl. Br., Exh. 18). Thus, pursuant to the special condition in the U.S. Army Corps of Engineer's after-the-fact approval of the CWA § 404 permit, the denial of the floodway construction permit also resulted in the CWA § 404 being deemed denied and subject to a restoration order. Because the Crooked Creek Trail crossing lacked any CWA § 401 or CWA § 404 authorization, the presence of the fill material was unlawful. *See* 33 U.S.C. § 1341.

In its October 11, 2011 Opinion, the Court held as a matter of law that the continued presence of fill for the Crossings in Smith Ditch constitutes a continuing violation. *See* (Oct. 11, 2011 Opinion and Order, docket entry 157, p. 58) (citing *Stepniak v. United Materials, LLC*, No.

25

03-CV-0569A, 2009 WL 3077888, at *4 (W.D.N.Y. Sept. 24, 2009) (holding that "the weight of authority supports plaintiffs' position that the continued presence of fill material constitutes a continuing violation") (citing cases); *Greenfield Mills, Inc. v. Goss*, No. 1:00-CV-0219, 2005 WL 1563433, at *2-5 (N.D. Ind. June 28, 2005) (discussing extensively *Gwaltney*) (citing cases); *Sasser v. United States EPA*, 990 F.2d 127, 129 (4th Cir. 1993); *City of Mountain Park, GA v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2008) (analyzing cases and holding that violations of the CWA are ongoing as long as the pollutants remain in the wetlands, noting that the fill materials at issue in that case do not significantly dissipate or dissolve over time); *United States v. Reaves*, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996); *North Carolina Wildlife Fed'n v. Woodbury*, No. 87-584-CIV-5, 1989 WL 106517, *2-3 (E.D. N.C. Apr. 24 1989)); *see also Jones Creek Investors, LLC v. Columbia Cnty., Ga.*, No. CV 111-1742013, 2013 WL 1338238, at *12 (S.D. Ga. Mar. 28, 2013) (holding that the continued presence of illegally discharged fill material in U.S. jurisdictional waters constitutes a continuing violation).

In *Gwaltney*, the United States Supreme Court held that the harm to be addressed in a citizen suit under the CWA must be brought to address a present or future harm, not a past violation. *See Gwaltney*, 484 U.S. at 59-60. However, the defendant in *Gwaltney* discharged wastewater in violation of CWA § 402, not fill material in violation of CWA § 404, which is at issue in this case. *See* (Oct. 11, 2011 Opinion and Order, docket entry 157, p. 58) (citing *Lakeside at Ansley*, 560 F. Supp. 2d at 1296 (discussing the application of *Gwaltney* to discharges of fill material); *Informed Citizens United, Inc. v. USX Corp.*, 36 F. Supp. 2d 375, 377 (S.D. Tex. 1999) (concluding that *Gwaltney* does not apply to discharges of fill material because *Gwaltney* involved a wastewater

violation)).[3] The Court continues to agree that "to hold that no continuing violation exists when the very consequence of an illegal discharge is the harm, would provide no remedy to plaintiffs such as the ones in this case, where the relief sought is remediation" of the continued presence of fill in the waterway. *Greenfield Mills*, 2005 WL 1563433, at *5. Similarly, the Court found the fact that the CWA § 404 permits for the crossings in this case had expired did not preclude a citizen suit and to hold so would thwart the CWA's remedial purpose. Thus, on October 11, 2011, the Court held that the continued presence of the fill material in Smith Ditch at each of the Crossings constituted a continuing violation. Again, Stiglich filed no response in opposition to Plaintiff's first Motion for Summary Judgment.

As for the third requirement, that the discharge be made from a point source, the CWA defines a "point source" as "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). "Courts have consistently held that dump trucks, backhoes, bulldozers, tractors, and other equipment used for mechanized land clearing and filling are all point sources under the CWA." *Bedford*, 2009 WL 1491224, at *10 (citing *United States v. Tull*, 615 F. Supp. 610, 622 (E.D. Va. 1983), *aff'd* 769 F.2d 182 (4th Cir. 1985), *rev'd on other grounds*, 481 U.S. 412 (1987); *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 815 (9th Cir. 2001), *aff'd* 537 U.S. 99 (2002); *United States v. Pozsgai*, 999 F.2d 719, 726 n. 6 (3d Cir. 1993); *United States v. Huebner*, 752 F.2d 1235, 1243 (7th Cir. 1985); *Avoyelles*, 715 F.2d at 922). The construction of the Crossings

---

[3] In the prior summary judgment briefing, the Innovative Defendants argued that the harm to be addressed in a citizen suit under the CWA must be brought to address a present or future harm, not a past violation, citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987), and *Bettis v. Town of Ontario, N.Y.*, 800 F. Supp. 1113, 1118-19 (W.D.N.Y. 1992). In its October 11, 2011 Opinion, the Court reasoned that *Bettis*, cited by the Innovative Defendants, has been found to be an "aberration" in light of the weight of authority, *see* (Oct. 11, 2011 Opinion and Order, docket entry 157, p. 58) (citing *Informed Citizens United, Inc. v. USX Corp.*, 36 F. Supp. 2d 375, 377 (S.D. Tex. 1999), and is ignored even by the Western District of New York, *id*. (*citing Stepniak v. United Materials, LLC*, No. 03-CV-0569A, 2009 WL 3077888, *4 (W.D.N.Y. Sept. 24, 2009)).

undoubtedly involved bulldozers and dump trucks or other mechanized filling equipment, which are point sources under the CWA. *See Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.*, 608CV064, 2009 WL 2390851, at *9 (S.D. Ga. Aug. 4, 2009) (citing *United States v. Weisman,* 489 F. Supp. 1331, 1337 (M.D. Fla. 1980) (bulldozers and dump trucks are point sources)). Stiglich has not offered evidence to the contrary.

As for the first element, Plaintiffs have established that Stiglich is individually liable for the CWA violations at the Greenview Place, Stillwater Parkway, and Crooked Creek Trail crossings. Courts impose liability under the Clean Water Act upon a party who (1) performed the work or (2) had responsibility for or control over the performance of the work. *See Jones v. E.R. Snell Contractor, Inc.*, 333 F. Supp. 2d 1344, 1348 (N.D. Ga. 2004); *United Sates v. Lambert*, 915 F. Supp. 797, 802 (S.D. W.V. 1996); *United States v. Sargent County Water Res. Dist.*, 876 F. Supp. 1081, 1088 (D.N.D. 1992); *United States v. Bd. of Trs. of Florida Keys Cmty. College*, 531 F. Supp. 267, 274 (1981).

For the Greenview Place and Stillwater Parkway Crossings, Stiglich and Kovich were the two individuals responsible for the development of Stillwater Subdivision until March 2000, at which time Kovich sold his interest in both Stillwater Development and Stillwater Properties to Stiglich and relinquished his management role. Until that time, Stiglich had a 50 percent interest in Stillwater Development and Stillwater Properties, but the day-to-day operations and management of Stillwater Development and Stillwater Properties were undertaken by Kovich. In his Interrogatory answers, Stiglich states that he "did not develop any commercial or residential developments between August 18, 1997, and June 5, 2009." (Pl. Br., Exh. 6, answer to Inter. No. 7). It appears from the evidence that construction of the Greenview Place and Stillwater Parkway crossings began

28

in 1998, when Stillwater Development developed portions of Stillwater Subdivision and Kovich was responsible for the day-to-day operations. The April 28, 1998 letter from J.F. New to the U.S. Army Corps of Engineers provides that "[w]ork has begun on the project and will continue through next year." (Pl. Br., Exh. 7). The letter was cc'd to "Jack Kovich, Stillwater Properties, LLC." Plaintiffs have not offered any evidence that Stiglich personally had responsibility for or control over the performance of the development during that time period.

However, from 2000 to 2007, Diamond Veil Development, of which Stiglich was the sole shareholder and officer, developed portions of Stillwater Subdivision, and, beginning in 2000, Stiglich was the sole member of Stillwater Properties and the sole shareholder of Stillwater Development. Thus, beginning in 2000, whether the two crossings were still being built or were built and constituted a continuing violation, Stiglich was the only party who had responsibility for or control over the performance of the work related to the Greenview Place and Stillwater Parkway crossings. This is the time period during which the actions that constituted violations of the CWA § 401 and CWA § 404 permits for the two crossings occurred—the failure to restore the original hydrology levels to all wetland areas and the continued presence of unlawfully discharged fill in the wetland areas.

As for the Crooked Creek Trail crossing, Kovich sold his interest in Stillwater Development and Stillwater Properties to Stiglich in 2000. Although Plaintiffs have not offered evidence that Stiglich performed the work, Stiglich was the only developer of Stillwater Subdivision at the time the Crooked Creek Trail crossing was constructed in 2007 and, thus, was the only person who had responsibility for or control over the performance of the work. Stiglich was the only named permittee for the Crooked Creek Trail CWA § 401 and CWA § 404 permits that were submitted after

29

the fact–and violated; neither Stillwater Properties, Stillwater Development, Diamond Veil Development, nor any other entity is named on the permits. From 2004 to 2007, the U.S. Army Corps of Engineers addressed its correspondence to "Robert Stiglich, Stillwater Properties, LLC;" however, Stiglich stated in his Interrogatory Answer that Stillwater Properties was only active through 2002, when its ownership of the real property ceased.

Finally, for the time period after Kovich sold his interest in the entities and surrendered his management role, Stiglich is liable as the responsible corporate officer of Stillwater Properties, Stillwater Development, and Diamond Veil Development.[4] The United States Supreme Court first articulated the responsible corporate officer doctrine in *United States v. Dotterwiech*, 320 U.S. 277, 284 (1943), a criminal prosecution under the Federal Food, Drug, and Cosmetic Act ("FDCA"). The Supreme Court held that criminal liability under the 1938 version of the FDCA extended to responsible corporate officers, notwithstanding the omission of the explicit language holding corporate officers liable that had been in the 1906 version of the FDCA. The Supreme Court reasoned that "[t]o hold that the Act of 1938 freed all individuals, except when proprietors, from the culpability under which the earlier legislation had placed them is to defeat the very object of the new Act. Nothing is clearer than that the later legislation was designed to enlarge and stiffen the penal net and not to narrow and loosen it." *Id*. at 282. The Supreme Court held that a corporate officer is criminally liable under a public welfare statute if he had "a responsible share in the furtherance of the transaction which the statute outlaws." *Id*. at 284. Although *Dotterwiech* recognizes the

---

[4] Although the Court found in its October 11, 2011 Opinion that Kovich was individually liable under the responsible corporate officer doctrine, because Plaintiffs did not raise the responsible corporate officer doctrine in their brief in support of the first Motion for Summary Judgment, Stiglich did not previously have an opportunity to respond to the legal argument. However, Plaintiffs argue for the application of the doctrine in the instant motion, and Stiglich has offered no substantive legal or factual response.

application of the responsible corporate officer doctrine for criminal liability, the case did not apply the doctrine to civil suits.

The Supreme Court in *United States v. Park* expanded the concept of a "responsible share" in the criminal conduct articulated in *Dotterweich* and held that the Government may satisfy its burden of proof by introducing "evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so." 421 U.S. 658, 673-74 (1975).

Like the Food, Drug, and Cosmetic Act, the Clean Water Act specifically provides for responsibility under the responsible corporate officer doctrine for criminal penalties. 33 U.S.C. § 1319(c) (titled "criminal penalties"). For the purposes of the criminal penalties in subsection (c) of § 1319, "the term 'person' means, in addition to the definition contained in § 1362(5) of this title, any responsible corporate officer." *Id*. at § 1319(c)(6) (titled "responsible corporate officer as 'person'"). Section 1319(c) sets forth the criminal penalties for a person who violates certain sections of the CWA. *Id*. at § 1319(c)(1), (2), (3), (4). In contrast, there is no such provision adding a "responsible corporate officer" as a person for purposes of subsection (d) of § 1319, which addresses "civil penalties" of the type that can be brought by citizens pursuant to a citizen suit. 33 U.S.C. §§ 1319(d), 1365(a) ("civil penalties" and "citizen suits," respectively). Section 1362(5) defines a "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

At the time of this Court's October 11, 2011 Opinion, the Court had not identified any decisions in this circuit addressing the question of whether the responsible corporate officer doctrine

31

applies in a civil CWA case, and more specifically a citizen suit under the Act. Nor did the Seventh Circuit Court of Appeals appear to have addressed the application of the doctrine to a civil suit under any other public welfare act. However, two district courts within the circuit had applied the definition of "person" that includes responsible corporate officers set forth in 33 U.S.C. § 1319(c)(6) in criminal cases under the CWA without discussing the case law. *See United States v. Hagerman*, 525 F. Supp.1058, 1061 (S.D. Ind. 2007); *see also United States v. Metalite Corp.*, No. NA 99-008-CR-B/N, 2000 WL 1234389, at *9 (S.D. Ind. July 28, 2000). The Court recognized that courts in several other circuits have expressly found that the responsible corporate officer doctrine *does* apply in civil citizen suits brought under the CWA, 33 U.S.C. § 1365, several of which rejected the argument that the explicit application of the doctrine in the CWA to criminal penalties precludes its application to civil cases and citizen suits.[5]

---

[5] *See City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 160-162 (S.D.N.Y. 2010) (finding that the responsible corporate officer doctrine applies to claims against individuals under the CWA) (citing *Puget Soundkeeper Alliance v. Tacoma Metals, Inc.*, No. 07 Civ. 5227, 2008 WL 3166767, at *12 (W.D. Wash. Aug. 5, 2008) (holding that an individual can be held liable under the doctrine in a citizen suit and rejecting the defendant's argument that the doctrine applies only to criminal penalties); *Humboldt Baykeeper v. Simpson Timber Co.*, No. 06 Civ. 4188, 2006 WL 3545014, at *4 (N.D. Cal. Dec. 8, 2006); *Waterkeepers N. Cal. v. AG Indus.* Mfg., No. 00 Civ. 1967, 2005 WL 2001037, at *13 (E.D. Cal. Aug. 19, 2005) (denying summary judgment in favor of the individual defendant under the CWA after discussing the holding in *United States v. Iverson*, 162 F.3d 1015 (9th Cir. 1998), recognizing that *Iverson* was a criminal case, and noting that the doctrine has been applied in civil cases, citing *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 561 (6th Cir. 1985)); *Franklin v. Birmingham Hide & Tallow Co.*, No. CV-BU-0259-S, 1999 U.S. Dist. LEXIS 22489, *45-46 (N.D. Ala. Apr. 22, 1999) (applying the responsible corporate officer doctrine under the CWA and rejecting argument that the doctrine applies only to criminal cases) (citing *United States v. Gulf Park Water Co.*, 972 F. Supp. 1056 (S.D. Miss. 1997) (finding individual liability in a state enforcement action under 33 U.S.C. § 1319(a)(1) in appropriate cases when the individual participated in or was responsible for the violations, even when purporting to act through a corporate entity, because the definition of "person" specifically includes "individuals" under 33 U.S.C. § 1362(5)); *United States v. Mac's Muffler Shop, Inc.*, Civ. A. No. C85-138R, 1986 WL 15443, at *7 (N.D. Ga. Nov. 4, 1986) (holding, in an action for civil penalties under the Clean Air Act, that the statute contemplates that corporate officials as well as the corporation itself can be liable for violations because "person" is defined in the Clean Air Act as any "individual [or] corporation . . . and any officer, agent or employee thereof")); *United States v. Conservation Chem. Co.*, 660 F. Supp. 1236, 1245-46 (N.D. Ind. 1987) (holding corporate officer to be a "person" within meaning of RCRA and, thus, can be personally liable); *but see Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145, 1148 (N.D. Ill. 1980) (declining to apply the responsible corporate officer doctrine in a civil suit under the Clean Air Act, in the absence of any case authority to the contrary, because the court was "unwilling to disregard what it considers to be the clear intent of Congress to exempt individual corporate officers from liability under citizen's suits of this type"); *Illinois v. Celotex Corp.*, 516 F. Supp. 716 (C.D. Ill. 1981) (holding that, given the absence of language specifically defining "person" to include a responsible corporate officer for citizen suits when the term was included for EPA

The Sixth Circuit Court of Appeals, in the context of the Radiation Control for Health and Safety Act of 1968 ("RCHSA"), another public welfare statute, found the individual corporate officer individually liable for civil penalties for RCHSA violations. *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 560-61 (6th Cir. 1985). The court relied on the definition of "manufacturer" under the RCHSA as "any person engaged in the business of manufacturing, assembling, or importing of electronic products" and reasoned that because the individual defendant was the major shareholder and president of the company, "the conclusion that he was included in this definition is self-evident." *Id.* at 560. The court relied generally on the holdings in *Park* and *Dotterweich* "that corporate officers could be held individually liable for violations of public health legislation." *Id.* at 561. The court dismissed the defendant's argument that *Park* and *Dotterweich* applied to criminal, rather than civil liability, finding that

> the rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved, which at most would result in a monetary penalty. The fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders civil liability appropriate as well.

*Id.*

As set forth in its October 11, 2011 Opinion, the Court is persuaded by the weight of the case law and the rationale articulated in *Hodges X-Ray, Inc.* and finds that the responsible corporate officer doctrine extends to civil violations under the Clean Water Act. One of the key factors courts have relied upon to hold a person liable under the doctrine is whether the individual held himself out to the regulatory agency as the primary contact for compliance issues. *See Golf Park Water*, 972 F. Supp. at 1064 (finding defendant liable, as a "responsible corporate officer," for a water

---

enforcement actions, Congress did not intend that corporate officers be subject to civil citizen suits).

company's violations because he corresponded and met with wastewater authority on behalf of water company and sent compliance letters on another company's letterhead but signed by defendant as president of the water company); *Indiana Dep't of Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 561-63 (Ind. 2001) (noting that the permit applications identified the defendant as the person responsible for ensuring compliance with environmental permits); *Matter of Dougherty*, 482 N.W.2d 485, 490 (Minn. Ct. App. 1992) (considering that defendant was "primary contact with all regulatory bodies").

Stiglich is liable under the responsible corporate officer doctrine for the ongoing CWA violations at Greenview Place and Stillwater Parkway because he was the only developer of Stillwater Subdivision and the only corporate officer of the companies responsible for the permitting, construction, and development of the subdivision after December 5, 2000. As for the Crooked Creek Trail crossing, Stiglich stated in his Interrogatory Answers that Stillwater Properties was no longer active after 2002; thus, he was directly personally liable. To the extent that Stillwater Properties was in fact active, Stiglich would be liable as the responsible corporate officer of Stillwater Properties. Again, all of the correspondence from the U.S. Army Corps of Engineers regarding the Crooked Creek Trail crossing is to or from Stiglich; Stiglich held himself out to the agencies as the primary contact for compliance issues, and he was the only developer of Stillwater Subdivision at that time.

Although Stiglich's response brief itself does not contain any substantive arguments, in the interests of justice, the Court considers his handwritten notes made in the margins of the evidence Plaintiffs proffered in support of this summary judgment motion. Several of Stiglich's notations indicate that he believes that the City of Crown Point or the homebuilders are liable for Plaintiffs'

damages, for example: "*Builder's fault!" (Pl. Br., Exh. 3, p. 6), "Jeff Ban is responsible for this! All City's Fault!" (*id*. at 8), "Pretty ludicrous, isn't it? Hawk not required to obtain permit while we are. Same road-same project isn't it? WTF? Therein lies more confusion. However it does not take away from the fact that the City is at fault period!" (*id*. at 9). None of these comments refute the evidence set forth above placing liability on Stiglich, and Stiglich offers no law or analysis that the actions of the City or the homebuilders free him of his liability under the CWA for the reasons set forth above.

Lastly, Plaintiffs represent to the Court, without submission of evidence, that the City of Crown Point has purportedly removed most or all of the fill from the three crossings. *See* (Pl. Br., p. 14 n. 7, p. 20). Thus, it appears that there may no longer be a continuing violation. Nevertheless, courts have held, in the context of a § 402 violation (which, as discussed above in relation to the *Gwaltney* case, cannot be based on a continuing violation), that a claim for civil penalties is not mooted by the defendant's cessation of the challenged practice. *See Tamaska v. City of Bluff City*, 26 F. App'x 482, 486 (6th Cir. 2002) (citing *Friends of the Earth*, 528 U.S. at 189). Because the material unlawfully discharged by Stiglich was in the Crossings at the time Plaintiffs filed the lawsuit, and, thus, a continuing violation, Stiglich cannot avoid liability for his CWA violations by refusing to remedy the violations for so long that another party eventually undertook remedial action to end the continuing violation of the § 404 permit only after the lawsuit was filed and prosecuted for several years by Plaintiffs.

In the instant motion, Plaintiffs are not requesting the assessment of civil penalties nor do they seek injunctive relief as the remedy for their CWA claim; rather, Plaintiffs seek to recover their litigation costs in bringing the CWA claim against Stiglich. Although Plaintiffs state in footnote 9

35

that Stiglich is still liable for CWA violations and must pay "civil penalties and Plaintiffs' litigation costs–under 33 U.S.C. § 1365," Plaintiffs do not ask the Court to make an award of civil penalties in either the motion or the memorandum in support. Stiglich is liable for Plaintiffs' litigation costs, including attorney fees, under § 1365(d). *See Tamaska*, 26 F. App'x at 487.

Accordingly, the Court grants Plaintiffs' Motion for Partial Summary Judgment on Count I of the Complaint, holding that, pursuant to 33 U.S.C. § 1365(d), Defendant Robert Stiglich is liable for Plaintiffs' reasonable costs, including attorney fees, incurred in the litigation of the CWA claim. Although Plaintiffs have submitted affidavits in support of the costs and attorney fees incurred in this litigation, because all of Plaintiffs other claims remain for trial, a determination of attorney fees at this time is premature. For the same reasons, the request for prejudgment interest is also premature.

### B. Negligence *Per Se*

In Count IV of their Complaint, Plaintiffs allege a claim of negligence *per se* against Stiglich and the other developers for violating the duty under the Indiana Flood Control Act to obtain a floodway construction permit pursuant to Indiana Code § 14-28-1-22(c) before developing the crossings at Greenview Place, Stillwater Parkway, and Crooked Creek Trail. In the instant motion, Plaintiffs seek summary judgment against Stiglich on this claim.

Pursuant to Indiana law, a person is liable under a theory of negligence *per se* if that person 1) violates a duty imposed by statute or ordinance; 2) where the statute or ordinance intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred; and 3) the violation proximately causes the plaintiff's injuries. *Erwin v. Roe*, 928 N.E.2d 609, 616 (Ind. Ct. App. 2010); *see also Kho v. Pennington*, 875 N.E.2d

208, 212-13 (Ind. 2007)). Negligence *per se* "is not predicated upon any test for ordinary or reasonable care, but rather is founded in the defendant's violation of a specific requirement of law." *Erwin*, 928 N.E.2d at 616 (quoting *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1260 (Ind. Ct. App. 2009)). Moreover, "negligence *per se* accepts the legislative judgment that acts in violation of the statute constitute unreasonable conduct." *Id.* (citing *Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 276 (Ind. 2003)). Negligence *per se* does not mean liability *per se*. *Id.* A plaintiff must still prove causation and damages just as in any other negligence claim. *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 704 (Ind. Ct. App. 2004) (citing *City of Gary v. Smith & Wesson, Corp.*, 801 N.E.2d 1222, 1245 (Ind. 2003)).

Generally, the trier of fact determines whether the statute is applicable, whether a violation of the statute occurred, and, if so, whether the violation proximately caused the alleged injury. *Douglas*, 808 N.E.2d at 704 (citing *Dawson by Dawson v. Long*, 546 N.E.2d 1265, 1268 (Ind. Ct. App.1989), trans. denied). Stiglich offers no legal or factual response to this claim. Stiglich does not contest that a violation of the Indiana Flood Control Act constitutes negligence *per se*, that the crossings constitute violations of Indiana Code § 14-28-1-20 and Indiana Code § 14-28-1-22, that Plaintiffs are in the class of persons the statute is intended to protect, that Plaintiffs' damages are the type of harm the statute is intended to protect against, or that the violations caused Plaintiffs' damages.

Plaintiffs have established, and the Court has previously held in this case, that the Flood Control Act is intended to protect the class of persons in which Plaintiffs are included. To achieve the stated goal of protecting life and property from flooding, *see* Ind. Code § 14-28-1-1(1), the Flood Control Act requires IDNR approval before erecting, using or maintaining–or suffering or allowing

37

someone else to erect, use or maintain–a structure, obstruction, deposit, or excavation in a floodway that will adversely affect the efficiency of or unduly restrict the capacity of the floodway. Ind. Code §§ 14-28-1-20, 14-28-1-22 (1998); 312 IAC 10-1-2. A structure or obstruction that will "[a]dversely affect the efficiency of or unduly restrict the capacity of the floodway" or "[c]onstitute an unreasonable hazard to the safety of life or property" cannot receive a permit from IDNR and is expressly prohibited. *See* Ind. Code § 14-28-1-20 and 1-22(e). Thus, Plaintiffs, as citizens of Indiana and owners of property immediately adjacent to the floodway, are within the class of people the Indiana Flood Control Act was enacted to protect from flooding hazards such as the one that occurred in 2008. They deserve the safety protections mandated by these minimum requirements for floodway construction in order to prevent an unduly restricted floodway from creating unreasonable hazards to the safety of their lives, property, and botanical resources.

In contrast, Plaintiffs have not met their burden on the instant motion of establishing that Stiglich violated the statutory duty not to permanently restrict or impede the passage of expected high flows imposed by the Flood Control Act as to all three Crossings. In their memorandum, Plaintiffs assert generally that, for the same reasons Stiglich is responsible under the Clean Water Act, Stiglich is also "responsible for the . . . Indiana Flood Control Act violations at all three Crossings." (Pl. Br., p. 23). Plaintiffs reason that Stiglich was "responsible for the work performed at all three Crossings–and he was the *only* developer remaining when the Crooked Creek Trail crossing was constructed." (Pl. Br., p. 24).

Yet, Plaintiffs do not analyze the responsible corporate officer doctrine under Indiana law, which is applicable to this state common law tort claim. Indiana law provides that "[a corporate] officer is personally liable for the torts in which [he] has participated or which [he] has authorized

38

or directed." *Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000); *see also Cantrell v. Morris*, 849 N.E.2d 488, 493-94 (Ind. 2006) (recognizing the holding in *County Line Park*); *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 346 (7th Cir. 2004) (recognizing that, "[u]nder Indiana state law, an officer or shareholder of a corporation can be held individually liable, without the need to pierce the corporate veil, if he personally participates in the fraud" and that the principle applies to other common law causes).

Under this principle, Plaintiffs must establish that Stiglich personally participated in the construction of the Crossings or that Stiglich authorized or directed the construction of the Crossings. Plaintiffs have met this burden as to the Crooked Creek Trail crossing. With Kovich's departure from Stillwater Development and Stillwater Properties in 2000, Stiglich remained the only developer responsible for the development of Stillwater Subdivision when the Crooked Creek Trail crossing was built in 2007. Again, all of the correspondence with the U.S. Army Corps of Engineers regarding the Crooked Creek Trail is to or from Stiglich, and Stiglich held himself out to the agencies as the primary contact for compliance issues.

Yet, for the Greenview Place and Stillwater Parkway crossings, Plaintiffs have not offered any evidence that Stiglich participated in the building of those crossings or that he authorized or directed their construction. Plaintiffs offer no evidence of when those two crossings were built. It appears from the evidence that construction of the two crossings began in 1998 and continued into 1999, when Stillwater Development developed portions of Stillwater Subdivision and when Kovich was responsible for day-to-day operations. Plaintiffs have not offered any evidence of involvement by Stiglich during that time period, other than his 50% membership in Stillwater Properties and his ownership of 50% of the shares of Stillwater Development during that time period. His membership

and/or ownership during that period is insufficient to hold him liable under the responsible corporate officer doctrine.

These genuine issues of material fact impact Plaintiffs' causation analysis. Plaintiffs argue generally that the three Crossings violate the prohibitions of the Indiana Flood Control Act set forth above because they result in an increase of the 100-year frequency flood elevation at least 18 times the maximum allowable amount and create an unreasonable hazard to the safety of property by causing increased water depths for properties in Stillwater Subdivision and Pine Hill. However, Plaintiffs seek a recovery of damages incurred by the named homeowners yet do not specifically analyze causation for each homeowner's damages based on the location of the homes in relation to the Crossings. The evidence establishes that Kolodziej's residence is upstream from the Crooked Creek Trail crossing (the first crossing), and it appears from the evidence that the McKenna residence is upstream from the Greenview Place crossing (the third crossing) and downstream from the Stillwater Parkway crossing (the second crossing); the evidence does not appear to indicate the location of the Mahoney residence in relation to the Crossings. Therefore, it appears that the construction of the Crooked Creek Trail crossing could not have caused the flooding of the Mahoney and McKenna residences.

Accordingly, because genuine issues of material fact remain for trial, the Court denies Plaintiffs' Motion for Summary Judgment on the negligence *per se* claim brought against Stiglich in Count IV of the Complaint.

### C. Wetlands Restrictions and Covenants

In Count II, Plaintiffs allege a breach of the Declaration of Restriction of Land Use ("Wetlands Restriction") and the Restrictive Covenants of Stillwater Subdivision ("Covenants") by

Stiglich as a result of the development of undersized culverts at the Greenview Place and Stillwater Parkway crossings and the construction of the crossing at Crooked Creek Trail. In the instant motion, Plaintiffs seek summary judgment on this claim against Stiglich, arguing that the discharge of fill material into Smith Ditch violates the Wetlands Restriction and Covenants entered into by Stillwater Properties and recorded with the Lake County Recorder.

The Wetlands Restriction identified certain wetlands within the subdivision as a "Conservation Area," which included all three Crossings. In the Wetlands Restriction, Stillwater Properties agreed "to voluntarily restrict all activities except management practices for native plants and animals within the . . . Conservation Area" and "to protect said Conservation Area in exchange for and as a condition of authorization of the discharges by the Department of the Army, Corps of Engineers in permit number 97-145-042-OGC, dated March 3, 1998." (Pl. Br., Exh. 7).

With respect to wetlands in the Conservation Area, other than those authorized by permit 97-145-042-OGC, Stillwater Properties declared and covenanted that "no discharge of fill or dredged material into the Conservation Area shall occur [and that] [t]he restriction and covenant created herein shall be perpetual, and shall be binding upon the Grantor and its legal representatives, heirs and assigns." *Id.* Thus, pursuant to the Wetland Restriction, any discharge in the Conservation Area, which included all three Crossings, except those discharges performed in compliance with permit 97-145-042-OGC, was prohibited.

While the original discharges for the construction of the Greenview Place and Stillwater Parkway crossings were authorized under permit 97-145-042-OGC, the permit was only valid insofar as the developers complied with the mitigation and hydrology restoration requirements, upon which the authorization was expressly conditioned. As discussed in the context of the CWA claim

41

in Section A above, because of the developers' subsequent failure to comply with the permit conditions, the discharge of fill into Smith Ditch for the Greenview Place and Stillwater Parkway crossings was not in compliance with a valid CWA permit and was unlawful pursuant under the CWA. Because these crossings are located in the Conservation Area, these discharges also constitute breaches of the Wetlands Restriction.

However, as with their negligence *per se* claim, Plaintiffs again presume Stiglich's liability simply by his membership in Stillwater Properties prior to Kovich's departure in 2000 without offering any facts to establish that Stiglich participated in the discharges to construct the Greenview Place and Stillwater Parkway crossings or that he authorized or directed their construction. As discussed in the previous section, Kovich handled the day-to-day operations of Stillwater Development and Stillwater Properties until 2000, and it appears that the construction of the Greenview Place and Stillwater Parkway crossings began in 1998 and continued into 1999. Thus, Plaintiffs have not established that Stiglich is liable for the violation of the Wetlands Restriction and Covenants by the construction of the Greenview Place and Stillwater Parkway crossings.

As with the negligence *per se* claim, however, Plaintiffs have offered sufficient evidence to establish Stiglich's liability for the fill placed in the wetlands to construct the Crooked Creek Trail crossing. This crossing is also located in the Conservation Area, and it is undisputed that the discharges of fill material for the construction of that crossing took place without any CWA § 404 permit. The Crooked Creek Trail crossing was not included in permit 97-145-042-OGC. Thus, the unlawful discharges of fill material into the wetlands at Crooked Creek Trail constitute discharges into the Conservation Area and constitute an independent breach of the Wetlands Restriction.

42

Stiglich was the sole developer of Stillwater Subdivision at the time of this breach. Thus, Plaintiffs have established Stiglich's involvement with the violation as to the Crooked Creek Trail crossing.

Plaintiffs argue that the discharges at the three Crossings also violate the Covenants. The Covenants incorporate the Wetlands Restriction by reference. In addition, Paragraph 1 of the Covenants provides that "Wetlands within Stillwater Subdivision are to be preserved by the developer, contractor and homeowners, as stated in the Declaration of Restrictions on Land Use, filed April 3, 1009[sic], Document #98023475." (Pl. Br., Exh. 7). Plaintiffs argue that Stiglich and the other Stillwater Subdivision developers' unauthorized discharge of fill into wetlands and the failure to complete the wetlands mitigation on which the CWA § 401 and CWA § 404 permits were conditioned constitute failures to preserve wetlands in and around Stillwater Subdivision in violation of the Covenants.

Again, Plaintiffs have not offered evidence to render Stiglich personally liable for the *discharge* of fill into the wetlands to construct the Greenview Place and Stillwater Parkway crossings; however, Plaintiffs have offered evidence that Stiglich was the only developer responsible for Stillwater Subdivision after Kovich sold his interest to Stiglich in 2000. Thus, Plaintiffs have connected Stiglich to the failure to preserve the wetlands in and around Stillwater Subdivision after 2000 until the City allegedly removed the Crossings in 2012.

The Covenants, which incorporate the Wetland Restriction by reference, authorize lawsuits to recover damages caused by a violation:

> [I]f any owner or person in possession shall violate or attempt to violate any of these covenants, restrictions and conditions, it shall be lawful for the undersigned, "the Association," or any person or persons owning any lot in said subdivision, to file and prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any of these covenants, restrictions and conditions, to compel compliance with these covenants, restrictions and conditions *or to recover damages*

43

*caused by such violations*, and the owner or owners shall pay court costs and reasonable attorney fees in the event judgment is rendered against him or her or them.

(*Id*. ¶ 22). In paragraph 25, the Covenants further provide that "[a]ny aggrieved owner may enforce the provisions contained in this Declaration in any proceeding at law or in equity against any person or persons violating any provisions hereof, to restrain such violation and/or to recover damages incurred by the aggrieved owner." (*Id*. ¶25(E)).

However, Plaintiffs have offered no evidence on causation related to the effect of the failure to preserve the wetlands (that retroactively nullified the permits) as opposed to the effect of the placement of the fill in Smith Ditch and the construction of the Greenview Place and Stillwater Parkway crossings. Because genuine issues of material fact remain for trial, summary judgment on Plaintiffs' claims in Count II is denied.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Partial Summary Judgment Against Defendant Robert Stiglich [DE 196].

The Court **SETS** this matter for a telephonic status and scheduling conference for **March 27, 2014, at 11:00 a.m.** (Chicago/Hammond time), to be initiated by the Court.

SO ORDERED this 26th day of February, 2014.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record
       Pro se Defendant Robert Stiglich

44